**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

ROBERT G. KIEFER, individually and on behalf
of all others similarly situated,

                              Plaintiff,

             v.

MORAN FOODS, INC., d/b/a SAVE A LOT
LTD.;

                              Defendant.

ECF No.
3:12-CV-00756 (WGY)

February 28, 2013

**PLAINTIFF'S LOCAL CIVIL RULE 56(a)2 STATEMENT
AND ADDITIONAL STATEMENT OF DISPUTED ISSUES OF
MATERIAL FACT AND UNDISPUTED FACTS**

Plaintiff, by and through his attorneys, hereby respectfully submits this Local Rule 56(a)2

Statement.

1.      Kiefer was hired by Defendant on March 16, 2011 as an Assistant Store Manager

at Save A Lot's East Hartford, Connecticut location.  His first day of work was on Monday,

April 4, 2011.  Ex. B, Declaration of Evan Michailidis "Michailidis Dec." (Kiefer hire letter).

        <u>Response</u>: **Admit.**

2.      Kiefer worked for Defendant from April 4, 2011 to January 19, 2012 as an

Assistant Store Manager.  Ex. B and M, Michailidis Dec. (Kiefer hire letter; January 27, 2012

letter from Michael Draper to Kiefer).

        <u>Response</u>: **Admit.**

3.      When Kiefer was hired, he received a hire letter that stated "your annualized base

salary will be $45,000," which amounts to a weekly salary of $865.38.  Ex. A and B, Michailidis

Dec. (Kiefer Declaration, dated Dec. 8, 2012 ("Kiefer Dec."), ¶4; Kiefer hire letter).

Response: **Admit** that the hire letter Kiefer received contained the words "your annualized base salary will be $45,000," but **deny** that Defendant actually paid Kiefer a salary, because Defendant paid Kiefer on an hourly basis for non-overtime hours worked.  Ex. 2[1] (Kiefer Decl.) ¶ 7.  For example, in 2011, Plaintiff Kiefer's regular hourly rate of pay was $21.634615.  Ex. 2 (Kiefer Decl.) ¶¶ 7, 10.  This regular hourly rate appeared in his Kronos payroll records on a line labeled "Home Hourly Rate."  Ex. 11 (Kiefer payroll spreadsheet). During the week of April 3, 2011, Mr. Kiefer worked 38 hours and was paid his regular hourly rate of pay of $21.634615 times the 38 hours he worked, for a total of $822.12.  Ex. 2 (Kiefer Decl.) ¶ 10.

4.      When hired, Kiefer received an Associate Handbook, a U.S. Department of Labor Coefficient Table and a Coefficient Calculator.  Ex. A, Michailidis Dec. (Kiefer Dec. ¶5).

Response: **Admit.**

5.      The Handbook states that Full-time Salaried-Non-Exempt employees are "Full-time Associates paid on a salaried basis and earn co-efficient pay for hours worked over 40 in a workweek.  Ex. C at p. 8, Michailidis Dec.

Response: **Admit**.

6.      On April 3, 2011, Kiefer acknowledged that he "read and understand[s] the Associate Handbook of Save-A-Lot."  Ex. C. at p. 30, Michailidis Dec.

Response: **Admit.**

7.      The language at the top of the Coefficient Table states "[t]his table may be used for computing overtime on…fixed salaries for varying hours.  Refer to Part 778 of Title 29 of the CFR for guidance regarding when the coefficient method is applicable."  Ex. D, Michailidis Dec.

---

[1]      Unless otherwise specified, all exhibits referenced herein are attached to the Declaration of Justin M. Swartz in Opposition to Defendant's Cross-Motion for Summary Judgment.

<u>Response</u>: **Admit** that this language appears on the Coefficient Table attached as Exhibit D to the Michailidis Dec.

8.      The Coefficient Calculator demonstrates how to calculate half-time overtime.  Ex. E, Michailidis Dec.

<u>Response</u>: **Deny**.  Defendant's "Coefficient Calculator" attached as Exhibit E to the Michailidis Dec only demonstrates how Defendant calculated ASMs' pay for hours over 40.  Ex. 9 (Pay for Performance/Coefficient Pay Presentation) at 151-52 (coefficient pay computation table & instructions); Ex. 2 (Declaration of Robert Kiefer ("Kiefer Decl.")) ¶ 5; Ex. 6 (Declaration of Eric Everhart) ("Everhart Decl.") ¶ 5; Ex. 7 (Declaration of David Pagano "Pagano Decl.")) ¶ 5.

9.      Prior to beginning his employment with Defendant, Kiefer was interviewed by Michael Draper, Defendant's Assistant Human Resources Manager.  Ex. F, Michailidis Decl. (Plaintiff's Responses to Defendant's First Request for Interrogatories, p. 5-6).

<u>Response</u>: **Admit.**

10.      To ensure that Defendant and its assistant store managers ("ASMs") have a clear mutual understanding of Defendant's fluctuating workweek ("FWW") payment methodology, Draper, consistent with Defendant's regular practice, advises its ASMs upon hire that their salary rate is fixed regardless of the number of hours they work in a workweek and that they will be paid an overtime premium of one-half of their regular rate for all hours worked over 40 in a workweek.  Additionally Draper provides new ASMs with a hire letter, coefficient table and coefficient calculator so that Defendant and ASMs have a clear mutual understanding that each ASM receives his or her full weekly salary, regardless of how many or how few hours are

worked in the workweek.  Ex. G, Michailidis Dec. (Affidavit of Michael Draper dated September 28, 2011 ¶¶10-11).

Response: **Deny** that "Draper, consistent with Defendant's regular practice, advises its ASMs upon hire that their salary rate is fixed regardless of the number of hours they work in a workweek and that they will be paid an overtime premium of one-half of their regular rate for all hours worked over 40 in a workweek."  Ex. 2 (Kiefer Decl.) ¶ 9; Ex. 6 (Everhart Decl.) ¶ 9; Ex. 7 (Pagano Decl.) ¶ 9; Ex. 26 (Kiefer's Response to Interrogatory Nos. 4-5).  **Admit** that "Draper provides new ASMs with a hire letter, coefficient table and coefficient calculator," but **deny** that he does this "so that Defendant and ASMs have a clear mutual understanding that each ASM receives his or her full weekly salary, regardless of how many or how few hours are worked in the workweek."  Ex. 2 (Kiefer Decl.) ¶ 9; Ex. 6 (Everhart Decl.) ¶ 9; Ex. 7 (Pagano Decl.) ¶ 9; Ex. 26 (Kiefer's Response to Interrogatory Nos. 4-5).

11.     In addition to their weekly salary, ASMs received an additional paid time off benefit ("PTO") for holidays, vacations, and sick time.  Ex. C, Michailidis Dec. (Associate Handbook p. 10-15).

Response: **Admit** that ASMs received paid time off ("PTO") for holidays not worked, vacations, and sick time, but **deny** that PTO was a "benefit" or that ASMs received PTO pay "in addition to their weekly salary," because Defendant paid PTO compensation in addition to the wages it paid ASMs at their regular hourly rates only for hours worked.  Ex. 2 (Kiefer Decl.) ¶¶ 11-13; Ex. 6 (Everhart Decl.) ¶¶ 11-12; Ex. 7 (Pagano Decl.) ¶ 12.

12.     Kiefer's first pay check covered the pay period of April 3, 2011 to April 9, 2011. Kiefer started his employment with Defendant in the middle of the pay period.  He was paid a pro-rata share of his weekly salary of $865.38.  Ex. H, Michailidis Dec.

<u>Response</u>: **Admit** that "Kiefer's first pay check covered the pay period of April 3, 2011 to April 9, 2011." **Deny** that "Kiefer started his employment with Defendant in the middle of the pay period." Kiefer worked a full schedule of five days during the workweek of April 3, 2011 to April 9, 2011, for a total of 38 hours. Ex. 41 (Kiefer Supp. Decl.) ¶ 3. Throughout his employment, Kiefer was regularly scheduled to work five days per week. Ex. 2 (Kiefer Decl.) ¶ 8. **Deny** that Kiefer "was paid a pro-rata share of his weekly salary of $865.38." Defendant's policy was to pay Kiefer at his straight-time regular hourly rate of $21.634615 per hour, and for the first 40 hours Kiefer worked each week, he was paid $865.38, or $21.634615 per hour. Ex. 2 (Kiefer Decl.) ¶ 7; Ex. 11 (Kiefer payroll spreadsheet identifying regular hourly rate of $21.634615 under column labeled "Home Hourly Rate"). Pursuant to this policy, when Kiefer worked 38 hours during the pay period of April 3, 2011 to April 9, 2011, he was paid $21.634615 for each hour he actually worked, which totaled $822.12. Ex. 2 (Kiefer Decl.) ¶ 10; Ex. 11 (Kiefer payroll spreadsheet).

13.     Other than Kiefer's first pay check, he always received compensation amounting to at least his weekly salary of $865.38. Ex. I, Michailidis Dec. (Kiefer Payroll History).

<u>Response</u>: **Admit** that Kiefer's compensation in pay checks other than his first pay check was equal to or greater than $865.38, but **deny** that Kiefer was ever paid a "weekly salary of $865.38" during the remainder of his employment, because Defendant's policy was to pay Kiefer for non-overtime hours at his regular hourly rate of $21.634615 per hour. Ex. 2 (Kiefer Decl.) ¶ 7; Ex. 11 (Kiefer payroll spreadsheet identifying regular hourly rate of $21.634615 under column labeled "Home Hourly Rate").

14.     On Kiefer's December 2, 2011 paystub, Kiefer worked less than 40 hours and received total compensation of $936.13, which includes his weekly salary and additional compensation for paid time off ("PTO"). Ex. J, Michailidis Dec.

Response: **Admit** that the total compensation reflected in Kiefer's December 2, 2011 paystub for the workweek ending November 26, 2011 was $936.13. **Deny** that this amount "includes his weekly salary," because Defendant's policy was to pay Kiefer for non-overtime hours at his regular hourly rate of $21.634615 per hour. Ex. 2 (Kiefer Decl.) ¶ 7; Ex. 11 (Kiefer payroll spreadsheet identifying regular hourly rate of $21.634615 under column labeled "Home Hourly Rate"). Pursuant to this policy, when Kiefer worked 35.27 hours during the workweek ending December 2, 2011, Defendant paid him $763.05, or $21.634615 per non-overtime hour worked. Ex. 2 (Kiefer Decl.) ¶ 12; Ex. F to the Kiefer Decl. (paystub for pay period ending Nov. 26, 2011). On a separate line, Defendant paid Kiefer 8 hours of holiday pay at his regular rate of $21.634615, for a total of $173.08. Ex. 2 (Kiefer Decl.) ¶ 14; Ex. F to the Kiefer Decl. (paystub for pay period ending Nov. 26, 2011); Ex. 11 (Kiefer payroll spreadsheet, pay period ending Nov. 26, 2011, Dec. 2, 2011 paycheck).

15.     On Kiefer's January 6, 2012 paystub, Kiefer worked less than 40 hours and received total compensation of $925.53, which includes his weekly salary and additional compensation for PTO. Ex. K, Michailidis Dec.

Response: **Admit** that the total compensation reflected in Kiefer's January 6, 2012 paystub for the workweek ending December 31, 2011 was $925.53. **Deny** that this amount "includes his weekly salary," because Defendant's policy was to pay Kiefer for non-overtime hours at his regular hourly rate of $21.634615 per hour. Ex. 2 (Kiefer Decl.) ¶ 7; Ex. 11 (Kiefer payroll spreadsheet identifying regular hourly rate of $21.634615 under column labeled "Home

Hourly Rate").  Pursuant to this policy, when Kiefer worked 34.78 hours during the workweek

ending December 31, 2011, Defendant paid him $752.45, or $21.634615 per non-overtime hour

worked.  Ex. 2 (Kiefer Decl.) ¶ 13; Ex. F to the Kiefer Decl. (paystub for pay period ending Dec.

31, 2011).  On a separate line, Defendant paid Kiefer 8 hours of holiday pay at his regular rate of

$21.634615, for a total of $173.08.  Ex. 2 (Kiefer Decl.) ¶ 14; to the Kiefer Decl. (paystub for

pay period ending Dec. 31, 2011); Ex. 11 (Kiefer payroll spreadsheet, pay period ending Dec.

31, 2011, Jan. 6, 2012 paycheck).

    16.    When Kiefer worked more than 40 hours, he received additional overtime

compensation calculated at one-half his regular rate.  On his paystub, the overtime compensation

was described as "Overtime Coefficient."  Ex. L, Michailidis Dec. (Kiefer April 22, 2011

paystub).

    <u>Response</u>: **Deny** that "[w]hen Kiefer worked more than 40 hours, he received additional

overtime compensation calculated at one-half his regular rate."  Kiefer's regular rate was

$21.634615.  Ex. 2 (Kiefer Decl.) ¶ 7; Ex. 11 (Kiefer payroll spreadsheet, listing $21.634615

under "Home Hourly Rate").  Kiefer's compensation for hours over 40 was not calculated at one

half of his regular rate, but rather according to the following formula: **(Overtime hours

worked/(total hours worked x 2)) x ($21.634615 x 40)**.  Ex. 2 (Kiefer Decl.) ¶ 7; Ex. D to the

Kiefer Decl.  **Admit** that on Kiefer's paystub, his compensation for hours over 40 was described

as "Overtime Coefficient."

    17.    Although Kiefer was regularly scheduled to work at least 45 hours per week,

Kiefer's hours fluctuated as he usually worked more than 45 hours but occasionally worked

fewer than 40 hours in a week.  Kiefer never worked more than 55 hours in a workweek. Ex. A

and I, Michailidis Dec. (Kiefer Dec. ¶ 8; Kiefer Payroll History).

Response: **Admit** that Kiefer was regularly scheduled to work, and did work, between 45 and 55 hours per week.  Ex. 2 (Kiefer Decl.) ¶ 8; Ex. 11 (Kiefer payroll spreadsheet listing hours worked).  **Admit** that on the three occasions discussed in Paragraphs 12, 14, and 15, and no others, Kiefer worked fewer than 40 hours a week.  *See* Plaintiff's Response to Paragraphs 12, 14, and 15.  **Deny** that Kiefer's hours "fluctuated" within the meaning of the U.S. Department of Labor interpretive bulletin codified at 29 C.F.R. 778.114 because Defendant's policy was to pay Kiefer for non-overtime hours at a regular hourly rate of $21.634615 per hour.  Ex. 2 (Kiefer Decl.) ¶ 7; Ex. 11 (Kiefer payroll spreadsheet identifying regular hourly rate of $21.634615 under column labeled "Home Hourly Rate").  **Deny** that "Kiefer never worked more than 55 hours in a workweek."  *See* Ex. 11 (Kiefer payroll spreadsheet, pay period ending Oct. 8, 2011, Oct 14, 2011 paycheck, 55.18 hours worked).

18.    For Kiefer's regular rate to have been less than Connecticut's $8.25 minimum wage in effect at the time of his employment, Kiefer would have had to work in excess of 104 hours.

Response: **Admit**.

19.    Kiefer's employment with Defendant was terminated on January 19, 2012 for failing to contact his district manager after having been suspended for insubordination and poor job performance.  Ex. M, Michailidis Dec. (January 27, 2012 letter from Michael Draper to Kiefer).

Response: **Admit** that Defendant suspended Kiefer from his employment, but **deny** that Kiefer was insubordinate or had poor job performance.  Ex. 43 (April 12, 2012 Opinion by the State of Connecticut Employment Security Appeals Division), at 2.  **Deny** that Kiefer's employment was terminated for "failing to contact his district manager."  From approximately

January 9, 2012 through January 18, 2012, Kiefer contacted Defendant on several occasions

seeking information about his employment status.  *Id*. at 2-3.  Defendant did not return Kiefer's

calls.  *Id*.  On January 18, 2012, Defendant issued Kiefer a final paystub, which indicated sick

leave and vacation leave paid to him as a result of termination.  *Id*. at 3.  On January 19, 2012,

Defendant informed Kiefer that he had been discharged.  *Id*.  Kiefer was under no obligation to

contact his district manager thereafter, because he had already been discharged.  *Id*.

20.     Kiefer never complained to Defendant that he was paid incorrectly or in violation

of the Fair Labor Standards Act or Connecticut Minimum Wage Act during the term of his

employment.  Michailidis Dec., ¶ 26.

Response: **Deny.**  While working as an ASM, Kiefer expressed concern about his

compensation on several occasions. On the first occasion, shortly after receiving his first

paycheck, he told his manager, Pam Dalton, that he did not think the calculation of his overtime

pay was legal.  Her response was "this is the way that we do it" and "it's hard to explain." Ex. 41

(Kiefer Supp. Decl.) ¶ 4.  On another occasion, the manager to whom Kiefer expressed concern

responded "this is the way we do it."  *Id.*  When Kiefer raised concerns about the low overtime

pay to a co-worker who had worked at Save a Lot for many months, his only response was "this

is the way they do it."  *Id.* ¶ 5.

21.     Jeff Rodd, currently employed by Defendant as a Store Manager in

Massachusetts, spent approximately nine years as a Retail Operations Store Manager for

Defendant, during which time he trained and oriented ASMs in New York, Massachusetts and

Connecticut.  As part of the Day One routine on the first day of work, Rodd explained coefficient

pay to ASMs and gave them the handout and formula for calculating coefficient pay.  Rodd

additionally explained to ASMs that they "would be paid a fixed salary each week no matter how

many hours they worked during that week, whether more or less than 40." Ex. P, Michailidis

Dec. (Affidavit of Jeff Rodd).

Response: Plaintiffs lack facts sufficient to respond to this Statement because, *inter alia*,

Defendants did not disclose this witness on their initial disclosures or in response to Plaintiff's

discovery requests. Ex. 46 (Defendant's Rule 26(a) initial disclosures); Ex. 12 (Defendant's

Responses to Plaintiff's document requests).

22. David Tisdale is currently employed by Defendant as a Store Manager in

Connecticut and was previously employed by Defendant as an ASM. Prior to beginning his

employment as an ASM, Michael Draper explained to Tisdale how he would be compensated,

specifically telling him that he would receive a fixed salary for however many hours he worked,

whether more or less than 40 hours. Defendant additionally provided Tisdale with a hire letter,

handbook, and a sheet explaining coefficient pay confirming he would be paid a fixed salary and

coefficient pay for overtime hours. Ex. Q, Michailidis Dec. (Affidavit of David Tisdale).

Response: Plaintiffs lack facts sufficient to respond to this Statement because, *inter alia*,

Defendants did not disclose this witness on their initial disclosures or in response to Plaintiff's

discovery requests. Ex. 46 (Defendant's Rule 26(a) initial disclosures); Ex. 12 (Defendant's

Responses to Plaintiff's document requests).

23. William Garforth is currently employed by Defendant as a Store Manager in

Massachusetts and was previously employed by Defendant as an ASM. Prior to beginning his

employment as an ASM, Michael Draper explained to Gaforth how he would be compensated,

specifically telling him that he would receive a fixed salary for however many hours he worked,

whether more or less than 40 hours. Defendant additionally provided Garforth with a hire letter,

handbook, and a sheet explaining coefficient pay confirming he would be paid a fixed salary and coefficient pay for overtime hours.  Ex. R, Michailidis Dec. (Affidavit of William Garforth).

Response: Plaintiffs lack facts sufficient to respond to this Statement because, *inter alia*, Defendants did not disclose this witness on their initial disclosures or in response to Plaintiff's discovery requests.  Ex. 46 (Defendant's Rule 26(a) initial disclosures); Ex. 12 (Defendant's Responses to Plaintiff's document requests).

24.     Brian Nulty is currently employed by Defendant as a Store Manager in Florida and was previously employed by Defendant as an ASM.  Prior to beginning his employment as an ASM, Doris Morris explained to Nulty how he would be compensated.  Nulty understood that he would receive a fixed salary for however many hours he worked, whether more or less than 40 hours.  Defendant additionally provided Nulty with a hire letter and an explanation of coefficient pay calculation confirming he would be paid a fixed salary and coefficient pay for overtime hours.  Ex. S, Michailidis Dec. (Affidavit of Brian Nulty).

Response: Plaintiffs lack facts sufficient to respond to this Statement because, *inter alia*, Defendants did not disclose this witness on their initial disclosures or in response to Plaintiff's discovery requests.  Ex. 46 (Defendant's Rule 26(a) initial disclosures); Ex. 12 (Defendant's Responses to Plaintiff's document requests).

25.     Jason Hodge is currently employed by Defendant as a Store Manager in Massachusetts and was previously employed by Defendant as an ASM.  At the beginning of his employment as an ASM, Kristy Castro explained to Hodge how he would be compensated, specifically telling him that he would receive a fixed salary for however many hours he worked, whether more or less than 40 hours.  Defendant additionally provided Hodge with a hire letter, handbook, and a table and instructions on how to calculate the coefficient confirming he would

11

be paid a fixed salary and coefficient pay for overtime hours.  Ex. T, Michailidis Dec. (Affidavit of Jason Hodge).

    <u>Response</u>: Plaintiffs lack facts sufficient to respond to this Statement because, *inter alia*, Defendants did not disclose this witness on their initial disclosures or in response to Plaintiff's discovery requests.  Ex. 46 (Defendant's Rule 26(a) initial disclosures); Ex. 12 (Defendant's Responses to Plaintiff's document requests).

    26.    When Eric Everhart was hired by Defendant as an ASM, he received a hire letter, Associate Handbook, Coefficient Table and Coefficient Calculator.  Ex. U at ¶¶4-5, Michailidis Dec. (Everhart Declaration dated December 3, 2012).

    <u>Response</u>: **Admit**.

    27.    When David Pagano was hired by Defendant as an ASM, he received a hire letter, Associate Handbook, Coefficient Table and Coefficient Calculator.  Ex. V at ¶¶4-5, Michailidis Dec. (Pagano Declaration dated December 13, 2012).

    <u>Response</u>: **Admit**.

    28.    Edward Roach alleged in his Amended Complaint filed against Defendant in Connecticut State Court that during the hiring process, Roach was told that he would be paid a weekly salary and that in addition he would be paid "chinese overtime."  Roach also received a hire letter, coefficient table and coefficient calculator.  Ex. W at ¶5, Ex. G at ¶ 12, Michailidis Dec.

    <u>Response</u>: **Admit**.

**PLAINTIFF'S ADDITIONAL STATEMENT OF DISPUTED ISSUES OF MATERIAL
FACT AND UNCONTESTED FACTS**

Plaintiff, by and through his attorneys, hereby respectfully submits, pursuant to Local

Rule 56(a)2, this Additional Statement of Disputed Issues of Material Fact, as to which Plaintiff

contends there is a genuine issue to be tried, and Uncontested Facts, which preclude summary

judgment for Defendant.

**Defendant's Centralized Payroll Processing Functions**

1.     Defendant is a wholly-owned subsidiary of Supervalu, Inc., and, as "one of the

leading retailers in the U.S. hard-discount grocery retailing sector," it operates 397 grocery stores

in the United States.   Ex. 1 (excerpt of Supervalu, Inc. 10-K, filed Apr. 19, 2012 ("Form 10-K")

at 7; "Save-A-Lot: Our Grocery Store Chain History" (*available at* http://save-a-lot.com/about-

save-a-lot/our-history (last viewed February 28, 2013).

2.     Defendant's payroll operations are consolidated in a central Supervalu "Shared

Services" office in Phoenix, Arizona.  Ex. 3 (Draper Tr.) at 57:20-58:5, and all ASM payroll

documents issue from that office.  Ex. 2 (Kiefer Decl.) ¶ 15; Ex. 6 (Everhart Decl.) ¶ 13; Ex. 7

(Pagano Decl.) ¶ 14; Ex. 4 (Def.'s Resp. to Pl.'s Interrogatories) at ¶ 9 ("Payroll was processed

by Human Resources Shared Services.").

3.     Shared Services is the division of Supervalu, Inc. that generates payroll for "all

the banners" that belong to the company.  Ex. 3 (Draper Tr.) at 63:4-5.

4.     During the relevant time period, Defendant used a centralized "Kronos" payroll

system to administer all ASM payroll.  Ex. 4 (Def.'s Resp. to Pl.'s Interrogatories) at ¶¶ 1(B); 9.

5.     The paystubs Defendant issued to ASMs from its Shared Services department

show that Defendant paid ASMs by the hour based on documented work.  Ex. 2 (Kiefer Decl.) ¶¶

10-13; Ex. 6 (Everhart Decl.) ¶ 10-12; Ex. 7 (Pagano Decl.) ¶¶ 10-12.

6.      Defendant issued paystubs to ASMs in a uniform format.  Exs. 30, 31, 32, 33, 34, 35, 36, 37, 38, and 39 (ASM paystubs).

**ASMs Were Paid a Regular Hourly Rate of Pay for Non-Overtime Hours.**

7.      Defendant's policy was to pay each ASM on the basis of his or her regular hourly rate of pay for all non-overtime hours worked.  Ex. 2 (Kiefer Decl.) ¶ 7; Ex. 6 (Everhart Decl.) ¶ 10, 15; Ex. 7 (Pagano Decl.) ¶ 7; Ex. 4 (Employee Handbook) at 8.

8.      ASMs only received a "fixed amount" for straight-time pay if they worked a minimum of 40 hours, and if they worked fewer than 40 hours, received hourly pay based on the regular hourly rate of pay for non-overtime hours worked.  Ex. 2 (Kiefer Decl.) ¶ 7; Ex. 6 (Everhart Decl.) ¶ 10, 15; Ex. 7 (Pagano Decl.) ¶ 7.

9.      Pursuant to Defendant's paid time off ("PTO") policies, ASMs accrued 40 hours of vacation time only after six months of continuous active employment, 8 hours of sick time for each four months of work, beginning after the first 4 months of employment, and one "flexible holiday" after the first full year of employment, and well as leave for bereavement and jury duty. Ex. 5 (Employee Handbook) at 10-14.

10.      Under its PTO policies, Defendant also paid ASMs holiday pay for holidays worked and holidays not worked.  Ex. 5 (Employee Handbook) at 10; Ex. 47 (Draper Tr.) 145:9-146:5; 149:5-152:10.

11.      When an ASM was not scheduled to work on a holiday, he received holiday pay at his "regular hourly rate for [his] regularly scheduled hours of work."  Ex. 5 (Employee Handbook) at 10.

12.     When an ASM worked on a holiday, he received "holiday pay" compensation in addition to his regular compensation for hours worked.  Ex. 5 (Employee Handbook) at 10; Ex. 47 (Draper Tr.) 145:9-146:5; 149:5-152:10.

13.     Defendant did not include the additional "holiday pay" compensation for holidays worked in ASMs' regular rates of pay.  Ex. 5 (Employee Handbook) at 10; Ex. 47 (Draper Tr.) 145:9-146:5; 149:5-152:10.

### *Defendant's Payroll Records Demonstrate Its Hourly Pay Policy*

14.     Each ASM's regular hourly rate of pay appears in Defendant's payroll records under the heading "Home Hourly Rate."  Ex. 11 (Kiefer payroll spreadsheet); Ex. 17 (Employee 62 payroll spreadsheet); Ex. 13 (Employee 2 payroll spreadsheet); Ex. 14 (Employee 10 payroll spreadsheet); Ex. 15 (Employee 23 payroll spreadsheet); Ex. 16 (Employee 31 payroll spreadsheet).

15.     The column in Defendant's payroll records labeled "Calculated Rate Used" reflects the regular hourly rate Defendant used to calculate non-overtime wages owed, overtime wages owed, and PTO pay owed.  Ex. 11 (Kiefer payroll spreadsheet); Ex. 17 (Employee 62 payroll spreadsheet); Ex. 13 (Employee 2 payroll spreadsheet); Ex. 14 (Employee 10 payroll spreadsheet); Ex. 15 (Employee 23 payroll spreadsheet); Ex. 16 (Employee 31 payroll spreadsheet).

16.     The column in Defendant's payroll records labeled "Earn Code" identifies whether the Calculated Rate Used column contains the regular rate of pay ("REG"), overtime coefficient ("OTC"), or Paid Time Off ("PTO"), which includes paid holiday ("HOL"), paid vacation ("VAC"), or paid sick time ("SCK").  Ex. 44 (Email, dated Nov. 11, 2011, from K. Greenberg to R. Hayber); Ex. 11 (Kiefer payroll spreadsheet); Ex. 17 (Employee 62 payroll

spreadsheet); Ex. 13 (Employee 2 payroll spreadsheet); Ex. 14 (Employee 10 payroll spreadsheet); Ex. 15 (Employee 23 payroll spreadsheet); Ex. 16 (Employee 31 payroll spreadsheet).

17.    The column in Defendant's payroll records labeled "Oth Earns" reflects the total amounts Defendant paid ASMs in each of straight-time pay, overtime coefficient pay, and PTO. Ex. 11 (Kiefer payroll spreadsheet); Ex. 17 (Employee 62 payroll spreadsheet); Ex. 13 (Employee 2 payroll spreadsheet); Ex. 14 (Employee 10 payroll spreadsheet); Ex. 15 (Employee 23 payroll spreadsheet); Ex. 16 (Employee 31 payroll spreadsheet).

18.    For regular, non-overtime hours ASMs worked each week, the regular rate of pay in the "Calculated Rate Used" column was equal to the amount in the "Home Hourly Rate" column to the thousandth decimal point. [2]  Ex. 11 (Kiefer payroll spreadsheet); Ex. 17 (Employee 62 payroll spreadsheet); Ex. 13 (Employee 2 payroll spreadsheet); Ex. 14 (Employee 10 payroll spreadsheet); Ex. 15 (Employee 23 payroll spreadsheet); Ex. 16 (Employee 31 payroll spreadsheet).

19.    For PTO hours, the regular rate of pay in the "Calculated Rate Used" column was also equal to the amount in the "Home Hourly Rate" column.  Ex. 11 (Kiefer payroll spreadsheet); Ex. 17 (Employee 62 payroll spreadsheet); Ex. 13 (Employee 2 payroll spreadsheet); Ex. 14 (Employee 10 payroll spreadsheet); Ex. 15 (Employee 23 payroll spreadsheet); Ex. 16 (Employee 31 payroll spreadsheet).

---

[2]    Defendant's payroll records express ASMs' regular rates of pay, from which it calculated straight time wages, in decimals to the millionth decimal point.  *See, e.g.*, Ex. 11 (Kiefer payroll spreadsheet, Home Hourly Rate column).  Because Defendant has refused to produce payroll spreadsheets for opt-in Plaintiffs, Plaintiff has expressed regular rates of pay for these individuals to the ten thousandth decimal point based on information in their paystubs.  This may result in mathematical rounding incongruities in some places.

20.     For overtime hours, the overtime coefficient rate reflected in the "Calculated Rate Used" column was determined according to the following formula: **(Overtime hours worked/(total hours worked x 2)) x (Home Hourly Rate x 40).** Ex. 2 (Kiefer Decl.) ¶ 7, Ex. D; Ex. 6 (Everhart Decl.) ¶ 10, 15, Ex. D; Ex. 7 (Pagano Decl.) ¶ 7, Ex. D; Ex. 9 (Pay for Performance/Coefficient Pay Presentation) at 149 (Defendant coefficient pay calculation tools); *id*. at 151-52 (coefficient pay computation table & instructions); Ex. 11 (Kiefer payroll spreadsheet); Ex. 17 (Employee 62 payroll spreadsheet); Ex. 13 (Employee 2 payroll spreadsheet); Ex. 14 (Employee 10 payroll spreadsheet); Ex. 15 (Employee 23 payroll spreadsheet); Ex. 16 (Employee 31 payroll spreadsheet).

### _ASMs Paid on an Hourly Basis When They Worked Fewer Than 40 Hours and Did Not Have PTO Time_

21.     When ASMs worked fewer than 40 hours in a workweek and did not have PTO time available, Defendant's policy and practice was to calculate ASMs' compensation by **multiplying the ASM's regular hourly rate of pay times the number of non-overtime hours the ASM actually worked.** Ex. 2 (Kiefer Decl.), Ex. F to Kiefer Decl. (Kiefer paystubs); Ex. 2 (Kiefer Decl.), Ex. E to Kiefer Decl. (Kiefer paystubs); Ex. 6 (Everhart Decl.), Ex. E to Everhart Decl. (Everhart paystubs); Ex. 39 (Everhart paystub); Ex. 7 (Pagano Decl.), Ex. F to Pagano Decl. (Pagano paystubs); Ex. 7 (Pagano Decl.), Ex. E to Pagano Decl. (Pagano paystubs); Ex. 35 (Pagano paystubs); Ex. 32 (Dozier paystubs); Ex. 33 (Escude paystubs); Ex. 17 (Employee 62 payroll spreadsheet).

### Kiefer

22.     Defendant paid Kiefer a straight-time regular hourly rate of $21.634615 per hour. Ex. 11 (Kiefer payroll spreadsheet); Ex. 2 (Kiefer Decl.) ¶ 7; Ex. F to Kiefer Decl. (paystub for week ending April 16, 2011).

23.     When Kiefer worked 40 hours, he was paid $865.38, or $21.634615 per hour.  Ex. 11 (Kiefer payroll spreadsheet); Ex. 2 (Kiefer Decl.) ¶ 7; Ex. F to Kiefer Decl. (paystub for week ending April 16, 2011).

24.     When Kiefer worked fewer than 40 hours, he was paid $21.634615 for each hour he actually worked.  Ex. 11 (Kiefer payroll spreadsheet); Ex. 2 (Kiefer Decl.) ¶ 10; Ex. E to Kiefer Decl. (paystub for week ending April 9, 2011).

25.     For the week ending April 9, 2011, Kiefer worked 38 hours and was paid his regular hourly rate of $21.634615, for a total of $822.12.  Ex. 11 (Kiefer payroll spreadsheet, week ending April 9, 2011); Ex. 2 (Kiefer Decl.) ¶ 10, Ex. E to Kiefer Decl. (paystub for week ending April 9, 2011).

26.     Kiefer did not receive PTO time during the week ending April 9, 2011.  Ex. 11 (Kiefer payroll spreadsheet, week ending April 9, 2011); Ex. 2 (Kiefer Decl.) ¶ 10, Ex. E

Everhart

27.     Defendant paid Everhart a straight-time regular hourly rate of $24.038500, per hour.  Ex. 6 (Everhart Decl.) ¶ 10; Ex. E to the Everhart Decl. (paystub for week ending Feb. 28, 2010).

28.     When Everhart worked 40 hours, he was paid $961.54, or $24.038500 per hour.  Ex. 39 (Everhart paystub), paystub for week ending Oct. 31, 2009, Bates-stamped P000067.

29.     When Everhart worked fewer than 40 hours, he was paid $24.038500 for each hour he actually worked.  Ex. 6 (Everhart Decl.) ¶ 10; Ex. E to Everhart Decl. (paystub for week ending February 28, 2010).

18

30.     For the week ending February 28, 2010, Everhart worked 20.5 hours and was paid his regular hourly rate of $24.038500, for a total of $492.79. Ex. 6 (Everhart Decl.) ¶ 10; Ex. E to Everhart Decl. (paystub for week ending February 28, 2010).

31.     Everhart did not receive PTO time during the week ending February 28, 2010. Ex. 6 (Everhart Decl.); Ex. E to the Everhart Decl. (paystub for week ending February 28, 2010).

Pagano

32.     In June 2009, Pagano's straight-time regular hourly rate was $21.31690. Ex. 7 (Pagano Decl.), Ex. F to Pagano Decl. (paystub for week ending June 27, 2009).

33.     When Pagano worked 40 hours in June 2009 and thereafter,[3] Defendant paid him $852.68, or $21.31690 per hour.  Ex. 7 (Pagano Decl.), Ex. F to Pagano Decl. (paystub for week ending June 27, 2009).

34.     When Pagano worked fewer than 40 hours in June 2009 and thereafter, he was paid $21.31690 for each hour he actually worked.  Ex. 7 (Pagano Decl.), Ex. F to Pagano Decl. (paystub for week ending June 20, 2009).

35.     For the week ending June 20, 2009, Pagano worked 31.25 hours and was paid his regular hourly rate of $21.31690, for a total of $666.15.  Ex. 7 (Pagano Decl.), Ex. F to Pagano Decl. (paystub for week ending June 20, 2009).

36.     In August 2012, Pagano's straight-time regular hourly rate was $22.62000. Ex. 35 (Pagano paystub), week ending Aug. 4, 2012, Bates-stamped P000306.

37.     When Pagano worked 40 hours prior to and after August 2012, he was paid $904.80, or $22.62000. Ex. 35 (Pagano paystub), week ending Aug. 4, 2012, Bates-stamped P000306.

---

[3]     Pagano received raises during his employment, as set forth *infra*, which impacted his regular hourly rate.

38.     When Pagano worked fewer than 40 hours prior to and after August 2012, he was paid $22.62000 for each hour he actually worked. Ex. 7 (Pagano Decl.), Ex. E to Pagano Decl. (paystub for week ending July 28, 2012).

39.     For the week ending July 28, 2012, Pagano worked 34.20 hours and was paid his regular hourly rate of $22.62000, for a total of $773.61.  Ex. 7 (Pagano Decl.), Ex. E to Pagano Decl. (paystub for week ending July 28, 2012).

Dozier

40.     Defendant paid Dozier a straight-time hourly rate of $16.99525 per hour.  Ex. 32 (paystub for week ending August 28, 2010, Bates-stamped P000692).

41.     When Dozier worked 40 hours, she was paid $679.81, or $16.99525 per hour.  Ex. 32 (paystub for week ending August 28, 2010, Bates-stamped P000692).

42.     When Dozier worked fewer than 40 hours, she was paid $16.99525 for each hour she actually worked. Ex. 32 (paystub for week ending September 4, 2010, Bates-stamped P000693).

43.     For the week ending September 4, 2010, Dozier worked 9.75 hours and was paid her regular hourly rate of $16.99525, for a total of $165.70. Ex. 32 (paystub for week ending September 4, 2010, Bates-stamped P000693).

44.     Dozier did not receive PTO time during the week ending September 4, 2010.  Ex. 32 (paystub for week ending September 4, 2010, Bates-stamped P000693).

Escude

45.     Defendant paid Escude a straight-time hourly rate of $20.02000 per hour.  Ex. 33 (paystub for week ending September 29, 2012, Bates-stamped P000794).

46.     When Escude worked 40 hours, she was paid $800.80, or $20.02000 per hour. Ex. 33 (paystub for week ending September 29, 2012, Bates-stamped P000794).

47.     When Escude worked fewer than 40 hours, she was paid $20.02000 for each hour she actually worked.  Ex. 33 (Escude paystubs for weeks ending August 18, 2012, September 1, 2012 and October 20, 2012, Bates-stamped P000788, P000790 and P000797).

48.     For the week ending August 18, 2012, Escude worked 39.48 hours and was paid $790.39.  Ex. 33 (Escude paystub for week ending August 18, 2012, Bates-stamped P000788).

49.     For the week ending September 1, 2012, Escude worked 39.17 hours and was paid $784.18. Ex. 33 (Escude paystub for week ending September 1, 2012, Bates-stamped P000790).

50.     For the week ending October 20, 2012, Escude worked 39.43 hours and was paid $789.39.  Ex. 33 (Escude paystub for week ending October 20, 2012, Bates-stamped P000797).

51.     Escude did not receive PTO time during the weeks ending August 18, 2012, September 1, 2012, and October 20, 2012.  Ex. 33 (Escude paystubs for weeks ending August 18, 2012, September 1, 2012, and October 20, 2012).

<u>Employee 62</u>

52.     Defendant paid an individual it identified as "Employee 62" a straight-time hourly rate of $24.408750 per hour.  Ex. 17 (Employee 62 payroll spreadsheet).

53.     When Employee 62 worked 40 hours, he was paid $976.35, or $24.408750 per hour.  Ex. 17 (Employee 62 payroll spreadsheet).

54.     When Employee 62 worked fewer than 40 hours, he was paid $24.408750 for each hour he actually worked. Ex. 17 (Employee 62 payroll spreadsheet).

55.     For the week ending October 30, 2010, Employee 62 worked 32 hours and was paid his regular hourly rate of $24.408750 per hour, for a total of $781.08. Ex. 17 (Employee 62 payroll spreadsheet).

56.     Employee 62 did not receive PTO time during the week ending October 30, 2010. Ex. 17 (Employee 62 payroll spreadsheet).

### ASMs Paid on an Hourly Basis When They Worked Fewer Than 40 Hours and Had Accrued PTO Time

57.     When ASMs worked fewer than 40 hours in a workweek and had PTO time available, Defendant's policy and practice was to calculate ASMs' compensation according to the following formula: **(regular hourly rate x non-overtime hours worked) + (regular hourly rate x 8)**. Ex. 2 (Kiefer Decl.), Ex. F. to Kiefer Decl. (Kiefer paystubs); Ex. 6 (Everhart Decl.), Ex. F to Everhart Decl. (Everhart paystubs); Ex. 6 (Everhart Decl.), Ex. G to Everhart Decl. (Everhart paystubs); Ex. 7 (Pagano Decl.), Ex. G to Pagano Decl. (Pagano paystubs); Ex. 35 (Pagano paystubs); Ex. 32 (Dozier paystubs); Ex. 33 (Escude paystubs); Ex. 34 (Meister paystubs); Ex. 37 (Sanders paystubs); Ex. 30 (Battle paystub); Ex. 36 (Palmisano paystubs); Ex. 31 (Robinson paystub); Ex. 38 (Schaaf paystub); Ex. 13 (Employee 2 payroll records); Ex. 14 (Employee 10 payroll records); Ex. 15 (Employee 23 payroll records); Ex. 16 (Employee 31 payroll records); Ex. 17 (Employee 62 payroll records).

58.     Defendant's policy and practice was to pay ASMs a varying amount for their non-overtime hours during weeks in which they took PTO days, depending on how many non-overtime hours they worked.   Ex. 2 (Kiefer Decl.), Ex F. to Kiefer Decl. (Kiefer paystubs); Ex. 6 (Everhart Decl.), Ex. F to Everhart Decl. (Everhart paystubs); Ex. 6 (Everhart Decl.), Ex. G to Everhart Decl. (Everhart paystubs); Ex. 7 (Pagano Decl.), Ex. G to Pagano Decl. (Pagano paystubs); Ex. 35 (Pagano paystubs); Ex. 32 (Dozier paystubs); Ex. 33 (Escude paystubs); Ex. 34

(Meister paystubs); Ex. 37 (Sanders paystubs); Ex. 30 (Battle paystub); Ex. 36 (Palmisano paystubs); Ex. 31 (Robinson paystub); Ex. 38 (Schaaf paystub); Ex. 13 (Employee 2 payroll records); Ex. 14 (Employee 10 payroll records); Ex. 15 (Employee 23 payroll records); Ex. 16 (Employee 31 payroll records); Ex. 17 (Employee 62 payroll records).

59.     When an ASM did not work a weekly schedule of at least 45 hours for any reason, Defendant often applied paid time off ("PTO") to the calculation of his weekly pay, in eight-hour increments.   Ex. 2 (Kiefer Decl.), Ex F. to Kiefer Decl. (Kiefer paystubs); Ex. 6 (Everhart Decl.), Ex. F to Everhart Decl. (Everhart paystubs); Ex. 6 (Everhart Decl.), Ex. G to Everhart Decl. (Everhart paystubs); Ex. 7 (Pagano Decl.), Ex. G to Pagano Decl. (Pagano paystubs); Ex. 35 (Pagano paystubs); Ex. 32 (Dozier paystubs); Ex. 33 (Escude paystubs); Ex. 34 (Meister paystubs); Ex. 37 (Sanders paystubs); Ex. 30 (Battle paystub); Ex. 36 (Palmisano paystubs); Ex. 31 (Robinson paystub); Ex. 38 (Schaaf paystub); Ex. 13 (Employee 2 payroll records); Ex. 14 (Employee 10 payroll records); Ex. 15 (Employee 23 payroll records); Ex. 16 (Employee 31 payroll records); Ex. 17 (Employee 62 payroll records).

Kiefer

60.     For the week ending Nov. 26, 2011, Kiefer worked 35.27 hours and was paid his regular hourly rate of $21.634615, for a total of $763.05.  On a separate line, he received eight hours of holiday pay at his regular hourly rate of $21.634615, for a total of $173.08.  Ex. 2 (Kiefer Decl.) ¶ 12, Ex. F to Kiefer Decl. (paystub for week ending Nov. 26, 2011).  In total, he received $936.13 for the week.

61.     For the week ending Dec. 31, 2011, Kiefer worked 34.78 hours and was paid his regular hourly rate of $21.634615, for a total of $752.45.  On a separate line, he received eight hours of holiday pay at his regular hourly rate of $21.634615, for a total of $173.08.  *id.* ¶ 13, Ex.

F to Kiefer Decl. (paystub for week ending Dec. 31, 2011). In total, he received $925.53 for the week, slightly less than he received during Thanksgiving week when worked slightly more hours.

<u>Everhart</u>

62.     For the week ending Dec. 26, 2009, the week of Christmas 2009, Everhart worked 19.5 hours and was paid his regular hourly rate of $24.038500, for a total of $468.75.  On a separate line, he received eight hours of holiday pay at his regular hourly rate of $24.038500, for a total of $192.31.  Ex. 6 (Everhart Decl.) ¶ 11, Ex. F to Everhart Decl. (paystub for week ending Dec. 26, 2009).

63.     For the week ending Jan. 22, 2011, Everhart worked 37.75 hours and was paid his regular hourly rate of $24.038500, for a total of $907.45.  On a separate line, he received 8 hours of sick pay at his regular hourly rate of $24.038500, for a total of $192.31, *id.* ¶ 12, Ex. G to Everhart Decl. (paystub for week ending Jan. 22, 2011).

<u>Pagano</u>

64.     In December 2008, Pagano's straight-time regular hourly rate of pay was $20.899. Ex. 7 (Pagano Decl.), Ex. G to Pagano Decl. (paystub for week ending June 27, 2009).

65.     When Pagano worked 40 hours in December 2008 through approximately May 2009, Defendant paid him $835.96, or $20.899 per hour.  Ex. 35 (paystub for week ending Dec. 20, 2009, Bates-stamped P000474).

66.     For the week ending Dec. 27, 2008, the week of Christmas 2008, Pagano worked 38.17 hours and was paid his then-regular hourly rate of $20.899, for a total of $797.71.  On a separate line, he also received eight hours of holiday pay at his then-regular hourly rate of

$20.899, for a total of $167.19. Ex. 7 (Pagano Decl.) ¶ 12, Ex. G to Pagano Decl. (paystub for week ending Dec. 27, 2008).

> Dozier

67.　For the week ending Dec. 26, 2009, Dozier worked 38.02 hours and was paid her regular hourly rate of $16.99525, for a total of $646.16.  On a separate line, she received four hours of vacation pay at her regular hourly rate of $16.99525, for a total of $67.98. Additionally, she received 8 hours of holiday pay at her regular hourly rate of $16.99525, for a total of $135.96.  Ex. 32 (Dozier paystub for week ending Dec. 26, 2009, Bates-stamped P000686).

68.　For the week ending Sept. 11, 2010, Dozier worked 19.35 hours and was paid her regular hourly rate of $16.99525, for a total of $328.86.  On a separate line, she received 8 hours of holiday pay at her regular hourly rate of $16.99525, for a total of $135.96. Additionally, she received 16 hours of sick pay at her regular hourly rate of $16.99525, for a total of $271.92. Ex. 32 (Dozier paystub for week ending Sept. 11, 2010, Bates-stamped P000694).

> Escude

69.　For the week ending August 4, 2012, Escude worked 26.77 hours and was paid her regular hourly rate of $20.02000, for a total of $535.94.  On a separate line, she received 16 hours of personal time pay at her regular hourly rate of $20.02000, for a total of $320.32.  Ex. 33 (Escude paystub for week ending August 4, 2012, Bates-stamped P000786).

70.　For the week ending December 8, 2012, Escude worked 37.57 hours and was paid her regular hourly rate of $20.02000, for a total of $752.15.  On a separate line, she received 8 hours of personal time pay at her regular hourly rate of $20.02000, for a total of $160.16.  Ex. 33 (Escude paystub for week ending December 8, 2012, Bates-stamped P000804).

Meister

71.     For the week ending December 17, 2011, opt-in Plaintiff Miester ("Miester")

Meister worked 37.13 hours and was paid his regular hourly rate of $22.29, for a total of

$827.55.  On a separate line, he received 8 hours of personal time pay at his regular hourly rate

of $22.29, for a total of $178.30. Ex. 34 (Meister paystub for week ending December 17, 2011,

Bates-stamped P000176).

72.     For the week ending March 31, 2012, Meister worked 36.12 hours and was paid

his regular hourly rate of $22.29, for a total of $805.04.  On a separate line, he received 8 hours

of personal time pay at his regular hourly rate of $22.29, for a total of $178.30.  Ex. 34 (Meister

paystub for week ending March 31, 2012, Bates-stamped P000179).

Sanders

73.     For the week ending December 24, 2011, opt-in Plaintiff Sanders ("Sanders")

worked 32 hours and was paid his then-regular hourly rate of $18.71, for a total of $598.85.  On

a separate line, he received 8 hours of sick pay at his regular hourly rate of $18.71, for a total of

$149.71.  Ex. 37 (Sanders paystub for week ending December 24, 2011, Bates-stamped

P000476).

74.     For the week ending December 25, 2010, Sanders worked 32.45 hours and was

paid his then-regular hourly rate of $17.75, for a total of $576.07.  On a separate line, he received

8 hours of holiday pay at his then-regular hourly rate of $17.75, for a total of $142.02.  Ex. 37

(Sanders paystub for week ending December 25, 2010, Bates-stamped P000477).

75.     For the week ending December 26, 2009, Sanders worked 36 hours and was paid

his then regular hourly rate of $17.75, for a total of $639.09.  On a separate line, he received 8

hours of holiday pay at his regular hourly rate of $17.75, for a total of $142.02.  Ex. 37 (Sanders paystub for week ending December 26, 2009, Bates-stamped P000478).

Battle

76.     For the week ending August 25, 2012, opt-in Plaintiff Battle ("Battle") worked 32.67 hours and was paid her regular hourly rate of $18.41, for a total of $601.45.  On a separate line, she received 8 hours of personal time pay at her regular hourly rate of $18.41, for a total of $147.28.  Ex. 30 (Battle paystub for week ending August 25, 2012, Bates-stamped P000575).

Palmisano

77.     For the week ending December 29, 2012, opt-in Plaintiff Palmisano ("Palmisano") worked 24.47 hours and was paid her regular hourly rate $22.85, for a total of $559.14.  On a separate line, she received 8 hours of holiday pay and 8 hours of vacation pay at her regular hourly rate of $22.85, for a total of $365.60.  Ex. 36 (Palmisano paystub for week ending December 29, 2012, Bates-stamped P001247).

78.     For the week ending December 22, 2012, Palmisano worked 32.68 hours and was paid her regular hourly rate of $22.85, for a total of $746.74.  On a separate line, she received 14 hours of sick pay at her regular hourly rate of $22.85, for a total of $319.90.  Ex. 36 (Palmisano paystub for week ending December 22, 2012, Bates-stamped P001248).

79.     For the week ending December 8, 2012, Palmisano worked 39.98 hours and was paid her regular hourly rate $22.85, for a total of $913.54.  On a separate line, she received 6 hours of vacation pay at her regular hourly rate of $22.85, for a total of $137.10.  Ex. 36 (Palmisano paystub for week ending December 8, 2012, Bates-stamped P001250).

80.     For the week ending November 24, 2012, Palmisano worked 30.75 hours and was paid her regular hourly rate $22.85, for a total of $702.64.  On a separate line, she received 16

hours of holiday and vacation pay at her regular hourly rate of $22.85, for a total of $365.60.  Ex. 36 (Palmisano paystub for week ending November 24, 2012, Bates-stamped P001252).

81.     For the week ending September 29, 2012, Palmisano worked 39.97 hours and was paid her regular hourly rate of $22.85, for a total of $913.31.  On a separate line, she received 4 hours of sick pay at her regular hourly rate of $22.85, for a total of $91.40.  Ex. 36 (Palmisano paystub for week ending September 29, 2012, Bates-stamped P001260).

82.     For the week ending September 8, 2012, Palmisano worked 38.38 hours and was paid her regular hourly rate of $22.85, for a total of $876.98.  On a separate line, she received 8 hours of holiday pay at her regular hourly rate of $22.85, for a total of $182.80.  Ex. 36 (Palmisano paystub for week ending September 8, 2012, Bates-stamped P001263).

83.     For the week ending August 25, 2012, Palmisano worked 35.07 hours and was paid her regular hourly rate of $22.85, for a total of $801.35.  On a separate line, she received 5 hours of sick pay at her regular hourly rate of $22.85, for a total of $114.25.  Ex. 36 (Palmisano paystub for week ending August 25, 2012, Bates-stamped P001265).

84.     For the week ending August 11, 2012, Palmisano worked 0.25 hours and was paid her regular hourly rate of $22.85, for a total of $5.71.  On a separate line, she received 40 hours of personal and vacation pay at her regular hourly rate of $22.85, for a total of $914.00.  Ex. 36 (Palmisano paystub for week ending August 11, 2012, Bates-stamped P001267).

Robinson

85.     For the week ending December 25, 2010, opt-in Plaintiff Robinson ("Robinson") worked 39.67 hours and was paid his regular hourly rate $17.68, for a total of $701.28.  On a separate line, he received 8 hours of holiday pay at his hourly rate of $17.68, for a total of

$141.42.  Ex. 31 (Robinson paystub for week ending December 25, 2010, Bates-stamped P001307).

### Schaaf

86.     For the week ending September 26, 2009, opt-in Plaintiff Schaaf ("Schaaf") worked 30.13 hours and was paid his regular hourly rate $20.24, for a total of $609.84.  On a separate line, he received 16 hours of vacation pay at his hourly rate of $20.24, for a total of $323.85.  Ex. 38 (Schaaf paystub for week ending September 26, 2009, Bates-stamped P001320).

### Employee 2

87.     For the week ending Jan. 1, 2011, an individual identified in Defendant's payroll records as "Employee 2" worked 26.75 hours and was paid his regular hourly rate of $21.634615, for a total of $578.73.  On a separate line, he received 8 hours of holiday pay at his regular hourly rate of $21.634615, for a total of $173.08. Ex. 13 (Employee 2 payroll records), week ending Jan. 1, 2011.

### Employee 10

88.     For the week ending Apr. 9, 2011, an individual identified in Defendant's payroll records as "Employee 10" worked 35.02 hours and was paid his regular hourly rate of $20.88, for a total of $731.21.  On a separate line, he received eight hours of sick pay at his regular hourly rate of $20.88, for a total of $167.04. Ex. 14 (Employee 10 payroll records), week ending Apr. 9, 2011.

### Employee 23

89.     For the week ending Feb. 19, 2011, an individual identified in Defendant's payroll records as "Employee 23" worked 33.17 hours and was paid his regular hourly rate of

$19.23, for a total of $637.88.  On a separate line, he received eight hours of personal pay at his regular hourly rate of $19.23, for a total of $153.85. Ex. 15 (Employee 23 payroll records), week ending Feb. 19, 2011.

<u>Employee 31</u>

90.     For the week ending Dec. 26, 2009, an individual identified in Defendant's payroll records as "Employee 31" worked 36 hours and was paid his regular rate of $25.00, for a total of $900.00.  On a separate line, he received eight hours of holiday pay at his regular hourly pay of $25.00, for a total of $200.00. Ex. 16 (Employee 31 payroll records), week ending Dec. 26, 2009.

<u>Employee 62</u>

91.     For the week ending February 27, 2010, Employee 62 worked 18.25 hours and was paid his regular hourly rate of $24.408750, for a total of $445.46.  On a separate line, he received 16 hours of sick pay at his regular hourly rate of $24.408750, for a total of $390.54. Ex. 17 (Employee 62 payroll records), week ending Feb. 27, 2010.

**Defendant's Overtime Calculation Methodology**

92.     Defendant provides a "Coefficient Table" to each ASM upon hire.  Ex. 2 (Kiefer Decl.) ¶ 5; Ex. 6 (Everhart Decl.) ¶ 5; Ex. 7 (Pagano Decl.) ¶ 5.

93.     Defendant calculated overtime premiums using a "Coefficient Table" prior to July 1, 2012.  Ex. 9 (Pay for Performance/Coefficient Pay Presentation) at 148 ("All hours exceeding 40 hours per week are paid Coefficient Pay opposed to Overtime pay . . ."); *id*. at 149 (Defendant coefficient pay calculation tools); *id*. at 151-52 (coefficient pay computation table & instructions); Ex. 10 (Save-A-Lot Processing Work Transition – Payroll) ("Assistant Managers are the only ones who are getting the co-efficient rate.").

94.     Defendant calculated ASMs' compensation for hours worked over 40 according to the following formula prior to July 1, 2012: **((Overtime hours worked/(total hours worked x 2)) x (Home Hourly rate x 40)**.  Ex. 2 (Kiefer Decl.) ¶ 7, Ex. D; Ex. 6 (Everhart Decl.) ¶ 10, 15, Ex. D; Ex. 7 (Pagano Decl.) ¶ 7, Ex. D; Ex. 9 (Pay for Performance/Coefficient Pay Presentation) at 149 (Defendant coefficient pay calculation tools); *id*. at 151-52 (coefficient pay computation table & instructions).

95.     In May 2012, Defendant told ASMs that it had decided to stop paying ASMs overtime based on the coefficient formula, and to instead pay them time-and-a-half overtime starting on July 1, 2012. Ex. 45 (Letter, dated May 2010, from T. Lenkevich to J. Meister), at 1.

96.     Defendant decided to make this change because "the fluctuating work week and coefficient overtime is confusing [for ASMs] to understand."  (Letter, dated May 2010, from T. Lenkevich to J. Meister), at 1.

97.     After July 1, 2012, Defendant calculated ASMs' compensation for hours worked over 40 according to the following formula: **(Hourly rate x 1.5) x overtime hours worked**. (Letter, dated May 2010, from T. Lenkevich to J. Miester), at 1; Ex. 35 (Pagano paystub for week ending August 4, 2012, Bates-stamped P000306).

98.     Defendant's payroll system has no prompts or alerts to indicate to a user that an ASM has worked less than 40 hours, or to otherwise instruct the manager processing payroll to pay an ASM a full weekly wage.   Ex. 3 (Draper Tr.) 137:12-138:2; Ex. 6 (Everhart Decl.) ¶ 14.

**Defendant's Work Hours Requirements**

99.     Defendant provides ASMs with a document upon hire that explains its expectation that they will work 45 hours per week.  *See* Ex. 18 (Coefficient Calculator).

100.    Defendant schedules ASMs to work five shifts per week of a minimum of nine hours each, for a total of at least 45 hours per week. Ex. 2 (Kiefer Decl.) ¶ 8; Ex. 6 (Everhart Decl.) ¶ 8; Ex. 7 (Pagano Decl.) ¶ 8.

101.    ASMs' regular work schedules do not regularly fluctuate below 40 hours per week.  Ex. 2 (Kiefer Decl.) ¶ 8; Ex. 6 (Everhart Decl.) ¶ 8; Ex. 7 (Pagano Decl.) ¶ 8; Ex. 26 (Kiefer's Response to Interrogatory No. 5).

102.    During the relevant time period, Michael Draper was a Senior Recruiting Specialist with Defendant.  Michailidis Decl. Ex. G, ECF No. 139-7 (Draper Decl.) ¶ 4.

103.    Draper was responsible for informing ASMs about SAL wages, benefits, and employment policies.  Michailidis Decl. Ex. G, ECF No. 139-7 (Draper Decl.) ¶ 4.

104.    Draper told all newly-hired ASMs that they would be required to work 45-50 hours per week.  Ex. 3 (Draper Tr.) 208:22-209:13.

105.    Draper did not tell Kiefer anything about how he would be compensated if he worked fewer than 40 hours per week.  Ex. 26 (Kiefer's Response to Interrogatory No. 4).

**Defendant Informed ASMs That They Would Be Paid By the Hour, Not a Fixed Salary**

106.    Defendant has not provided ASMs with any document that informs them that they will be paid a full weekly salary if they work fewer than 40 hours in a workweek. Ex. 2 (Kiefer Decl.) ¶ 9.  Ex. 5 (Employee Handbook); Ex. D to the Michailidis Dec. (Cefficient calculator).

107.    Defendant has not provided ASMs with any document that informs them that they will be paid a full weekly salary regardless of how many or how few hours are worked in the workweek. Ex. 2 (Kiefer Decl.) ¶ 9.  Ex. 5 (Employee Handbook); Ex. D to the Michailidis Dec. (Coefficient calculator).

108.    Defendant informs ASMs of its personnel policies through its uniform Employee Handbook, which it issues to all food store employees nationwide, regardless of their location. *See id.*; Ex. 5 (Employee Handbook); Ex. 2 (Kiefer Decl.) ¶¶ 5-6; Ex. 6 (Everhart Decl.) ¶¶ 5-6) Ex. 7 (Pagano Decl.) ¶¶ 5-6.

109.    All versions of the Employee Handbook that Defendant issued to ASMs stated that associates were paid "an established hourly rate based on documented work."  Ex. 5 (Employee Handbook) at 8; Ex. 2 (Kiefer Decl.) ¶ 6; Ex. 6 (Everhart Decl.) ¶ 6; Ex. 7 (Pagano Decl.) ¶ 6.

110.    There is no version of Defendant's Employee Handbook that informs ASMs that they will be paid a full weekly salary if they work fewer than 40 hours in a workweek.  Ex. 2 (Kiefer Decl.) ¶¶ 8, 10-13; Ex. 6 (Everhart Decl.) ¶ 10-12; Ex. 7 (Pagano Decl.) ¶¶ 10-12.

111.    No one ever explained to Kiefer that he would receive a full weekly salary if he worked fewer than 40 hours a week.  Ex. 2 (Kiefer Decl.) ¶ 9; Ex. 41 (Kiefer Supp. Decl.) at ¶¶ 4-5

112.    No one ever explained to Everhart that he would receive a full weekly salary if he worked fewer than 40 hours a week.  Ex. 6 (Everhart Decl.) ¶ 9.

113.    No one ever explained to Pagano that he would receive a full weekly salary if he worked fewer than 40 hours a week.  Ex. 7 (Pagano Decl.) ¶ 9.

**Defendant's Bonus Plan**

114.    Defendant paid ASMs bonuses pursuant to objective criteria.  Ex. 40 (2010 Bonus Plan).

115.    ASMs were entitled to bonuses according to a formula "based on actual results and [] measured against pre-established performance objectives," *id.* at 2, which is part of the company's "commitment to providing [employees] with competitive compensation while improving the company's overall performance." Ex. 40 (2010 Bonus Plan) at P001111.

116.    At least 11 opt-in Plaintiffs received bonuses during the relevant time period. Ex. 48 (paystubs reflecting bonuses paid to opt-in Plaintiffs Dozier, Escude, Everhart, Ford, Meister, Pagano, Palmisano, Robinson, Robinson, Sanders, and Schaaf).

117.    Defendant did not include the amount of its bonus payments in its calculation of the regular rate of pay for purposes of calculating overtime. Ex. 35 (Pagano paystubs, week ending Apr. 29, 2009, reflecting overtime pay and bonus pay).

118.    Defendant stopped paying ASMs bonuses when it started paying ASMs time-and-a-half for overtime.  (Letter, dated May 2010, from T. Lenkevich to J. Meister), at 2.


Dated:          New York, New York
                February 28, 2013
                                                Respectfully submitted,

                                                **OUTTEN & GOLDEN LLP**
                                                By:

                                                */s/ Justin M. Swartz*
                                                Justin M. Swartz (PHV03853)
                                                Cyrus E. Dugger (PHV05016)
                                                Elizabeth Wagoner (PHV05548)
                                                3 Park Avenue, 29th Floor
                                                New York, New York 10016
                                                Telephone:  (212) 245-1000
                                                Facsimile: (212) 977-4005
                                                jms@outtengolden.com
                                                cdugger@outtengolden.com
                                                ewagoner@outtengolden.com

**THE HAYBER LAW FIRM, LLC**
Richard Hayber (CT11629)
Erick I. Díaz Vázquez (CT27023)
221 Main Street, Suite 502
Hartford, CT  06106
Telephone:  (203) 522-8888
Facsimile:  (203) 915-9555
rhayber@hayberlawfirm.com
ediaz@hayberlawfirm.com

## <u>CERTIFICATION OF SERVICE</u>

Pursuant to Local Rule 5(c), I hereby certify that on March 1, 2013 a copy of the above document was filed electronically.  Notice of this filing will be sent by email to all parties by operation of the Courts Electronic filing system.  A complete, duplicate copy of this document has been forwarded directly to Judge Young in Boston, MA. Parties may access this filing through ECF.


 _/s/Justin M. Swartz___
Justin M. Swartz