IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| ROBERT G. KIEFER, individually and on behalf of all others similarly situated, | : : : | |
| Plaintiff, | : : | |
| v. | : : | Civil Action No. 3:12-CV-00756(WGY) |
| MORAN FOODS, INC., d/b/a SAVE A LOT LTD., | : : : | |
| Defendant. | : : | |

## <u>COMPENDIUM OF CASES</u>

**Case**                                                                 **Tab**

*Clarke v. JPMorgan Chase Bank, N.A.,*
    2010 U.S. Dist. LEXIS 33264 (S.D.N.Y. Mar. 26, 2010) .............................. 1

*Daniels v. Michiana Metronet, Inc.,*
    2010 U.S. Dist. LEXIS 43686 (N.D. Ind. May 3, 2010) .............................. 2

*Delaney v. LaHood*
    2009 U.S. Dist. LEXIS 91293 (E.D.N.Y. Sept. 30, 2009) ................................. 3

*Ellis v. J.R. 's Country Stores, Inc.*
    2012 U.S. Dist. LEXIS 175257 (D. Col. Dec. 11, 2012) ..................…..………... 4

*Mitchell v FirsTrust Mortg., Inc.*
    2013 U.S. Dist. LEXIS 16563 (D. Kan. Feb. 7, 2013) ...................................... 5

**1**



Caution
As of: Apr 17, 2013

**ANDREW CLARKE and TAPAS SARKAR, Individually and on Behalf of Others Similarly Situated, Plaintiffs, -against- JPMORGAN CHASE BANK, N.A., Defendant.**

**08 Civ. 2400 (CM)(DCF)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2010 U.S. Dist. LEXIS 33264; 159 Lab. Cas. (CCH) P35,732**

**March 26, 2010, Decided**
**March 26, 2010, Filed**

**PRIOR HISTORY:** Clarke v. J.P. Morgan Chase & Co., 2009 U.S. Dist. LEXIS 54061 (S.D.N.Y., June 19, 2009)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant employer filed a motion for summary judgment in the putative collection action brought by plaintiffs, current and former employees of defendant who were allegedly misclassified as exempt from the overtime requirements of the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq. The court addressed the claims of the two named plaintiffs only.

**OVERVIEW:** Plaintiff 1 worked in defendant's IT department until his employment ended in 2007. In 2005, he was among many of defendant's employees who were reclassified as nonexempt. Plaintiff 1 remained overtime eligible from that date until he voluntarily left defendant's employment. Plaintiff 2 worked as a computer specialist for defendant and in 2008, his job, among hundreds of others, was reclassified as overtime eligible. The court held that Plaintiff 1's claim under the FLSA was time-barred. The court found that Plaintiff 1 failed to make a factual showing here that there was any genuine

issue about whether defendant willfully violated the FLSA's overtime provisions. Thus, the two-year statute of limitations governed Plaintiff 1's FLSA claim and was time barred. Likewise, Plaintiff 2's claim was time-barred but it also failed because he was exempt from the FLSA and New York state overtime law requirements under the FLSA's computer employee exemption, 29 U.S.C.S. § 213(a)(17).

**OUTCOME:** The court granted defendant's motion for summary judgment.

**CORE TERMS:** overtime, exemption, summary judgment, server, exempt, team, user, job duties, reclassification, network, statute of limitations, willful, certification, remediation, discovery, undisputed, software, frame, deposition, eligible, collective action, willfulness, opinion letters, primary duty, reclassified, technology, training, desktop, spent, space

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*

*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*

[HN1]It is well-settled that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment. Factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiffs affidavit opposing summary judgment and that affidavit contradicts his own prior deposition testimony.

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Evidence > Inferences & Presumptions > Inferences*

[HN2]A party is entitled to summary judgment when there is no genuine issue as to any material fact and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Standards > Materiality*

[HN3]The moving party on a motion for summary judgment has the initial burden of demonstrating the absence of a disputed issue of material fact. Once such a showing has been made, the nonmoving party must present specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The party opposing summary judgment may not rely on conclusory allegations or unsubstantiated speculation. Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*

[HN4]To withstand a motion for summary judgment, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. Summary judgment is designed to flush out those cases that are predestined to result in directed verdict.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period*
*Labor & Employment Law > Wage & Hour Laws > Statutes of Limitations*
*Labor & Employment Law > Wage & Hour Laws > Wage Payments*

[HN5]The statute of limitations for a Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., overtime claim is two years, except that the limitations period is three years for a claim arising out of a willful violation. 29 U.S.C.S. § 255(a). The statute of limitations for an overtime claim under the New Jersey Wage and Hour Law, N.J.S.A. § 34:11-56a25.1, is also two years, with no exception for willful violations. A cause of action accrues at each payday following an allegedly unlawful pay period.

*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Labor & Employment Law > Wage & Hour Laws > Statutes of Limitations*
*Labor & Employment Law > Wage & Hour Laws > Wage Payments*

[HN6]An employer willfully violates the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq., only if it either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute. Reckless disregard involves actual knowledge of a legal requirement, and deliberate disregard of the risk that one is in violation. A willful violation requires more than mere negligence. The plaintiffs must prove more than that the defendant should have known it was violating the law. Willfulness cannot be found where the employer acted negligently or assumed in good faith, but incorrectly, that its conduct complied with the FLSA. Further, an employer does not willfully violate the FLSA even if it acted unreasonably, but not recklessly, in determining its legal obligation. The employee bears the burden of proving willfulness.

*Civil Procedure > Summary Judgment > Burdens of*

*Production & Proof > Nonmovants*
*Labor & Employment Law > Wage & Hour Laws > Statutes of Limitations*
*Labor & Employment Law > Wage & Hour Laws > Wage Payments*
[HN7]The fact that the United States Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations under the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq. Proof of willfulness requires a factual showing of an employer's knowing or reckless violation of the FLSA. An FLSA plaintiff seeking to invoke the three-year limitations period cannot survive a motion for summary judgment unless he makes a competent demonstration that there is a trial worthy issue as to whether the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.

*Labor & Employment Law > Wage & Hour Laws > Remedies > Private Suits*
*Labor & Employment Law > Wage & Hour Laws > Statutes of Limitations*
*Labor & Employment Law > Wage & Hour Laws > Wage Payments*
[HN8]A Fair Labor Standards Act (FSLA), 29 U.S.C.S. § 201 et seq., collective action overtime suits are often prompted by a reclassification; if the mere fact of a reclassification were enough to trigger the exceptional three-year limitations period, it would cease to be an exception. That is clearly not what the United States Congress intended when it passed the two-tiered statute of limitations in 1966. In a decision from the Eastern District of Louisiana, the court held that the defendant's reclassification of a plaintiff as an hourly employee and its payment of back overtime pay after a United States Department of Labor audit is not evidence that defendant willfully violated the FLSA.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Labor & Employment Law > Wage & Hour Laws > Statutes of Limitations*
*Labor & Employment Law > Wage & Hour Laws > Wage Payments*
[HN9]The question of willfulness under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., absent genuinely disputed issues of fact, is properly decided on summary judgment.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
*Evidence > Documentary Evidence > Affidavits*
[HN10]A party cannot contradict its own pleading with affidavits. The allegations in the complaint are judicial admissions by which a plaintiff is bound throughout the course of the proceeding. Judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
[HN11]Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in the United States District Court for the Southern District of New York have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Employees*
*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period*
*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional Employees*
[HN12]Under the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq., employees must be compensated for every hour worked over 40 per week at a rate not less than one and one-half times the regular rate at which he is employed. 29 U.S.C.S. § 207(a)(1). However, the FLSA provides that certain categories of employees are exempt from its overtime requirements. Some exemptions are: the administrative employee exemption, pursuant to 29 U.S.C.S. § 213(a)(1); the computer employee exemption under § 213(a)(17); the combination exemption under 29 C.F.R. § 541.708; the highly compensated employee exemption under 29 C.F.R. § 541.601.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Employees*
*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period*
*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional Employees*

[HN13]N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 expressly provides that New York's overtime requirement is subject to the exemptions of the Fair Labor Standards Act, 29 U.S.C.S. §§ 207 and 213. There is general support for giving FLSA and the New York Labor Law consistent interpretations.

*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period*
*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional Employees*

[HN14]Because the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., is a remedial law, courts must narrowly construe its exemptions. The employer has the burden of proving that the employee clearly falls within the terms of the overtime exemption under 29 U.S.C.S. § 213.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period*
*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional Employees*

[HN15]Whether an employee is exempt from the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 213, overtime coverage is a mixed question of law and fact. The question of how the employee spent his working time is a question of fact. The question whether his particular activities excluded him from the overtime benefits of the FLSA is a question of law. Thus, the ultimate question of a particular worker's exemption, based on factual findings as to his actual work activities, requires a conclusion of law.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period*

*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional Employees*

[HN16]Under the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 213(a)(17), the FLSA exempts from its overtime requirements any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is: (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications; (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications; (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or (D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $ 27.63 an hour.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period*
*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional Employees*

[HN17]The term primary duty set forth in the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 213(a)(17), means the employee's principal, main, major or most important duty. 29 C.F.R. § 541.700 defines primary duty for purposes of executive, administrative, professional, computer and outside sales employee exemptions. In determining an employee's primary duty, courts look to all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. 29 C.F.R. § 541.700. The amount of time an employee spends performing exempt work can be a useful guide in determining whether his primary duty consists of exempt work. Employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period*
*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional*

*Employees*

[HN18]The computer employee exemption to overtime payments set forth in the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 213(a)(17), applies to a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker. Thus, an employee's job duties, not his job title, determine whether the exemption applies. 29 C.F.R. § 541.400. Because job titles vary widely and change quickly in the computer industry, job titles are not determinative of the applicability of the computer employee exemption. Where the prescribed duties tests are met, the computer exemption may be applied regardless of the job title given to the particular position.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period*
*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional Employees*

[HN19]The exemption in the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 213(a)(17), broadens the coverage of computer services personnel from that included in the prior § 213(a)(1) computer professional exemption and the 1991 United States Department of Labor regulations in three significant ways. Most notably, it eliminates the requirement that the employee's work require the exercise of independent judgment and discretion. It also eliminates any reference to educational requirements, and dispenses with the requirement that the employee must have achieved a level of proficiency in the theoretical and practical application of a body of highly specialized knowledge.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Employees*
*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period*
*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional Employees*

[HN20]The exempt status of a given employee from overtime depends upon an analysis of the employee's job duties. 29 C.F.R. § 541.2 The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the exemption.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Opposition > Supporting Materials*

[HN21]Under Fed. R. Civ. P. 56(f), if a party opposing the summary judgment motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order. However, it is well established that Rule 56(f) applies to summary judgment motions made before discovery is concluded.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period*
*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional Employees*

[HN22]The computer employee exemption set forth in the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 213(a)(17), does not require the exercise of discretion and independent judgment.

**COUNSEL:** [*1] For Andrew Clarke, individually and on behalf of all others similarly situated, Tapas Sarkar, individually and on behalf of all others similarly situated, Plaintiffs: Adam T Klein, Jack A. Raisner, LEAD ATTORNEYS, Outten & Golden, LLP (NYC), New York, NY; Eve H. Cervantez, LEAD ATTORNEY, James M. Finberg, PRO HAC VICE, Altshuler Berzon, L.L.P., San Francisco, CA; Jahan C. Sagafi, LEAD ATTORNEY, Kelly Dermody, Lieff Cabraser Heimann & Bernstein, LLP(SF), San Francisco, CA; Peter E. Leckman, LEAD ATTORNEY, Altshuler Berzon LLP, San Francisco, CA; Rachel Geman Lieff Cabraser Heimann & Bernstein, LLP, New York, NY.

For J.P. Morgan Chase & Co., Defendant: Debra S. Morway, Morgan, Lewis and Bockius LLP (NY), New York, NY; Sam Scott Shaulson Morgan, Lewis & Bockius LLP (New York), New York, NY; Sarah E. Bouchard, PRO HAC VICE, Morgan, Lewis & Boukius, LLP, Philadelphia, Pa.

**JUDGES:** Colleen McMahon, U.S.D.J.

**OPINION BY:** Colleen McMahon

**OPINION**

DECISION AND ORDER GRANTING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AND DENYING AS MOOT PLAINTIFFS' MOTION FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION

McMahon, J.:

## INTRODUCTION

Plaintiffs Andrew Clarke ("Clarke") and Tapas Sarkar ("Sarkar") bring this putative collective action [*2] against defendant JPMorgan Chase Bank, N.A. ("JPM" or "Defendant"), asserting claims individually and on behalf of hundreds of similarly situated current and former JPM information technology ("IT") employees, under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"), Article 19 of the New York Labor Law ("NYLL") and the New Jersey Wage and Hour Law, N.J.S.A. 34:11-56a et seq. ("NJWHL"). Plaintiffs allege that JPM violated the overtime pay requirements of the FLSA, NYLL and NJWHL by failing to compensate them for hours worked in excess of forty per week.

Three motions are pending before the Court: (1) JPM's motion for summary judgment on the claims of Plaintiff Clarke (the "Clarke Summary Judgment Motion"); (2) JPM's motion for summary judgment on the claims of Plaintiff Sarkar (the "Sarkar Summary Judgment Motion"); and (3) Plaintiffs' motion for conditional collective action certification. For the reasons set forth below, the Court grants JPM's summary judgment motions. Plaintiffs' collective action certification motion is therefore denied as moot.

## BACKGROUND

### I. The Claims Asserted and the Putative Classes

Plaintiffs filed their complaint (the "Complaint") on March 7, 2008. [*3] The Complaint asserts three causes of action.

Count I is the FLSA claim, brought by both Plaintiffs individually, and as a putative collective action pursuant to 29 U.S.C. § 216(b) on behalf of current and former JPM IT employees who were allegedly misclassified by JPM as exempt from the FLSA's overtime requirements, and later reclassified as nonexempt--i.e., overtime eligible. (See Compl. PP 23-25, 39-46.) Count II is the

NJWHL claim, brought by Plaintiff Clarke individually and as a putative class action pursuant to Federal Rule of Civil Procedure 23 on behalf of similarly situated current and former IT employees who worked in New Jersey (the "New Jersey Class"). (See id. PP 27-28, 47-53.) Count III is the NYLL claim, brought by Plaintiff Sarkar individually and as a putative Rule 23 class action on behalf of similarly situated current and former IT employees who worked in New York (the "New York Class"). (See id. PP 29-30, 54-60.)

Plaintiffs seek, inter alia, damages in the amount of their unpaid overtime wages, an award of liquidated damages pursuant to § 216(b), attorneys' fees and expenses.

### II. The Pending Motions

JPM argues that it is entitled to summary judgment on Clarke's claims [*4] because they are time-barred, and that even if his claims are timely, Clarke was exempt from FLSA overtime coverage. (Def.'s Mem. in Supp. of Summ. J. Mot. to Dismiss Claims of Pl. Clarke, Apr. 14, 2009, at 1-2.) JPM argues that it is entitled to summary judgment on Sarkar's claims because he was exempt from FLSA and NYLL overtime provisions under several different exemptions, including the computer employee exemption. (Def.'s Mem. in Supp. of Summ. J. Mot. to Dismiss Claims of Pl. Sarkar, Apr. 14, 2009 ("Def.'s Sarkar Mem."), at 1-2.) Sarkar opposes JPM's summary judgment motion on the merits, but also submits a Rule 56(f) affidavit, asking the Court to deny JPM's motion on Rule 56(f) grounds or, alternatively, to stay its decision and order additional discovery. (See Decl. of Adam T. Klein in Supp. of Pls.' Opp. to Def.'s Sarkar Summ. J. Mot., Pursuant to Fed. R. Civ. P. 56(0, May 14, 2009 ("Klein 56(f) Decl."), P 27.)

For the reasons stated herein, the Court finds that Clarke's claims are time-barred and that Sarkar was exempt as a computer employee, and rejects Sarkar's Rule 56(f) application. Accordingly, the Court grants summary judgment to JPM on both Plaintiffs' claims, mooting [*5] Plaintiffs' certification motion.

### III. Facts

The undisputed facts relevant to JPM's summary judgment motions are taken from the parties' Rule 56.1 statements, and from certain deposition testimony, declarations and documents.

## A. JPM

JPM is a global financial services firm that provides a variety of products and services, including investment banking, mortgages, loans, retail banking, private banking and wealth management. (Def.'s Rule 56.1 Stmt. in Supp. of Sarkar Summ. J. Mot., Apr. 14, 2009 ("Def.'s Sarkar 56.1 Stmt."), P 3.) [1] Each of these various business units is referred to as a "line of business" or "LOB." (Id.) As a normal practice, JPM periodically reviews the exempt status of its jobs to ensure that they are classified consistent with FLSA overtime requirements. (Pls.' Resp. to Def.'s Clarke 56.1 Stmt. & Pls.' Stmt. of Add'l Material Facts, June 30, 2009 ("Clarke 56.1 Cntrstmt."), P 98.)

> 1 When the Court cites only Defendant's Rule 56.1 statement, that means the cited paragraph is expressly admitted in the corresponding paragraph in Plaintiffs' Rule 56.1 counterstatement; otherwise, when taking undisputed facts from the parties' Rule 56.1 statements, the Court cites paragraphs [*6] from both parties' statements or only from Plaintiffs' counterstatement.

## B. Andrew Clarke

Because the Court finds that Plaintiff Clarke's claims are time-barred, the Court sets forth only those limited facts relevant to the timeliness of his claims. The Court does not get into the nature of Clarke's job duties, as it need not decide whether he was exempt from the FLSA's overtime requirements.

Andrew Clarke worked in JPM's IT department until his employment at JPM ended on June 11, 2007. (Def.'s Rule 56.1 Stmt. in Supp. of Clarke Summ. J. Mol., Apr. 14, 2009 ("Def.'s Clarke 56.1 Stmt."), P 7; Clarke 56.1 Cntrstmt. PP 3, 7.) Prior to August 1, 2005, Clarke was classified as overtime exempt. (See Def.'s Clarke 56.1 Stmt. P 2.)

It is undisputed that on August 1, 2005, Clarke was among many JPM employees who were reclassified as nonexempt. (See id.; Clarke 56.1 Cntrstmt. PP 98-101; Def.'s Resp. to Clarke 56.1 Cntrstmt., July 17, 2009, PP 98-101.) Clarke remained overtime eligible from that date until he voluntarily left JPM in June 2007. (See Clarke 56.1 Cntrstmt. P 3.) Nor can it be disputed that Clarke did, in fact, receive overtime from August 2005 until he

left JPM. (See id. P 5; Aff. of [*7] Debra Morway in Supp. of Def.'s Clarke Summ. J. Mot., Apr. 14, 2009, Ex. A (Dep. of Andrew Clarke ("Clarke Dep.")), 44:5-46:24, 63:13-24; Pls.' Mem. in Opp. to Def.'s Clarke Summ. J. Mot., June 30, 2009 ("Clarke Opp."), at 10 n.4.)

## C. Tapas Sarkar

The Rule 56.1 statements submitted in connection with the Sarkar Summary Judgment Motion rely predominantly on Sarkar's extensive deposition testimony. Sarkar's testimony clearly shows that his job duties place him within the FLSA's computer employee exemption.

In a transparent attempt to avoid summary judgment, Sarkar submits a self-serving declaration that contradicts certain portions of his deposition, sworn to just *three months* after he was deposed. (See Decl. of Tapas Sarkar, May 13, 2009 ("Sarkar Decl.").) However, [HN1]"it is well-settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995) (quoting Mack v. United States, 814 F.2d 120, 124-25 (2d Cir. 1987)); accord Cordell v. Verizon Comm'ns, Inc., 331 Fed. Appx. 56, 58 (2d Cir. 2009) ("[F]actual allegations that might [*8] otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiffs affidavit opposing summary judgment and that affidavit contradicts [his] own prior deposition testimony." (quoting Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)).

Further, Sarkar's Rule 56.1 Counterstatement, which relies heavily on his post-deposition declaration, attempts to manufacture disputes by citing various snippets of his testimony that, if taken out of context, could be said to support his position. (See Pls.' Resp. to Def.'s Sarkar 56.1 Stmt. & Pls.' Stmt. of Add'l Material Facts, May 14, 2009 ("Sarkar 56.1 Cntrstmt."),) However, the Court looks to the entirety of the Sarkar deposition testimony submitted by the parties in determining whether material facts are *genuinely* in dispute.

### 1. Sarkar's Position at JPM

Tapas Sarkar began working for JPM in December 2002. (Def.'s Sarkar 56.1 Stmt. P 62; Sarkar 56.1

Cntrstmt. P 62.) When he was hired, Sarkar understood that he would be paid a salary and would not be paid overtime. (Dep. of Tapas Sarkar, Feb. 11, 2009 ("Sarkar Dep."), 51:20-52:3.) [2] Sarkar's annual compensation ranged from $ 78,850 [*9] in 2003 to $ 101,932 in 2007. (Id. 54:3-10, 55:17-22.) At all times while at JPM, Sarkar earned well more than $ 455 per week. (See id. 53:11-54:2.)

> 2 Pages from Sarkar's deposition transcript are attached as exhibits to various affidavits submitted in connection with the Sarkar Summary Judgment Motion. Throughout this opinion, the Court cites directly to the transcript itself.

Before being hired by JPM, Sarkar earned two technical certifications, as a Certified Novell Engineer ("CNE") and as a Microsoft Certified Systems Engineer ("MCSE"). (Sarkar 56.1 Cntrstmt. P 60.) The CNE certification enabled Sarkar to "understand" Novell's Netware, a network operating system. (See Sarkar Dep. 22:25-23:16.) To obtain his CNE, Sarkar attended a ten-month course, during which he had to pass approximately seven exams. (Id. 22:6-21, 23:25-24:13.) According to Novell's website, the CNE "has been recognized as the IT industry's leading certification for advanced networking and troubleshooting," and teaches its holder to "solve advanced company-wide support problems and high-level network problems." (See Aff. of Debra Morway in Supp. of Def.'s Sarkar Summ. J. Mot., Apr. 14, 2009 (Morway Sarkar Aff."), [*10] Ex. A-l.)

Sarkar is a member of JPM's Global Technology Infrastructure ("GTI"), which has at times been called Enterprise Technology Services ("ETS"). (See Def.'s Sarkar 56.1 Stmt. P 5; Sarkar 56.1 Cntrstmt. P 5.) GTI is part of JPM's IT department, and manages the file and print aspects of JPM's global computer network; GTI serves all of JPM's various LOBs. (See Sarkar Dep. 58:24-60:14,62:9-14.)

From the time he was hired until July 1, 2005, Sarkar worked as a Senior Technology Officer. (Morway Sarkar Aff. Ex. B (JPM Job Profile for Tapas Sarkar).) Sarkar then held the title of Distributed Computing Engineer II until May 1, 2007, when he became a Technology Operations Analyst. (Id.) Each of those positions was classified as overtime exempt. (Sarkar Decl. P 2.) On January 1, 2008, Sarkar was one of hundreds of JPM employees reclassified as overtime eligible. (See id.; Decl. of Courtney Smith Goodrich, May 13, 2009

("Goodrich Decl."), P 4.) On February 1, 2008, Sarkar was promoted to Vice President, which is an exempt position. (Sarkar Decl. P 2.) During this period, from 2003 to 2008, the nature of Sarkar's primary job duties remained essentially the same. (Id. PP 3-4; Sarkar Dep. 253:2-10.)

## 2. [*11] Sarkar's Job Duties

The bulk of Sarkar's work at JPM has been on the computer; since at least 2005, "[a]lmost 100 percent" of his work has been on the computer. (Sarkar Dep. 69:10-70:24.) In 2007 and 2008, Sarkar worked on a Novell Services Group ("NSG") "SWAT Team" led by Jodi Shinney. (See Morway Sarkar Aff. Ex. D (Dep. of Jodi Shinney, Feb. 26, 2009 ("Shinney Dep.")), 35:2-22.) The SWAT Team had eight members, each of whom had different areas of expertise. (See id.) Sarkar worked to support the operation of JPM's Novell network with respect to file and print functionality and storage capacity. (See id.; Sarkar Dep. 61:11-62:14.) During his time at JPM, Sarkar's job duties have included: capacity management; Novell Distributed Print Services ("NDPS") remediation; resolution of escalated server-related issues; special projects; and the creation and updating of technical manuals.

### i. Capacity Management

Sarkar spent the majority of his time on capacity management. (Sarkar 56.1 Cntrstmt. P 76; Sarkar Dep. 163:20-22.) Capacity management refers to Sarkar's ensuring that users within his area of responsibility had sufficient capacity on Novell servers to store their electronic data. (Sarkar [*12] Dep. 78:6-10.) [3]

> 3 A server is a shared device that routes information and acts as a communicator between different technologies on a network, enabling data, printers and applications to be shared across computers. (Morway Sarkar Aff. Ex. C (Decl. of Jodi Shinney, Mar. 30, 2009 ("Shinney Decl.")), P 4.)

Sarkar was responsible for capacity management in JPM's Northeast region, which includes the New York City area and Delaware. (Sarkar Dep. 73:14-17, 74:9-17.) Sarkar supported multiple LOBs within the Northeast region, but mainly JPM's Investment Bank (id. 78:11-23), which accounted for over $ 12 billion of JPM's revenue in 2008 (Morway Sarkar Aff. Ex. F (Decl. of Una Miller,

Mar. 31, 2009)), P 2). Sarkar was responsible for about fifty to sixty physical servers and 1,500 virtual servers, affecting more than 10,000 users. (Sarkar Dep. 76:13-77:17.) [4] In connection with his capacity management work, Sarkar has identified the need to add data servers to JPM's infrastructure. (Def.'s Sarkar 56.1 Stmt. P 66; Sarkar 56.1 Cntrstmt. P 66.) If Sarkar did not do his job correctly, data would be lost, potentially causing financial loss to JPM. (See Def.'s Sarkar 56.1 Stmt. P 9; Sarkar 56.1 Cntrstmt. [*13] P 9.) Sarkar testified that he has "excellent" "[c]omputer skill[s] for storage-related work." (See Sarkar Dep. 203:25-204:17.) Many people at JPM considered Sarkar "the 'go-to' person for capacity management in the Northeast region." (Sarkar Decl. P 27.)

> 4   A standalone server that individually houses resources is a "physical server." (See Morway Sarkar Aff. Ex. C (Shinney Decl.), P 4.) When physical servers exist in a cluster, however, they work together so that if one server goes down, the resources on the failed server migrate to the other, working servers in the cluster, which is called a "virtual server." (Id.) Servers are clustered so that all of the resources necessary to run a large computer network can be provided. (Id.)

An important aspect of Sarkar's capacity management responsibilities was "put[ting] plans together to . . . remediate a lot of situations in the disk space area." (Sarkar Dep. 242:11-15.) In a performance review, Sarkar's manager stated that "[Sarkar] has engineered improvements in a number of space shortage situations." (See Sarkar Dep. 242:2-25.) When creating a plan for disk space remediation, Sarkar considers the following factors: the space available on [*14] the current frame, the clusters that the frame was connected to, future frame growth, frame decommission, Symmetrix Remote Data Facility ("SRDF") needs, [6] and the viability of moving between frames. (Def.'s 56.1 Stmt. PP 72-73.)

> 5   When Novell servers appear in a cluster, an EMC frame houses storage on physical disks, and the frame is attached by cables to the cluster of servers. (See Morway Sarkar Aff. Ex. C (Shinney Decl.), P 4.) Chunks of storage from the EMC frame, called "volumes," are assigned to the server clusters. (Id.) These volumes, which are often referred to as virtual servers, house data for JPM's LOBs and are allocated based on the needs

of the business. (Id.)

> 6   SRDF is a data replication mechanism between two EMC frames that ensures changes in data are replicated to a disaster recovery copy of the data nearly instantaneously. (Morway Sarkar Aff. Ex. D (Shinney Dep.), 190:19-24.)

For example, it is undisputed that in October 2007, Sarkar devised a disk space remediation plan for JPM data centers in New York City and Brooklyn. (Def.'s Sarkar 56.1 Stmt. P 16; Sarkar 56.1 Cntrstmt. P 16.) Sarkar attached the draft plan (contained in a series of spreadsheets) to an email dated [*15] October 10, 2007, which he sent to several JPM employees, including Jodi Shinney. (See Morway Sarkar Aff. Ex. A-6.) Sarkar's email states that implementing the plan, which he "put together to achieve some disk space remediation goals by the end of this year," was "not going to be straight forward and easy." (Id.) Sarkar then listed numerous technical issues relating to the plan that he anticipated encountering and/or that needed to be considered. (Id.; Sarkar Dep. 117:14-24.)

It is also undisputed that Sarkar developed remediation plans for JPM's LOBs. (Def.'s Sarkar 56.1 Stmt. P 69; Sarkar 56.1 Cntrstmt. P 69.) In response to an LOB's request for additional capacity, Sarkar would design a plan to meet its needs. (Sarkar Dep. 214:22-216:2.) In developing the plan, Sarkar would consult with the LOB--the client--about the LOB's requirements, and about the impact that implementing the plan would have on its business. (Id. 306:9-309:5.) Sarkar provided this sort of "impact analysis" to LOBs on a regular basis. (See id. 308:9-309:5.)

The capacity remediation plans provided to LOBs often involved data migration--i.e., moving data among volumes and server frames. (See id. 92:6-12 (explaining [*16] that another option for increasing storage capacity is to allocate more hardware resources to the user community).) Data can be migrated in several different ways, which have various benefits and risks. (See id. 94:4-97:8.) In connection with data migrations, Sarker would discuss numerous technical issues with a liaison at the LOB client, including: the number of login scripts at issue; the complexity of the migration; whether there are any hard-coded databases; the number of users that may be impacted by the migration; and the future capacity needs of the LOB. (Def.'s Sarkar 56.1 Stmt. P 71; Sarkar 56.1 Cntrstmt. P 71; Sarkar Dep. 97:21-98:10.)

### ii. NDPS Remediation

Novell Distributed Print Services ("NDPS") is a component of the Novell network operating system that enables users to print to certain printers. Sarkar was responsible for NDPS printing for the Northeast region, and estimates that he spent about ten percent of his time on NDPS remediation. (Sarkar Dep. 163:23-164:2, 195:13-18.) Sarkar was considered a subject matter expert ("SME") in NDPS printing. (Def.'s Sarkar 56.1 Stmt. P 39; Sarkar 56.1 Cntrstmt. P 39.) Indeed, Sarkar's team members called him the NDPS "guru." (Def.'s [*17] Sarkar 56.1 Stmt. P 59; Sarkar 56.1 Cntrstmt. P 59.) Sarkar testified that he agreed with this assessment of his skills. (Sarkar Dep. 371:3-5.) Other members of Sarkar's team were considered SMEs in their particular areas of expertise. (Sarkar Decl. P 15.)

As part of his NDPS remediation work, Sarkar has drafted detailed plans regarding whether certain printers at JPM sites around the country could be moved off data servers onto EDG servers, or "boxes." (See Sarkar Dep. 218:19-222:2; Morway Sarkar Aff. Ex. D (Shinney Dep.), 157:8-24.) An EDG box is a dedicated server that directs printers. (Morway Sarkar Aff. Ex. D (Shinney Dep.), 157:8-17.) Printer agents can be migrated from data servers to EDG servers in different ways, and Sarkar would suggest an approach to accomplish a particular migration. (See Sarkar Dep. 279:19-281:18.)

To develop these plans, Sarkar would analyze the printing infrastructure at a given site, determine whether it was causing problems, and then make a recommendation--to the LOB and to his manager--about what should be done. (See id. 218:19-222:2.) For example, Sarkar testified that he "did some work for Rochester," which had three servers and a user community [*18] of about 1,200 to 2,000, and was "having [a] problem with slowness." (Id. 220:16-21.) Sarkar "looked at that site" and, based on the size of its user community, recommended adding two servers. (Id. 220:22-221:14.) The LOB accepted Sarkar's suggestion, and two additional servers were implemented for that site. (Id. 221:6-14.)

In addition to responding to NDPS concerns at particular locations, Sarkar proactively developed plans to alleviate NDPS issues throughout the country. (See id. 221:15-23.) Sarkar "identif[ied] locations where NDPS should be moved to add servers," "establish[ed] plans to remove inactive printers from strategic trees" and transmitted ideas to the desktop team to create a "more healthy printing environment." (Id. 221:24-223:11.)

### iii. Escalation Work

Sarkar spent about seven or eight percent of his time responding to incidents that had been escalated to his attention. (See Sarkar Dep. 163:3-13.) An incident "ticket" is an electronic form that is filled out when a user or multiple users are having computer problems. (Id. 193:4-7.) An incident ticket typically originates with JPM's helpdesk, which attempts to resolve the issue. (Id. 193:10-194:4.) It is undisputed that [*19] Sarkar never worked on the helpdesk. (Def.'s Sarkar 56.1 Stmt. P 65.)

If the helpdesk cannot resolve the issue, it determines where to send the ticket, depending on the nature of the problem. (Sarkar Dep. 194:5-10.) Often, the helpdesk would escalate the issue to desktop support. (See id. 194:11-15.) If desktop support could not resolve the problem, it would be escalated to Sarkar's team within the NSG group. (Id. 194:16-19.) Sarkar admitted that his team was thus referred to as "third level support." (See id. 194:20-24.) Further, when a ticket was assigned to another member of Sarkar's team and he or she could not solve the problem, it was sometimes escalated to Sarkar. (Id. 194:25-195:16.) Tickets that were escalated from other team members to Sarkar typically concerned disk space remediation or NDPS printing. (Id. 195:7-11.) Thus, Sarkar effectively functioned as a fourth point of escalation for certain types of incidents.

Incident tickets are classified according to the severity of the situation, ranging from Priority 1 ("P1") to P3. (Id. 123:24-124:13.) A P1 incident is the most serious. (Id. 124:11-13.) For example, an incident is designated P1 if it involves "a business, technical, [*20] or facility outage where service must be restored within the specified time to repair or deadlines will be missed," an issue that "results in non-compliance with Federal regulation," or one that "is causing cross-regional impact." (Morway Sarkar Aff. Ex. A-30 (JPM Priority and Severity Guidelines).) There are multiple levels of P1 incidents, categorized based on the number of users affected and the amount of potential financial loss. (Id.)

It is undisputed that Sarkar regularly resolved P1 issues during his employment at JPM. (Def.'s Sarkar 56.1 Stmt. P 20; Sarkar Dep. 226:2-21.) Indeed, Sarkar testified that he has "always been in the forefront of all critical issues in the Northeast region mostly in Atlas and

in some cases in [the] Heritage [Novell network] environment." (Sarkar Dep. 161:9-17.) Sarkar explained that by "critical," he meant "P1, P2 situations." (Id. 161:18-21.) Sarkar also testified that his colleagues and clients sought him out when they needed help with difficult problems. (Id. 172:19-173:4.) While at JPM, Sarkar resolved issues that could have resulted in millions of dollars of losses for the business. (Def.'s Sarkar 56.1 Stmt. P 10.)

When Sarkar tackled escalated [*21] incident tickets, and when he dealt with capacity management, NDPS remediation and other issues, he would find the "root cause" of a problem and then figure out how to address it. (Sarkar Dep. 227:20-228:21.) Whenever possible, Sarkar tried to devise a solution that would prevent the issue from recurring. (Id. 229:3-10.) In performing his various duties, Sarkar encountered issues for which there was no documentation, no known solution, (Id. 424:14-18.) Sarkar testified that he was "creative" in performing his duties at JPM. (Def.'s Sarkar 56.1 Stmt. P 54; Sarkar 56.1 Cntrstmt. P 54.) Sarkar applied knowledge obtained from the engineering department, other team members, documentation and classes, as well as his own knowledge, skills and decision-making. (See id. 170:17-172:7, 424:14-425:3.)

In addition, it is undisputed that Sarkar proactively identified issues, thereby preventing potential PI and P2 situations. (Def.'s Sarkar 56.1 Stmt. P 33; Sarkar Dep. 175:7-24.) He has also identified areas for improvement in authentication performance and directory communications. (Def.'s Sarkar 56.1 Stmt. P 30.) For example, when his team was "getting a lot of PI tickets based on new workstation [*22] builds, and users [were] not able to log on to the network" at certain buildings, he determined that they "were not communicating to the nearest server" as a result of "authentication errors" in the site codes. (See Sarkar Dep. 139:21-140:10, 141:5-142:23.) Sarkar recommended a change to the specification that would route users to the nearest servers; it was accepted, and engineering corrected the site codes. (Id. 141:5-142:23.)

#### iv. Special Projects

One of Sarkar's job duties was to work on "special projects" as they arose. (Def.'s Sarkar 56.1 Stmt. P 11; Sarkar 56.1 Cntrstmt. P 11; Sarkar Dep. 72:15-73:2, 165:17-21.) In 2006 and 2007, Sarkar spent about ten to twelve percent of his time on special projects, including

the hardware or server refresh project, which involved the upgrade of Netware servers. (Sarkar Dep. 165:13-21, 231:3-10.) Sarkar identified servers most in need of refresh and determined the priority for their refresh by analyzing the age of the equipment, the criticality to the users and the load that the servers would be under. (Morway Sarkar Aff. Ex. D (Shinney Dep.), 166:3-10.)

Sarkar was also involved in the backup migration project, an effort to ensure that all data [*23] is sufficiently backed up, so that it would be available if lost from its primary server. (Morway Sarkar Aff. Ex. C (Shinney Decl.). P 7.) As part of the project, JPM upgraded to a different version of NetBackup software--the product that JPM used to back up data in the Northeast region. (Morway Sarkar Aff. Ex. D (Shinney Dep.), 80:3-8.) Sarkar tested the new version of the software and, in doing so, identified storage issues with the new software that the storage team fixed. (See id. 80:19-81:7.)

#### v. Manuals

In 2007, Sarkar drafted a troubleshooting guide for JPM's desktop support team, titled the NDPS Support & Troubleshooting Guide for Desktop Support Team. (Sarkar Dep. 348:23-349:6; Morway Sarkar Aff. Ex. A-25.) Sarkar's purpose in creating the documentation was to enable the desktop support team to resolve relatively straightforward NDPS issues so that they would only escalate more complicated issues--specifically, NDPS issues involving the server, since the desktop support team, unlike Sarkar's team, did not have access to the server. (See Sarkar Dep. 127:2-129:23.) In deciding what to include in the troubleshooting guide, Sarkar relied on materials from the engineering department, [*24] as well as his own training, knowledge and experience. (See id. 127:11-25, 352:14-25.)

It is undisputed that Sarkar also edited and updated another manual, called the NDPS Support & Troubleshooting Guide for Server Support Team, and that he is currently listed as the author of that manual. (Def.'s Sarkar 56.1 Stmt. P 27; Sarkar 56.1 Cntrstmt. P 27; Morway Sarkar Aff. Ex. A-26.) The purpose of this document was to guide the server support team in resolving NDPS issues without having to escalate them to Sarkar. (See Sarkar Dep. 349:20-350:3, 353:15-23.)

#### DISCUSSION

## I. Standard of Review

[HN2]A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

[HN3]The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. [*25] Celotex v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson, 477 U.S. at 248.

[HN4]To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. Summary judgment is designed to flush out those cases that are predestined to result in directed verdict. Lightfoot v. Union Carbide Corp., 110 F. 3d 898, 907 (2d Cir. 1997).

## II. The Clarke Summary Judgment Motion

[HN5]The statute of limitations for an FLSA overtime claim is two [*26] years, except that the limitations period is three years for a claim arising out of a "willful" violation. 29 U.S.C. § 255(a). The statute of limitations for an overtime claim under the NJWHL is also two years, with no exception for willful violations. See N.J.S.A. § 34:11-56a25.1; Genarie v. PRD Mgmt., Inc., No. 04 Civ. 2082, 2006 U.S. Dist. LEXIS 9705, at *61 (D.N.J. Feb. 17, 2006). A cause of action accrues at

"each payday following an allegedly unlawful pay period." Lee v. ABC Carpet & Home, 236 F.R.D. 193, 199 (S.D.N.Y. 2006).

It is undisputed that Clarke was reclassified as overtime eligible and began receiving overtime in August 2005, and continued receiving overtime through the end of his employment at JPM. The Complaint in this case was not filed until March 7, 2008, more than two years after Clarke began receiving overtime.

Plaintiffs "concede that Clarke's individual New Jersey overtime claims are time-barred, because he did not file this action within New Jersey's two-year statute of limitations." (Clarke Opp. at 10 n.4.) Clarke also effectively concedes that his FLSA claim is likewise time-barred unless the three-year statute of limitations for "willful" violations applies--he [*27] argues only that his FLSA claim is "timely for the period from March 7, 2005 (three years before filing the complaint) through the time he was reclassified in August 2005." (Id. at 10.) For the reasons set forth below, Clarke fails to raise any genuine issue about whether JPM's alleged FLSA violations were willful; thus, the ordinary two-year period applies, and Clarke's FLSA claim is time-barred.

In an attempt to somehow assert a timely claim, Clarke also argues--for the very first time--that he has an overtime claim under *New York* law, which provides for a six-year statute of limitations. That argument is improper and rejected.

## A. Clarke's FLSA Claim Is Time-Barred

[HN6]An employer willfully violates the FLSA only if it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988). "Reckless disregard . . . involves actual knowledge of a legal requirement, and deliberate disregard of the risk that one is in violation." Damassia v. Duane Reade, Inc., No. 04 Civ. 8819, 2005 U.S. Dist. LEXIS 9768, at *7 n.2 (S.D.N.Y. May 20, 2005) (Lynch, J.). A willful violation requires more than mere [*28] negligence. See id. ("[P]laintiffs must prove more than that defendant 'should have known' it was violating the law."); El v. Potter, No. 01 Civ. 6125, 2004 U.S. Dist. LEXIS 24447, at *15 (S.D.N.Y. Dec. 13, 2004) ("Willfulness cannot be found where the employer acted negligently or assumed in good faith, but incorrectly, that its conduct complied with the

FLSA."). Further, an employer does not willfully violate the FLSA even if it acted "unreasonably, but not recklessly, in determining its legal obligation." McLaughlin, 486 U.S. at 135 n.13; accord Reich v. Waldbaum, Inc., 52 F.3d 35, 39 (2d Cir. 1995). The employee bears the burden of proving willfulness. Young v. Cooper Cameron Corp., 586 F.3d 201, 207 (2d Cir. 2009); Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 141 (2d Cir. 1999).

In determining the meaning of the word "willful" in the FLSA statute of limitations, the McLaughlin Court looked to legislative history. The Court noted that in 1965, the Secretary of Labor had proposed expanding the coverage of the FLSA by replacing the two-year statute of limitations with a three-year period. McLaughlin, 486 U.S. at 132. Congress did not adopt that proposal; instead, in 1966, Congress [*29] enacted "the 3-year exception for willful violations." Id. The Supreme Court concluded that, [HN7]"The fact that Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations." Id.

Proof of willfulness requires a "factual showing" of an employer's knowing or reckless violation of the FLSA. See Saunders v. City of N.Y., 594 F. Supp. 2d 346, 358 (S.D.N.Y. 2008). An FLSA plaintiff seeking to invoke the three-year limitations period cannot survive a motion for summary judgment unless he "make[s] a competent demonstration that there [is a] trial worthy issue as to whether [the employer] 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" See Lopez v. Corporacion Azucarera de P.R., 938 F.2d 1510, 1515-16 (1st Cir. 1991) (quoting McLaughlin, 486 U.S. at 133).

For example, in Gustafson v. Bell Atlantic Corp., 171 F. Supp. 2d 311 (S.D.N.Y. 2001), the plaintiff-employee alleged that Bell Atlantic had "intentionally misclassified him as an independent contractor [*30] instead of an employee in order to deny him overtime pay." Id. at 316. Defendants moved for summary judgment on the FLSA claims that had accrued more than two years before the complaint was filed; plaintiff countered that the three-year statute of limitations should apply. See id. at 318, 322-23. Judge Conner concluded that "plaintiff [did] not offer sufficient

evidence to carry his burden of proving a willful or reckless violation of the FLSA." Id. at 323. Plaintiff "only speculate[d] that [Bell Atlantic] willfully attempted to conceal plaintiff's eligibility for overtime pay," but there was "nothing in the record to support this allegation." Id. "Similarly, plaintiff offered no credible evidence to support his argument that defendants were reckless in failing to determine whether plaintiff was eligible for overtime pay under the FLSA." Id. at 323-24. Judge Conner held that "[p]laintiff's FLSA claim is therefore governed by the two-year statute of limitations," and granted defendants' motion. See id. at 324.

In Yourman v. Dinkins, 865 F. Supp. 154 (S.D.N.Y. 1994), plaintiffs alleged that their New York City agency employers had willfully denied them overtime, when plaintiffs clearly [*31] did not qualify as salaried employees and thus were overtime eligible. See id. at 156-58. In determining whether to apply the three-year limitations period to plaintiffs' claims, Judge Preska held that, "To carry their burden of proof on the issue of knowledge, plaintiffs must show that defendants maintained their time and leave policies with full awareness that doing so rendered the classification of plaintiffs as FLSA-exempt improper." Id. at 159.

The Yourman plaintiffs argued that defendants must have been aware of their noncompliance because their policies were "so plainly inconsistent with regulatory requirements for salaried status." Id. However, even if the unlawfulness of defendants' policies was "obvious, that alone is not sufficient to establish defendants' willfulness." Id. at 160. The fact that defendants "lacked a reasonable basis" to believe that their policies complied with the FLSA "will not support a finding [of] willful[ness]." Id. Judge Preska acknowledged that defendants had acted negligently and even unreasonably; but, "in the absence of any evidence that defendants actually perceived the illegality of maintaining their . . . policies," the violations stemming from [*32] those policies could not be labeled as willful. Id. Thus, the two-year statute of limitations governed plaintiffs' claims. Id. at 166; see, e.g., Bowrin v. Catholic Guardian Soc'y, 417 F. Supp. 2d 449, 476 (S.D.N.Y. 2006) (finding that "[defendant's] violations of the overtime provisions of the FLSA do not rise to the level of willfulness," as "Plaintiffs have not presented evidence that [defendant] knew it was violating the FLSA," and defendant had at least "ma[d]e some effort to ascertain whether it was entitled to an exemption"); Potter, 2004 U.S. Dist. LEXIS

24447, at *40 (holding that "the two year statute of limitations is applicable to Plaintiffs' FLSA claims" because "[n]o genuine issue of material fact exist[ed] as to whether the defendant's conduct was willful").

Here, Plaintiff Clarke has not raised any genuine issue about whether JPM's alleged noncompliance with the FLSA was willful. Indeed, Clarke references only *one* fact in support of his contention that the three-year limitations period should apply: his reclassification in 2005 as overtime eligible.

It is undisputed that, as a normal practice, JPM periodically reviews the exempt status of its employees to ensure they [*33] are classified consistent with FLSA requirements. In summer 2005, after a firm-wide examination of its employees' exemption status, JPM reclassified several different job titles as overtime eligible. Clarke was one of the employees reclassified.

None of the documents cited by Clarke in connection with the reclassification suggests that JPM's failure to pay him overtime before August 2005 was a willful violation of the FLSA. (See Decl. of Adam T. Klein in Supp. of Pls.' Opp. to Def.'s Clarke Summ. J. Mot., June 30, 2009 ("Klein Clarke Decl."), Exs. A-C, F.) To the contrary, the internal JPM emails and memoranda cited by Clarke suggest that the reclassification was a good-faith effort to ensure that its classification of IT employees complied with the FLSA--and that the reclassification was likely a conservative measure adopted at a time when FLSA collective action overtime lawsuits were becoming more and more common. Simply put, even viewed in the light most favorable to Clarke, the reclassification is not evidence that JPM's alleged violation of the FLSA was knowing or reckless. In fact, the documents do not even give rise to the inference that JPM acted negligently or unreasonably, [*34] and neither negligence nor unreasonableness constitutes willfulness for FLSA purposes. See McLaughlin, 486 U.S. at 135.

There is little case law touching upon whether an employer's reclassification of an employee can constitute evidence of willfulness. This is likely because the argument is rarely advanced. After all, FLSA [HN8]collective action overtime suits are often *prompted* by a reclassification; if the mere fact of a reclassification were enough to trigger the exceptional three-year limitations period, it would cease to be an exception. That is clearly not what Congress intended when it passed the two-tiered statute of limitations in 1966. See id. at 132.

In one relevant decision from the Eastern District of Louisiana, the court held that "defendant's reclassification of plaintiff as an hourly employee and its payment of back overtime pay after [a] Department of Labor audit is not evidence that defendant willfully violated the FLSA." Gettridge v. Civic Ctr. Site Dev. Co., LLC, No. 01 Civ. 2434, 2002 U.S. Dist. LEXIS 2426, at *8 (E.D. La. Jan. 29, 2002). Here, JPM's reclassification of Clarke as overtime eligible similarly does not constitute evidence that JPM willfully violated the [*35] FLSA by classifying him as exempt in the first place.

Clarke presents no other evidence in support of his contention that the three-year limitations period should apply. Other than the four reclassification-related paragraphs in his thirty-five paragraph Rule 56.1 Statement of Additional Material Facts, not a single paragraph is directed to the issue of willfulness. Moreover, even the four paragraphs related to the reclassification are plainly intended to show that the reclassification is evidence that Clarke was, in fact, overtime *eligible--not* that JPM's conduct prior to reclassification was *willful*, in that it knowingly or recklessly was misclassifying him. Instead, Clarke's Rule 56.1 Counterstatement and his brief are devoted almost entirely to showing that Clarke's job duties place him outside the scope of the potentially applicable FLSA exemptions. But without a timely claim, that is all for nought.

Clarke cites two cases in support of his assertion that JPM's alleged FLSA violations were willful. Neither case is at all analogous to this one.

In Yang v. ABCL Corp., 427 F. Supp. 2d 327 (S.D.N.Y. 2005), the defendant, the owner of a jewelry store, "repeatedly stated that he knew that [*36] he was required to pay the overtime premium for all hours worked in excess of 40 per week." Id. at 331, 337. Yet, "Despite [defendant's] knowledge of the law's requirement that employees be paid an overtime premium," he refused to pay overtime to plaintiff, who worked weekends and extended hours nearly every day of the week. Id. at 336-37. Judge Sand found that "Such conduct defines a willful violation," and applied the three-year statute of limitations. Id. at 338.

The other case cited by Clarke, Chao v. Vidtape, Inc., 196 F. Supp. 2d 281 (E.D.N.Y. 2002), was an enforcement action brought by the Department of Labor ("DOL") against two related Long Island videotape

companies and the three family members who ran them. See id. at 284. The defendants "admitted that they had knowledge of the minimum wage and overtime laws," and one of the defendants had held "a meeting and told his employees to lie [to DOL investigators] about their wages and hours worked." Id. at 295. Not surprisingly, the court concluded that defendants had willfully violated the FLSA.

Here, in stark contrast to Yang and Chao, the merits of Plaintiffs' FLSA claims turn on whether the nature of the specific job duties [*37] of certain employees in JPM's IT department render them overtime exempt. This is not a case, unlike Yang and Chao, where a small business owner is fully aware that he is required to pay overtime to his obviously eligible employees, and simply refuses to do so.

More generally, both Yang and Chao--like other cases in this Circuit that have found willfulness, or at least a triable issue as to willfulness--demonstrate only that Clarke might have been able to invoke the three-year statute of limitations *if* he had presented evidence of similarly culpable conduct by JPM. See, e.g., Young, 586 F.3d at 203-04, 207-08 (affirming district court's finding of willfulness where employer had extensively analyzed the FLSA's overtime provisions and then intentionally "hir[ed] [plaintiff] into the exempt . . . position instead of the nonexempt . . . position in order to avoid paying him overtime, even though his responsibilities did not change based on the different titles"); Kaur v. Royal Arcadia Palace, Inc., 643 F. Supp. 2d 276, 294 (E.D.N.Y. 2007) (concluding that "[w]hether Defendants acted willfully in violating the FLSA [was] a question of fact for the jury" because "Plaintiffs adduced evidence [*38] that they had complained to Defendants that Plaintiffs had not received their wages").

Clarke has made no such factual showing here. He has not raised any genuine issue about whether JPM *willfully* violated the FLSA's overtime provisions. Thus, the two-year statute of limitations governs Clarke's FLSA claim, the claim is barred, and JPM is entitled to summary judgment. Cf. Damassia, 2005 U.S. Dist. LEXIS 9768, at *4 (noting that [HN9]question of willfulness, absent genuinely disputed issues of fact, is properly decided on summary judgment).

**B. Clarke's Attempt to Assert a New York Claim Fails**

In a last-ditch effort to assert a timely claim, Clarke,

in a footnote in his opposition brief, argues for the first time that he falls within the putative *New York* Class represented by Plaintiff Sarkar. (Clarke Opp. at 10 n.4.) The Court rejects Clarke's purported New York claim on two grounds.

First, it is well established that [HN10]a "party cannot contradict its own pleading with affidavits." Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003). "[T]he allegations in the [complaint] are 'judicial admissions' by which [plaintiff is] 'bound [*39] throughout the course of the proceeding.'" See id. (quoting Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523, 528-29 (2d Cir. 1985) (holding that district court, on summary judgment motion, had "properly disregarded [plaintiff's] affidavits seeking to controvert its own pleading")); see also Soo Line R.R. v. St. Louis S.W. Ry., 125 F.3d 481, 483 (7th Cir. 1997) ("[J]udicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible.").

Here, the Complaint alleges that "Clarke was employed by Defendant in *New Jersey* from approximately 2000 until May 2007," and names Clarke as the representative of the putative New Jersey Class. (Compl. PP 9, 27-28 (emphasis added).) Plaintiff Sarkar represents the putative New York Class, whose members must have been "employed by Defendant in the State of *New York* within the last six (6) years." (Id. PP 29-30 (emphasis added).) Thus, Clarke pled himself out of the New York Class. Now, in his declaration submitted in opposition to summary judgment, Clarke claims that, "From roughly July, 2003 to January, 2004, [he] worked at one of [JPM's] facilities [*40] in Long Island, New York." (Decl. of Andrew Clarke, June 30, 2009, P 3.) The Court declines to consider that assertion, as it flatly contradicts what Clarke unequivocally alleged in his pleading.

Second, [HN11]"Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that 'it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.'" Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) (quoting Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 170 F.R.D. 111, 119 (S.D.N.Y. 1997)) (collecting cases).

Clarke does not argue that he pled a New York claim; instead, he inappropriately attempts to raise a New York claim for the first time in his brief in opposition to summary judgment. Allowing Clarke to assert a New York claim would unquestionably prejudice JPM, as it would be forced to litigate the nature of Clarke's pre-2005 job duties (as a result of the NYLL's six-year statute of limitations). Clarke's pre-2005 job responsibilities were not the subject of the fact discovery that has been closed since March 2009.

For both of the reasons stated [*41] above, the Court rejects Clarke's eleventh-hour attempt to assert a New York claim. Because his New Jersey and FLSA claims are time-barred, the Court grants JPM's motion for summary judgment on the claims of Plaintiff Clarke.

### III. The Sarkar Summary Judgment Motion

Plaintiff Sarkar's claims are timely, but they fail for a different reason: Sarkar was exempt from FLSA and NYLL overtime requirements under the computer employee exemption.

### A. FLSA Statutory Framework

[HN12]Under the FLSA, employees must be compensated for every hour worked over forty per week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). However, the FLSA provides that certain categories of employees are exempt from its overtime requirements. JPM argues that Sarkar falls within one or more of the following exemptions: the "administrative" employee exemption, 29 U.S.C. § 213(a)(1), the "computer" employee exemption, 29 U.S.C. § 213(a)(17), the "combination" exemption, 29 C.F.R. § 541.708 and, for 2007 only, the "highly compensated" employee exemption, 29 C.F.R. § 541.601. (See Def.'s Sarkar Mem. at 1-2, 24.) [7]

> 7    Sarkar's NYLL claim is also subject to the FLSA exemptions [*42] in 29 U.S.C. § 213. See N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 [HN13](expressly providing that New York's overtime requirement is "subject to the exemptions of sections 7 and 13 of 29 U.S.C. § 201 et seq., the Fair Labor Standards Act of 1938"); see also Topo v. Dhir, No. 01 Civ. 10881, 2004 U.S. Dist. LEXIS 4134, 2004 WL 527051, at *3 (S.D.N.Y. Mar. 16, 2004) ("There is general

support for giving FLSA and the New York Labor Law consistent interpretations."). Sarkar does not dispute that if he is exempt under the FLSA's administrative or computer employee exemptions, he is also exempt from the NYLL's overtime provisions.

[HN14]"Because the FLSA is a remedial law, [courts] must narrowly construe its exemptions." Reiseck v. Universal Comm'ns of Miami, Inc., 591 F.3d 101, 104 (2d Cir. 2010) (citing Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S. Ct. 453, 4 L. Ed. 2d 393 (1960)). "The employer has the burden of proving that the employee clearly falls within the terms of the exemption." Young v. Cooper Cameron Corp., 586 F.3d 201, 204 (2d Cir. 2009).

[HN15]Whether an employee is exempt from FLSA overtime coverage is a "mixed question of law and fact." Downes v. J.P. Morgan Chase & Co., No. 03 Civ. 8991, 2007 U.S. Dist. LEXIS 36677, at *33 (S.D.N.Y. May 16, 2007) [*43] (Lynch, J.) (citing Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S. Ct. 1527, 89 L. Ed. 2d 739 (1986)). "The question of how the [employee] spent [his] working time . . . is a question of fact." Icicle Seafoods, 475 U.S. at 714. "The question whether [his] particular activities excluded [him] from the overtime benefits of the FLSA is a question of law . . . ." Id. Thus, "The ultimate question of a particular worker's exemption, based on factual findings as to [his] actual work activities, requires a conclusion of law." Downes, 2007 U.S. Dist. LEXIS 36677, at *33 (citing Freeman v. Nat'l Broadcasting Co., Inc., 80 F.3d 78, 82 (2d Cir. 1996)).

### B. The Computer Employee Exemption

[HN16]Under 29 U.S.C. § 213(a)(17), the FLSA exempts from its overtime requirements "any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty" is:

> (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

> (B) the design, development, documentation, analysis, creation, testing,

or modification of computer systems or programs, including prototypes, [*44] based on and related to user or system design specifications;

(C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or

(D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $ 27.63 an hour.

29 U.S.C. § 213(a)(17).

[HN17]The term "primary duty" means the employee's "principal, main, major or most important duty." 29 C.F.R. § 541.700 (defining "primary duty" for purposes of executive, administrative, professional, computer and outside sales employee exemptions). [8] In determining an employee's primary duty, courts look to "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700. The amount of time an employee spends performing exempt work can be a "useful guide" in determining whether his primary duty consists of exempt work. Id. "[E]mployees [*45] who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." Id.

8 Congress has never defined numerous terms--such as "primary duty"--used in the FLSA exemptions. With respect to the "executive, administrative, or professional" exemption of § 213(a)(1), Congress has directed the Secretary of Labor to define such terms through notice-and-comment rulemaking; regulations so issued carry the force of law and warrant deference unless arbitrary, capricious, or manifestly contrary to the purpose of the statute. See 29 U.S.C. § 213(a)(1); Freeman, 80 F.3d at 82 (citing Chevron v. Natural Res. Defense Council, Inc., 467 U.S. 837, 843-44, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)). However, with respect to the "computer" exemption of § 213(a)(17), the DOL itself has acknowledged some ambiguity as to its

rulemaking authority--the statutory text, in contrast to that of § 213(a)(1), does not specifically provide for such rulemaking. See Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,159 (Apr. 23, 2004). Here, as both parties rely in their papers on the DOL regulations interpreting [*46] the FLSA exemptions, this Court takes such regulations as instructive authority, Cf. Downes, 2007 U.S. Dist. LEXIS 36677, at *35 n.9.

[HN18]The computer employee exemption applies to a "computer systems analyst, computer programmer, software engineer, *or other similarly skilled worker.*" 29 U.S.C. § 213(a)(17) (emphasis added). Thus, an employee's job *duties*, not his job *title*, determine whether the exemption applies. 29 C.F.R. § 541.400 ("Because job titles vary widely and change quickly in the computer industry, job titles are not determinative of the applicability of [the computer employee] exemption."); 69 Fed. Reg. at 22,160 ("Where the prescribed duties tests are met, the [computer] exemption may be applied regardless of the job title given to the particular position.").

In order to properly delineate the scope of the computer employee exemption, it is necessary to briefly consider its unique legislative and regulatory history. In 1990, Congress directed the DOL to issue regulations allowing certain computer services personnel to qualify as exempt professional employees under § 213(a)(1). See Pub. L. No. 101-583, § 2, 104 Stat. 2871 (1990); see also 69 Fed. Reg. at 22, 159-60 (describing [*47] legislative and regulatory history of computer employee exemption). In 1991, the DOL implemented that legislation in 29 C.F.R. § 541, which contains the regulations that apply the § 213(a) exemptions. See 69 Fed. Reg. at 22,159.

However, in 1996, Congress revisited the issue and created a separate statutory exemption for computer employees, § 213(a)(17). See Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 2105, 110 Stat. 1755, 1929 (codified at 29 U.S.C. § 213(a)(17)). The new exemption contained "*most--but* not *all--of* the [DOL's] regulatory language" comprising the old computer employee exemption under § 213(a)(1). See 69 Fed. Reg. at 22,159.

[HN19]"[T]he exemption in Section 213(a)(17)

broadened the coverage of computer services personnel from that included in the prior Section 213(a)(1) computer professional exemption and the 1991 DOL regulations in three significant ways." Bobadilla v. MDRC, No. 03 Civ. 9217, 2005 U.S. Dist. LEXIS 18140, at *19 n.5 (S.D.N.Y. Aug. 24, 2005). Perhaps most notably, "it eliminated the requirement that the employee's work require the exercise of independent judgment and discretion." Id. It also "eliminated any reference to educational requirements," [*48] and dispensed with the requirement that the employee must "have achieved a level of proficiency in the theoretical and practical application of a body of highly specialized knowledge." Id. (internal quotations and citations omitted).

## C. Sarkar Qualifies as an Exempt Computer Employee

Plaintiff Sarkar falls squarely within the computer employee exemption. As shown by the facts set forth above, supra at Background III.C, Sarkar's "primary duty" consisted of a combination of the computer functions described in subparagraphs (A), (B) and (C) of § 213(a)(17).

Before being hired by JPM, Sarkar earned two technical certifications, as a CNE and MCSE. Sarkar attended a ten-month course and passed about seven exams to obtain his CNE, which enables its holders to "solve advanced company-wide support problems and high-level network problems." (See Morway Sarkar Aff. Ex. A-1.) While at JPM, Sarkar served as a Senior Technology Officer, Distributed Computing Engineer and Technology Operations Analyst, and spent almost all of his working time on the computer.

As part of his capacity management and NDPS remediation work, which accounted for the majority of his time, Sarkar consulted with users--JPM's [*49] LOBs--to determine hardware, software or system functional specifications. Sarkar regularly consulted with LOBs about the impact that implementing a particular capacity remediation plan would have on the business. For example, in connection with data migrations, Sarkar consulted with the LOB client about numerous technical issues, including the number of login scripts at issue, whether there were any hard-coded databases, and the LOB's future capacity needs. When Sarkar drafted NDPS remediation plans regarding whether certain printers could be moved off data servers onto EDG boxes, Sarkar consulted with the LOB client about the printing infrastructure at the site in question.

As the employee responsible for capacity management in the Northeast region--about fifty to sixty physical servers and 1,500 virtual servers affecting more than 10,000 users--Sarkar analyzed computer systems based on and related to user or system specifications. For example, in developing disk space remediation plans, such as the plan he drafted for JPM's data centers in New York City and Brooklyn, Sarkar analyzed numerous factors, including the space available on the current frame, the clusters that the frame [*50] was connected to, future frame growth, frame decommission, SRDF needs and the viability of moving between frames. Sarkar has also identified the need to add data servers to JPM's infrastructure.

When P1, P2 and other "difficult" and "critical" server issues were escalated to Sarkar, he analyzed the JPM system to identify the "root cause" of the problem, and then devised a solution. In addition, Sarkar proactively identified issues in the system, thereby preventing potential P1 and P2 situations. He has also identified areas for improvement in authentication performance and directory communications.

Sarkar's job duties also included testing software and products in a live environment and then giving feedback to the engineering department. For example, as part of his work on the backup migration project, Sarkar tested new versions of the NetBackup software, and discovered storage issues.

While at JPM, Sarkar drafted documentation for JPM's desktop support personnel, which was intended to enable the desktop support team to resolve relatively straightforward problems, so that only more complicated, server-related issues would be escalated to Sarkar. Sarkar also edited and updated another [*51] manual for the server support team, and is currently listed as the author of that document.

In sum, Sarkar's testimony and the other evidence before the Court show that Sarkar spent the majority of his time at JPM performing a combination of the functions specified in § 213(a)(17). Thus, he is exempt from the FLSA's overtime requirements.

One of the very few cases in this or any other district to squarely address the FLSA's computer employee

exemption, Bobadilla v. MDRC, No. 03 Civ. 9217, 2005 U.S. Dist. LEXIS 18140 (S.D.N.Y. Aug. 24, 2005), is on point. In that case, as here, plaintiff Bobadilla alleged that his former employer, defendant MDRC, had violated the FLSA by failing to pay him overtime. Id. at * 1. MDRC moved for summary judgment, arguing that Bobadilla was exempt as a computer employee under § 213(a)(17), and as an administrative employee under § 213(a)(1). Id. Judge Koeltl granted MDRC's motion, finding that, "In view of all the evidence, Bobadilla performed highly-skilled work on MDRC computer systems and is an exempt computer employee." Id. at *29.

In reaching that conclusion, Judge Koeltl considered Bobadilla's technical certification. Bobadilla "held a certificate issued [*52] by Cisco Systems . . . , which entitled him to designation as a Cisco Certified Network Associate ('CCNA')." Id. at *6. Referring to Cisco's website--just as JPM has referenced Novell's website with regard to Sarkar's CNE certification--Judge Koeltl noted that the CCNA equips its holder with "important knowledge and skills necessary to select, connect, configure, and troubleshoot the various CISCO networking devices." See id. at *7 n.3. Thus, Bobadilla "held a valuable Cisco CCNA credential that would allow him to develop computer systems based on user specifications." Id. at *22.

Bobadilla testified that he was a member of the networking team, and that he was referred to as a "Network Administrator." See id. at *7 n.2. As at JPM, MDRC's IT department also included lower-level helpdesk employees, See id. at *12. Bobadilla "was paid in excess of $ 75,000 per year, substantially more than the approximately $ 43,000 typically paid to Help Desk personnel." Id. at *22. Here. Sarkar's annual compensation ranged from $ 78,850 to $ 101,932, and it is undisputed that he, like Bobadilla, was not a member of the helpdesk.

Bobadilla's duties at MDRC included, inter alia, "Network Administration [*53] in the Novell . . . environment"; the "analysis [of] existing network resources and determination [that] an underutilization existed"; and "resolving a problem with MDRC's [Virtual Private Network], which required the plaintiff to use trial and effort to mix and match various commands" and "a thorough understanding of the physical devices involved, their operating systems, and the logical protocols demanded by each." Id. at *24-27 (internal quotations

and citations omitted). Bobadilla was also involved in the introduction of new backup software, as well as a server upgrade project. See id. at *27-29. Thus, in Bobadilla, as here, "plaintiff's primary duties included a combination of the duties covered in 29 U.S.C. § 213(a)(17)." Id. at *22.

Critically, Judge Koeltl rejected Bobadilla's contention "that he spent most of his time performing Help Desk functions." Id. In other words, the court rejected precisely the tactic that Sarkar has employed here--denigrating his duties to make it appear as if he primarily performed lower-level, helpdesk functions. Judge Koeltl concluded, based on Bobadilla's own testimony and pre-litigation documents (including resumes and performance evaluations), [*54] that "Bobadilla was principally of value to MDRC because he had sophisticated knowledge of computing that went beyond that of a non-exempt Help Desk employee." Id. The Court reaches the same conclusion here--Sarkar, like Bobadilla, qualifies as an exempt computer employee under § 213(a)(17).

In opposition to JPM's motion, Sarkar strains to fit his job duties within the contours of authority applicable to lower-level technology personnel. As in Bobadilla, that attempt fails.

First, Sarkar cites 29 C.F.R. § 541.401, in which the DOL states that the computer exemption

> does not include employees engaged in the manufacture or repair of computer hardware and related equipment [or] whose work is highly dependent upon, or facilitated by, the use of computers and computer software programs (e.g., engineers, drafters and others skilled in computer-aided design software), but who are not primarily engaged in computer systems analysis and programming or other similarly skilled computer-related occupations.

Tapas Sarkar does not "manufacture" computer equipment, and he is not a repairman. Nor is he someone whose occupation is merely "dependent upon, or facilitated by, the use of computers." Instead, [*55] as established above, he was "primarily engaged" in the skilled, computer-related functions that render him exempt under § 213(a)(17). Thus, 29 C.F.R. § 541.401 is

plainly inapplicable.

Sarkar also points to four DOL opinion letters from 1999, 2001 and 2006, each of which concluded that the employee described by the seeker of the opinion would not be exempt from the FLSA's overtime requirements. The Court finds these opinion letters wholly unpersuasive.

The most recent opinion letter concerned a "Help Desk Support Specialist." See DOL Wage & Hr. Op. Ltr., FLSA 2006-42, 2006 DOLWH LEXIS 56, *2, Oct. 26, 2006. It is undisputed that Sarkar did not work on JPM's helpdesk.

Similarly, the DOL opinion letter dated August 19, 1999 concerned "customer training consultants (CTCs)," who were "paid a salary of approximately $ 26,000 to $ 27,000," and whose duties consisted of training customers on computer software, modifying basic settings--for example, "toolbars"--to meet customer needs, installing, debugging and troubleshooting, testing customers' modems, and conducting customer follow-up visits to ensure customer satisfaction. See 1999 DOLWH LEXIS 88, 1999 WL 1788144. This is hardly a description of Sarkar's job duties at JPM. Sarkar [*56] was responsible, inter alia, for ensuring that servers affecting more than 10,000 JPM users in the Northeast region had sufficient storage capacity, and spent much of his time developing disk space remediation plans for JPM's LOBs. He spent little of his time doing installation and when he was troubleshooting, he was analyzing critical, complex P1 and P2 issues that had been escalated by lower-level units in JPM's IT department.

The third DOL opinion letter, dated November 5, 1999, concerned an employee who "oversees other [IT] personnel; performs . . . installations, tuning [and] troubleshooting . . .; maintains assigned priorities and prepares status reports; schedules work pertaining to network problems and software upgrades; assists the User Support Manager with training and mentoring of staff; and researches and assists the User Support Manager with network problem solving." 1999 DOLWH LEXIS 122, 1999 WL 33210907. Once again, this DOL opinion letter applies to lower-level, less skilled computer work than that performed by Sarkar.

The fourth DOL opinion letter, dated May 11, 2001, concluded that an employee whose primary duty "appears" to be "identify[ing] computer solutions to fit the need of a variety [*57] of local businesses," would not fall within the computer employee exemption. See 2001 DOLWH LEXIS 4, 2001 WL 1558967. Thus, this opinion letter, like the other three, does not apply to an employee with Sarkar's job duties. Further, the Court notes that the May 11, 2001 opinion letter contains little analysis, is "[b]ased on . . . limited information" and was issued "to assist [the seeker of the opinion] in writing a paper for class." Id.

In short, the four DOL opinion letters cited by Sarkar are inapposite. To the extent they provide even a modicum of support for Sarkar's position, they are unpersuasive. See Christensen v. Harris County, 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000) (holding that interpretations in opinion letters "do not warrant Chevron-style deference," and "are entitled to respect . . . but only to the extent that those interpretations have the power to persuade" (internal quotations and citation omitted)).

Finally, Sarkar points to two court of appeals decisions, Bohn v. Park City Group, Inc., 94 F.3d 1457 (10th Cir. 1996), and Martin v. Indiana Michigan Power Co., 381 F.3d 574 (6th Cir. 2004). In light of the absence of any Second Circuit authority on the scope of the computer employee exemption under § 213(a)(17), [*58] the Court feels compelled to address them.

In Bohn, the Tenth Circuit considered the *old* computer professional exemption under § 213(a)(1), *not* § 213(a)(17)'s new computer employee exemption. See 94 F.3d at 1461. As explained above, Congress broadened the scope of the exemption for computer employees when it passed § 213(a)(17). In reversing the district court's grant of summary judgment for the defendant-employer, the Bohn court expressly found factual issues concerning the level of plaintiff's education, "whether plaintiff's primary duty required theoretical and practical application of highly specialized knowledge" and whether his "work involve[d] consistent exercise of discretion and judgment." See id. at 1462-64 (internal quotations and citation omitted). Section 213(a)( 17) eliminated all three of those requirements from the computer employee exemption. See Bobadilla, 2005 U.S. Dist. LEXIS 18140, at *19 n.5. Further, the Bohn plaintiff was a "technical writer" who earned $ 47,000. Bohn, 94 F.3d at 1460; regardless of whether he would fall within the scope of § 213(a)(17)'s computer exemption, his job duties were not analogous to those of

Sarkar. Thus, Bohn is inapposite on multiple [*59] levels.

Martin, too, was decided under the narrower computer professional exemption of § 213(a)(1). See 381 F.3d at 579. In any event, the plaintiff in Martin, unlike Sarkar, performed classic helpdesk functions--his primary duties consisted of "respond[ing] to . . . help desk tickets," "install[ing] software, such as Microsoft's Office 97, on individual workstations," "troubleshoot[ing] Windows 95 problems," "configuring desktops, checking cables [and] replacing parts." See id. at 577, 580; see also Bobadilla, 2005 U.S. Dist. LEXIS 18140, at *30 n.8 (distinguishing the Martin plaintiff's duties as "closer to those of a Help Desk employee . . . rather than to Bobadilla's duties as a Network Administrator"). Thus, Martin, like Bohn, has no application here.

In the end, Sarkar's own testimony and the pre-litigation documents before the Court clearly establish that he falls within § 213(a)(17)'s computer employee exemption. Indeed, if Tapas Sarkar--who, by his own admission, was the NDPS "guru" and "the 'go-to' person for capacity management in the Northeast region"--does not qualify as a JPM computer employee, it is difficult to imagine who, other than, perhaps, a computer programmer, [*60] would.

### D. Sarkar Cannot Rely on His Reclassification

Sarkar argues that by reclassifying him as overtime eligible in 2008, JPM "has admitted that Mr. Sarkar was not exempt from overtime." (Pls.' Mem. in Opp. to Def.'s Sarkar Summ. J. Mot., May 14, 2009, at 10.) That argument fails.

It is undisputed that in January 2008, JPM reclassified more than 635 technology employees--including Sarkar--holding a wide array of job titles. (Goodrich Decl. P 4.) JPM states that, "in an environment in which its competitors and other employers saw an ever increasing number of class and collective action overtime lawsuits," it was "act[ing] conservatively by treating employees who were exempt from overtime under the law as eligible for overtime." (Def.'s Reply Br. in Supp. of Sarkar Summ. J. Mot., June 1, 2009, at 2 (internal citation omitted).) Pursuant to DOL regulations, an employer does not lose an exemption by paying overtime to an exempt employee. See 29 C.F.R. § 541.604(a).

The January 2008 reclassification is not materially relevant to the determination of whether Sarkar falls within the computer employee exemption. As noted above, a significant percentage of these FLSA overtime suits are triggered [*61] by such reclassifications--the mere fact that an employee was reclassified cannot establish an employer's liability for the period prior to the reclassification. Sarkar does not cite a single case suggesting otherwise.

Instead, [HN20]the exempt status of a given employee depends upon an analysis of the employee's *job duties*. See 29 C.F.R. § 541.2 ("The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the [exemption]."); Liger v. New Orleans Hornets NBA Ltd. P'ship, No. 05 Civ. 1969, 2008 U.S. Dist. LEXIS 9098, at *7 (E.D. La. Feb. 6, 2008) (finding that "evidence of the [defendant's] post-lawsuit compliance with the FLSA is not relevant to determining whether the [defendant] can claim the exemption during the period of time before the lawsuit was filed"); Mike v. Safeco Ins. Co. of Am., 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (holding, in denying plaintiff's motion for collective action certification, that "[t]he fact that Safeco decided to re-classify all Claims Representatives, including all Field Claims Representatives, does not provide the necessary common thread," and that "[t]he [*62] merits of [plaintiff's] claim will turn upon evidence relating to [his] day-to-day tasks, and not upon any Safeco company policy or decision"); Black v. Comdial Corp., No. 92 Civ. 81, 1994 U.S. Dist. LEXIS 2457, at *7-10 (W.D. Va. Feb. 15, 1994) (finding administrative exemption inapplicable to plaintiff based on analysis of his job duties, not because defendant had reclassified plaintiff's position as nonexempt after a DOL audit).

Here, as discussed above, Sarkar's job duties place him within the computer employee exemption. The mere fact of the January 2008 reclassification is not enough to raise a genuine issue regarding his exempt status.

In sum, the Court finds that JPM is entitled to summary judgment on the claims of Plaintiff Sarkar because he is in fact exempt under § 213(a)(17)'s computer employee exemption. Accordingly, the Court need not reach JPM's other asserted bases for exemption. See Bobadilla, 2005 U.S. Dist. LEXIS 18140, at *29-30 ("Because the plaintiff is an exempt computer employee

under Section 213(a)(17), it is unnecessary to reach the defendant's additional argument that the plaintiff is an exempt administrative or professional employee under 29 U.S.C. § 213(a)(1).").

### E. [*63] Sarkar's Rule 56(f) Application

In a final attempt to stave off summary judgment, Sarkar submits a Rule 56(f) affidavit with his opposition papers, asking the Court to delay ruling on JPM's motion so that he can depose two of JPM's declarants and obtain additional "training and supervision documents." (Klein 56(f) Decl. P 27.) Sarkar's Rule 56(f) application is denied as procedurally improper and substantively meritless.

### 1. Sarkar's Rule 56(f) Application Is Procedurally Improper

[HN21]Under Rule 56(f), "If a party opposing the [summary judgment] motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." Fed. R. Civ. P. 56(f).

However, it is well established that Rule 56(f) "applies to summary judgment motions made before discovery is concluded." RSL Comm'ns PLC v. Bildirici, 649 F. Supp. 2d 184, 221 (S.D.N.Y. 2009) (quoting McAllister v. N.Y. City Police Dep't, 49 F. Supp. 2d 688, 696 n.5 (S.D.N.Y. 1999)); accord Espada v. Schneider, 522 F. Supp. 2d 544, 549 (S.D.N.Y. 2007) [*64] (denying plaintiff's Rule 56(f) application because "[t]he relief that may be afforded under Rule 56(f) is not available when summary judgment motions are made after the close of discovery").

Here, as Sarkar acknowledges, fact discovery for the instant motions closed on January 15, 2009, and the period for depositions ended on February 27, 2009. (Klein 56(f) Decl. PP 8-9.) Magistrate Judge Freeman set these discovery deadlines with all parties knowing that JPM would be moving for summary judgment about a month after the end of depositions. (See Docket No. 32 (Order, Oct. 24, 2008).) Discovery was "targeted" for Plaintiffs' collective action certification motion, and for "Defendant's motion for summary judgment on the merits of Plaintiffs' individual claims." (See id.; Klein 56(f)

Decl. P 6.) Now, four months after the close of fact discovery, and more than two months after the end of depositions, Sarkar seeks a reprieve under Rule 56(f). Such relief is not available to Sarkar at this late stage.

Further, Sarkar's Rule 56(f) application seeks discovery expressly denied by Magistrate Freeman. On April 6, 2009, more than a month after the close of discovery, Plaintiffs sent a letter to [*65] Magistrate Freeman requesting that she compel additional discovery. (Klein 56(f) Decl. Ex. J.) On April 27, 2009, Magistrate Freeman held a hearing to resolve the dispute.

During that hearing, Magistrate Freeman repeatedly noted the dilatory nature of Plaintiffs' requests. (See, e.g., Aff. of Debra Morway in Supp. of Def.'s Reply to Pl. Sarkar's Rule 56(f) Aff., June 1, 2009 ("Morway 56(0 Aff."), Ex. C (Hr'g Tr., Apr. 27, 2009 ("4/27/09 Tr.")), at 8:8-9, 47:6-14, 96:12-19.) Nevertheless, Magistrate Freeman granted Plaintiffs additional electronic discovery relating to the training and supervision of Clarke and Sarkar, and directed the parties to agree on search terms and time limits. (See id. 56:9-57:14.) The parties reached an agreement on May 6, 2009 (see Morway 56(0 Aff. Ex. J (Joint Ltr. to Magistrate Freeman)), and JPM produced additional documents relating to Plaintiffs' training and supervision on May 12, 2009 (see id. Ex. K (JPM Cover Ltr. for Supplemental Production)).

With the exception of the additional electronic discovery discussed above, Magistrate Freeman denied Plaintiffs' requests at the April 27 hearing. (See 4/27/09 Tr. 99:9-10.) Magistrate Freeman instructed Plaintiffs [*66] that to obtain any further discovery, they would have to provide her with specifics regarding the item requested, why it was necessary to oppose summary judgment, when it was requested, how JPM responded to the request and, if the request was late, the burden on JPM to produce it. (See id. 99:9-100:11.) On April 30, Plaintiffs again wrote Magistrate Freeman, requesting, inter alia, that she order the depositions of two of JPM's declarants (and coworkers of Sarkar), Suresh Kumar ("Kumar") and Peter MacDonald ("MacDonald"). (Klein 56(0 Decl. Ex. K.) On May 8, 2009, Magistrate Freeman denied Plaintiffs' request for those depositions. (Docket No. 54.)

Now, in his Rule 56(f) application, Sarkar again asks to depose Kumar and MacDonald. In other words, Sarkar seeks to relitigate a discovery issue already decided by

Magistrate Freeman. The Court sees no reason to disturb Magistrate Freeman's decision, particularly in light of the fact that the Court has not relied at all on the declarations of Kumar or MacDonald in reaching today's decision.

At the April 27 hearing, Magistrate Freeman predicted that "Judge McMahon would [not] be likely to smile upon [a Rule 56(f)] affidavit" because she would [*67] likely say where were you in the period Judge Freeman set." (4/27/09 Tr. 94:10-20.) That is exactly what this Court says now. Plaintiff Sarkar's Rule 56(f) application is denied.

## 2. Sarkar's Rule 56(f) Application Is Meritless

Even if Sarkar's Rule 56(f) application were procedurally proper, it is meritless. It is well established that a party resisting summary judgment on Rule 56(f) grounds "must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 303 (2d Cir. 2003) (internal quotations and citation omitted).

Sarkar fails to identify the facts he seeks or how they would create a genuine issue of material fact. Instead, he merely asks to depose Kumar and MacDonald "to test the meaning of their generalized statements in support of their employer's position," and to obtain additional "training and supervision documents" that "Plaintiffs believe will strongly support their opposition to [*68] summary judgment." (Klein 56(f) Decl. PP 22, 24.)

Moreover, as noted above, the Kumar and MacDonald declarations have played no part in the Court's decision to grant JPM's motion. The Court thus sees no reason to delay its decision so Sarkar can depose them.

As for training and supervision documents, they are relevant principally to the issue of whether Sarkar's work entailed "the exercise of discretion and independent judgment," a requirement for the *administrative* exemption of § 213(a)(1). As this opinion has made clear, [HN22]the computer employee exemption of § 213(a)(17) does *not* require the exercise of discretion and independent judgment. Thus, the Court does not see how forcing JPM to produce additional documents related to Sarkar's training and supervision could change today's result. Simply put, this decision is based primarily on Sarkar's own testimony, which clearly establishes that his job duties at JPM place him within the computer employee exemption. There is no reason to delay a decision on JPM's motion so Sarkar can depose two irrelevant witnesses and obtain additional documents that will not allow him to avoid summary judgment. Accordingly, Sarkar's Rule 56(f) application [*69] is denied on the merits.

## IV. Plaintiffs' Motion for Conditional Collective Certification Is Denied as Moot

As explained herein, JPM is entitled to summary judgment on the claims of both Plaintiffs Clarke and Sarkar. Thus, Plaintiffs' collective action certification motion is denied as moot. Cf. English v. Ecolab, Inc., No. 06 Civ. 5672, 2008 U.S. Dist. LEXIS 25862, at * 1 -2, 55 (S.D.N.Y. Mar. 31, 2008) (granting defendant's motion for summary judgment on plaintiffs' FLSA claims and thus not reaching plaintiffs' motion for conditional certification).

## CONCLUSION

For the reasons set forth above, the Court grants JPM's motions for summary judgment on the claims of Clarke and Sarkar. Plaintiffs' motion for conditional collective action certification is denied as moot. The Clerk of the Court is directed to remove Docket Nos. 37, 43 and 49 from this Court's list of pending motions, and to close this case.

Dated: March 26, 2010

/s/ Colleen McMahon

U.S.D.J.

**2**



Analysis
As of: Apr 17, 2013

RAYMOND F. DANIELS, III, Plaintiff, v. MICHIANA METRONET, INC. d/b/a
CENTENNIAL WIRELESS and CENTENNIAL COMMUNICATIONS, Defendant.

CIVIL NO. 1:09cv121

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
INDIANA, FORT WAYNE DIVISION

2010 U.S. Dist. LEXIS 43686

May 3, 2010, Decided
May 3, 2010, Filed

**SUBSEQUENT HISTORY:** Costs and fees proceeding at, Request granted, in part, Request denied by, in part, Objection granted by, in part, Objection denied by, in part Daniels v. Michiana Metronet, Inc., 2010 U.S. Dist. LEXIS 65856 (N.D. Ind., July 1, 2010)

**CORE TERMS:** salary, overtime, summary judgment, calculated, weekly, training, hours worked, workweek, hourly, acknowledgment, genuine, premium, inside, paid holiday, overtime pay, number of hours, hourly rate, fluctuating, non-moving, genuine issue, moving party, regular rate, mutual understanding, salaried, halftime, intranet, issue of material fact, material fact, work weeks, base salary

**COUNSEL:** [*1] For Raymond F Daniels, III, Plaintiff: Brian M Simpson, John S Bloom, LEAD ATTORNEYS, Shambaugh Kast Beck & Williams LLP, Fort Wayne, IN.

For Michiana Metronet Inc, doing business as Centennial Wireless, doing business as Centennial Communications, Defendant: Jeffrey B Halbert, Suzanne S Newcomb, LEAD ATTORNEYS, Stewart & Irwin PC, Indianapolis, IN.

**JUDGES:** William C. Lee, United States District Judge.

**OPINION BY:** William C. Lee

**OPINION**

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendant Michiana Metronet, Inc. d/b/a Centennial Wireless and Centennial Communications ("Centennial"), on February 1, 2010. The plaintiff, Raymond F. Daniels, III ("Daniels"), filed his response on March 1, 2010, to which Centennial replied on March 17, 2010.

For the following reasons, the motion will be granted.

Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, Rule 56(c) is not a requirement that the [*2] moving party negate his opponent's claim. Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate

time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." Id. In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could [*3] not lead a rational trier of fact to find for the nonmoving party." Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960, 104 S. Ct. 392, 78 L. Ed. 2d 336 (1983).

So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate [*4] citation to the record to which the moving party contends no genuine issues exist. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated. See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511. Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248. Irrelevant or unnecessary [*5] facts do not preclude summary judgment even when they are in dispute. Id. The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. Id. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagree-ment to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252. Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

Discussion

Centennial claims that the following background facts are undisputed. During the time period [*6] relevant to his Complaint, Daniels applied for employment with Centennial because it was a local business and he had heard from friends that it was a fair company and a good place to work. [1] Before he had even received a formal offer, one of those friends, Michael

Loveless, explained to Daniels that he would receive base pay plus commission and that he would be paid "halftime" for overtime work. [2] Daniels and Loveless worked together previously at Chase Bank. [3] At the time of this discussion, Loveless managed Centennial's Decatur store. [4] Loveless explained that Daniels' starting base pay would be $ 18,000 annually and that it would increase incrementally thereafter. [5] Loveless told Daniels he might be called upon to work mandatory overtime during the holiday season and that it was company policy to pay "halftime" not time and a half for overtime work. [6] Loveless suggested Daniels look for further explanation of Centennial's pay structure during his formal training course. [7] Daniels did not seek further clarification. [8]

1  Daniels Dep., pp. 6-11, 14, 19, 23.
2  Daniels Dep., pp. 19, 34-38.
3  Daniels Dep., p. 31.
4  Daniels Dep., p. 32.
5  Daniels Dep., p. 36-37.
6  Daniels Dep., p. 38.
7  Daniels Dep., [*7] p. 39.
8  Daniels Dep., p. 39.

By letter dated May 20, 2008, Centennial formally offered Daniels the position of Inside Sales Representative Trainee Level I. [9] The offer letter spelled out the basic pay structure, stating in relevant part:

> **Training Requirements**: New hires begin employment by attending three weeks of Sales Training at Centennial University in Fort Wayne, IN ....
>
> ****
>
> **Employment at Will**: As a condition of employment, you will be asked to sign and read our Associate Handbook, which explains "at will" employment, and to sign the Sales Compensation Plan, which describes how you will be paid, includes a non-disclosure agreement and confidentiality agreement.
>
> **Compensation**: You will receive a salary of $ 692.30 per pay period, which annualizes to $ 18,000. You are paid 26 times per year on a bi-weekly basis. In addition you will be paid a monthly commission, which is based on achieving the monthly quota.

The offer letter goes on to explain the details of and prerequisites for future, incremental salary increases. [10] Daniels read and accepted the offer by signing the letter on May 22, 2008. [11]

9  Daniels Dep., p. 33, Ex. 2.2.
10  Daniels Dep. Ex. 2.
11  Daniels Dep., pp. 33, 44.

Daniels began [*8] employment with Centennial on June 2, 2008. [12] He worked as a "shadow" his first week then attended three weeks of training. [13] Training Manager Mike Filson led Daniels' training class. [14] Filson told the class they would be paid "halftime" for overtime work. [15] The Centennial Associate Handbook, which was given to Daniels in hardcopy and formed the basis of his understanding of how he was paid, states: "Certain nonexempt positions (i.e. inside sales representatives) are paid overtime on a sliding scale." [16] Daniels understood the "sliding scale" reference to mean he was paid "halftime" for overtime work. [17] The Associate Handbook further directs employees to consult their "compensation agreement or manager for more details." [18]

12  Daniels Dep., p. 45.
13  Daniels Dep., p. 47-48; Filson Dep., p. 9.
14  Filson Dep., p. 4.
15  Daniels Dep., p. 50.
16  Daniels Dep., p. 51, 58-59; Ex. 4, p. 18.
17  Daniels Dep., p. 59.
18  Daniels Dep., p. 60, Ex. 4, p. 18.

Centennial's Sales Compensation Plan was electronically presented to Daniels and the others in his training class. [19] Employees are given as much time as is necessary to read the document and ask any questions they might have, and then they must acknowledge [*9] having read and understood the plan. [20] Had Daniels not acknowledged having read and understood the plan, Centennial's commission department would not have issued him any commission checks. [21] Daniels did in fact receive commission checks from Centennial. [22]

19  Filson Dep., p. 7; Daniels Dep., pp. 74-79, Ex. 5.
20  Filson Dep., p. 8-10.
21  Filson Dep., p. 10-11.
22  Defendant's Ex. 14, p. 115, 118, 121, 124,

128.

The Centennial Wireless Sales Compensation Plan states in relevant part:

Inside Sales Rep Overtime Program

Our Inside Sales Reps are salaried, non-exempt associates. This means two things. First, an ISR receives a full weekly salary regardless of the number of hours worked. For example, if an ISR missed two hours of scheduled work time due to an auto accident, the rep's salary is not reduced by the two missed hours. We believe this is the professional way to treat our Inside Sales Reps.

Second, the amount paid for any overtime is based on a calculated amount, not one and one-half times as an hourly associate would be paid. This is also the professional way to treat salaried, non-exempt associates.

The following are the guidelines for calculating ISR overtime pay.

1) A workweek is defined [*10] as Sunday at 12:00 am through Saturday at 11:59 pm.

2) ISR overtime is calculated based on workweek.

3) An ISR's annual salary is divided into 52 weeks to obtain a weekly salary, ($ 24,000 divided by 52 is $ 461.54)

4) The weekly salary is divided by the number of actual, total hours worked during the workweek to calculate the individual ISR's hourly rate.

5) The amount paid for overtime hours is one-half the calculated hourly rate.

6) The number of hours worked over forty (40) during the workweek is multiplied by the calculated hourly rate to determine the total amount paid.

The following example shows how to calculate the overtime paid to an ISR.

. Fifty (50) hours worked during the workweek.

. Weekly salary is $ 451.54 ($ 24,000 divided by 52 weeks).

. Hourly rate is $ 9.23 ($ 451.54 divided by 50 hours).

. Calculated hourly rate is $ 4.61 (one-half the $ 9.23 hourly rate).

. Ten (10) hours worked beyond forty (40) hours.

. Amount paid for overtime is $ 46.10.

. Overtime is paid in arrears twice monthly.

Defendant's Ex. 5, p. 4-5.

Daniels signed Centennial's Sales Compensation Plan electronically on June 25, 2008. [23] The signature page of the plan states: "I have read and understand the . . . [*11] Centennial Wireless Sales Compensation Plan. I agree to be bound by the terms, conditions, and policies contained in the Plan." [24] Defendant's Exhibit 6 is a time stamped confirmation of Daniels' electronic signature and acceptance of Centennial's Sales Compensation Plan during the course of his training. [25]

23 Daniels Dep., p. 78-79; Ex. 6.
24 Defendant's Ex. 5, p. 15.
25 Daniels Dep., 74-75, 77; Ex. 6.

Employees are free to access or print the Sales Compensation Plan at anytime via the Company's intranet, "CentWire." [26] Daniels accessed Centennial's intranet regularly for a variety of customer related issues. [27] He used the intranet to access pricing information, as well as specials, promotions and credits for his own sales. [28] There were several different areas on Centennial's intranet and it is equipped with a search function. [29] However, Daniels never searched Centennial's intranet for information relating to overtime pay. [30]

26  Filson Dep., 11.
27  Daniels Dep., p. 70-71.
28  Daniels Dep., p. 71.
29  Daniels Dep., p. 71.
30  Daniels Dep., p. 71.

Mike Loveless never told Daniels what would happen to his pay if he worked less than forty hours in a given week. [31] There was no discussion during the [*12] training session about what would happen if Daniels worked less than forty hours in a given week. [32] Aside from his own final pay check, Daniels is not aware of any situation in which he or any other Inside Sales Representative had his or her pay docked for working less than forty hours in a week. [33] In fact, Centennial paid Daniels his full salary on at least two occasions when he worked fewer than forty hours. Daniels' time cards and payroll records indicate:

    . Daniels worked 39.75 hours the week of August 17 - 23, 2008 but received his full salary. (D. Ex. 7, p. 101, D. Ex. 14, p. 125.)

    . Daniels worked 38.75 hours the week of December 28, 2008 - January 3, 2009, but received his full salary. (D. Ex. 7, p. 91; D. Ex. 14, p. 111.)

31  Daniels Dep., p. 43.
32  Daniels Dep., p. 59.
33  Daniels Dep., p. 62, 102; Exs. 7 and 14.

Moreover, Centennial paid Daniels overtime premium pay on several occasions when he actually worked less than forty hours, but logged more than forty by taking paid holiday time.

    . Daniels actually worked thirty-nine hours the week of November 23-29, 2008 and took two paid holidays totaling sixteen hours. (D. Ex. 7, p. 94.) Though he actually worked less than forty hours that [*13] week, Centennial paid him fifteen hours of overtime premium pay. (D. Ex. 14, p. 114.)

    . Daniels actually worked only 32.75 hours the week of December 21-27, 2008 and took a paid holiday totaling eight hours. (D. Ex. 7, p. 92.) Nevertheless, Centennial paid him .75 hour of overtime premium pay. (D. Ex. 14, p. 112.)

    . Daniels actually worked only 34.75 hours the week of January 4-10, 2009 and took a floating paid holiday totaling eight hours. Centennial paid him an additional 2.75 hours of overtime premium pay. (D. Ex. 7, p. 91, D. Ex. 14, p. 91.)

    . Daniels actually worked 37.5 hours the week of February 15-21, 2009, took eight hours of paid holiday time and yet received 5.5 hours of premium pay. (D. Ex. 7, p. 88, D. Ex. 14, p. 108.)

Daniels felt comfortable asking questions and raising complaints with his managers Mike Loveless and Joe Ammerman, as well as their boss, District Manager Trent Schott and company trainer Michael Filson, but he never asked any of them to further clarify Centennial's overtime pay scheme. [34]

34  Daniels Dep., pp. 31, 50, 55, 59-60, 87, 93-94, 118, 119.

The number of hours Daniels actually worked varied from week to week. [35] He was rarely scheduled to work more than [*14] forty hours per week but he was expected to stay past the end of his scheduled shift if he was with a customer. [36] Daniels' timecards show his hours fluctuated from week to week. The hours Daniels actually worked ranged from a low of 32.25 hours (exclusive of paid holiday and sick time) the week of November 30 - December 6, 2008 to a high of 51.75 hours the week of July 13-19, 2008. [37] The most Daniels ever worked in one week was 51.75 hours the week of July 13-19, 2008. [38] Even that week, his hourly rate exceeded minimum wage. Daniels was earning a base salary of $ 18,000 annually or $ 346.15 per week at the time. [39] Dividing his weekly base of $ 346.15 by 51.75 hours equals $ 6.69 per hour. At the time, the minimum wage was $ 5.85 per hour. 29 U.S.C. § 206 (a)(1)(A).

35  Daniels Dep., pp. 100-103.
36  Daniels Dep., pp. 102-105.
37  D. Ex. 7, p. 93 & 103.
38  D. Ex. 7, p. 103.

39  D. Ex. 2; D. Ex. 14, p. 127.

Daniels worked Sunday through Wednesday, February 22-25, 2009 and was terminated at the end of his shift on Wednesday, February 25, 2009. [40] This was the final day of the sales month. [41] Centennial's sales or "commission month starts on the 26th of one month and ends of the 25th of the following [*15] month." [42] Centennial paid Daniels for the 31.5 hours he actually worked, plus eight hours of holiday pay for a total of 39.5 hours his last week of employment. [43] Centennial also paid Daniels for forty-eight hours of unused vacation time. [44]

40  Daniels Dep., 141-143, Ex. 7, p. 87.
41  Daniels Dep., 145-146; Ex. 5, p. 15.
42  D. Ex. 5, p. 15.
43  D. Ex. 7, p. 87; Ex. 14, p. 107.
44  D. Ex. 14, p. 107.

After his termination Daniels believed that he was not paid according to federal law, and thus he instituted the present action pursuant to the Fair Labor Standards Act "(FLSA") [45]. The FLSA mandates employers pay non-exempt employees one and one-half times their regular rate for hours worked in excess of a forty per week. 29 U.S.C. § 207(a). In drafting the FLSA however, Congress did not define "regular rate" or explain how an employee's "regular rate" is to be computed. 29 U.S.C. § 201 et seq., Condo v. Sysco Corporation, 1 F.3d 599, 604, fn 6 (7th Cir 1993). Nor did Congress address the notion of fluctuating work weeks. Condo, 1 F.3d at 604. Instead, Congress charged the Secretary of Labor with filling in the gaps by formulating policy and making rules. Id. at 604-605, 29 U.S.C. § 204. The Secretary [*16] did exactly that in promulgating 29 C.F.R. § 778.114.

45  In his response brief, Daniels claims that this is a "contract dispute" and discusses various theories of contract construction. However, as Centennial points out Daniels was an employee at will, and did not assert a contract-based claim in his Complaint. Accordingly, Daniels' contract construction issues will not be addressed in this order.

Section 778.114 of the FLSA allows an employer to pay a salaried employee whose hours of work fluctuate from week to week a fixed amount as straight-time pay for whatever hours the employee is called upon to work in a given workweek, whether few or many. 29 C.F.R. § 778.114(a); Condo, 1 F.3d at 601-602. Section 778.114 further authorizes the employer to pay that employee fifty percent of his calculated regular hourly pay rate for that week as premium pay for each hour of work he actually performed over forty that week. Id. The employee's "regular" hourly pay rate is calculated each week by dividing the employee's weekly salary by the total number of hours that he actually worked that week. Id. As the Seventh Circuit explained, "[t]he fixed salary compensates the employee for all his hours, the [*17] overtime ones included. He therefore received 100 percent of his regular rate for each hour that he worked. As such he is entitled only to an additional fifty percent of his regular rate for the hours that he worked in excess of forty." Id. at 605; see also Heder v. City of Two Rivers, 295 F.3d 777, 779 (7th Cir. 2002) (If an employee works a "fluctuating work week" then the "standard compensation covers any number of hours, so that the only statutorily required payment is the 50% premium for overtime.").

Though § 778.114 ordinarily requires the employer to pay the full weekly salary even if the employee works less than forty hours, there are exceptions. For example, an employer is not always obligated to pay an employee his full weekly salary during his first and last weeks of employment. 29 C.F.R. § 541.602. Instead, the employer may choose to pay the salary nonexempt employee hourly at a rate that is proportional to his salary during his initial and/or terminal weeks of employment. 29 C.F.R. § 541.602(b)(6). Likewise, an employer may legally dock an employee's salary if the employee is willfully absent or tardy. Samson et al. v. Apollo Resources, Inc., 242 F.3d 629, 639 (5th Cir 2001).

This [*18] so called "fluctuating work week" structure is appropriate so long as: (1) the employee's hours fluctuate from week to week; (2) the employee receives a fixed salary that remains the same from week to week regardless of the number of hours worked; (3) the fixed salary is sufficient to provide compensation at a rate at or above the minimum hourly wage; (4) overtime premium pay for each hour worked above forty is at least one-half the employee's calculated hourly rate for that week; and (5) the parties have a clear mutual understanding that the fixed salary is intended to provide straight time compensation to the employee for how ever many hours he was called upon to work that week. Condo, 1 F.3d at 601-602; Lance v. The Scotts Company,

2005 U.S. Dist. LEXIS 14949, *10-11 (N.D.Ill. 2005).

The parties agree that items (1) through (4) have been met in this case. However, Daniels disputes item (5), and claims that he did not have a clear understanding that he would be paid a full weekly rate of pay regardless of the number of hours worked.

As a preliminary issue, "pursuant to section 778.114(c) an employer must establish that a clear mutual understanding exists between the parties as to this [*19] type of pay plan. Since this method is an exception to the normal requirements of the FLSA, the employer bears the burden of establishing that it has complied with the regulations." Local 359 Gary Firefighters, AFL-CIO-CLC v. City of Gary, Indiana, 1995 U.S. Dist. LEXIS 21729 (N.D.Ind.1995).

Daniels has submitted his affidavit in which he states that: "I believed I was being paid on an hourly basis and that my pay would be reduced if I worked fewer than 40 hours in a given week." [46] Daniels relies on Evans v. Lowe's Home Centers, Inc., 2006 U.S. Dist. LEXIS 32104, 2006 WL 1371073 (M.D. Pa.), for the proposition that "a sworn denial of a clear understanding by the employee was sufficient to establish a genuine issue of fact in the absence of other evidence that tends to show he did understand the plan." (Response Brief at 13). In Evans, the court held:

> Lowe's has not met its burden of proving that any of the Plaintiffs understood the Plan. Lowe's offers only that it had a policy of communicating and explaining the Plan to employees at various times including orientation, store meetings, employee promotion, and upon a change in pay. While Lowe's states that the policy included giving the employees a copy of the Plan, [*20] the company offered no evidence that this policy was executed or performed in the case of these Plaintiffs.

> On the other hand, the Plaintiffs to a one said that they did not understand the Plan. None were ever told about the Plan or had it explained to them, and no one was ever provided with a copy of the Plan. Plaintiffs Evans, Eidhl, Butler, and McClellan asked their supervisors about how their pay was calculated, and their

supervisors could not do so. In addition, Each Plaintiff said that a work week of 48 hours was not only noted as the requirement, but it was stressed as a minimum. Each said they did not understand that they would receive overtime for hours over 40 or that they could work less than 40 hours and still receive their salary.

> The signed acknowledgments in the case of Plaintiffs Evans and Anselmi present a more difficult question. No court has held that a signed acknowledgment form is conclusive evidence of a clear mutual understanding as a matter of law. Moreover, even Griffin said that an executed acknowledgment form is probative of a clear understanding. Id. (citing Highlander v. K.F.C. Nat'l Mgmt Co., 805 F.2d 644, 648 (6th Cir. 1986)). Here both Evans and Anselmi [*21] submitted sworn statements that they did not understand the plan, that it was never explained to them, and that the acknowledgment form was never explained to them as setting forth any kind of a FWW or Salaried Plus Overtime Eligible Compensation Plan. Unlike the plaintiff in Highlander, Evans and Anselmi swear to their lack of understanding of the Plan, and there is no other evidence that tends to show they understood the Plan. At this stage of the case, there is a genuine issue of material fact as to whether Evans and Anselmi understood the Plan.

2006 U.S. Dist. LEXIS 32104, [WL] at *11-13.

46  Daniels Aff. at P 4.

Centennial argues that Daniels has misinterpreted Evans. Centennial points out that all of the Evans Plaintiffs claimed they were never informed of the Defendant's "Salaried Plus Overtime Eligible Compensation Plan." 2006 U.S. Dist. LEXIS 32104, [WL] at 8. Each Plaintiff stated that "Lowe's never met with employees to have the employees review the Plan, never explained it, and never provided employees with a

copy of the Plan." 2006 U.S. Dist. LEXIS 32104, [WL] at *9. Plaintiff Evans testified that though she signed an acknowledgment of the plan, she "never read the form, never received a copy of the form, nor was the plan ever explained to her." 2006 U.S. Dist. LEXIS 32104, [WL] at *6. Evans' co-Plaintiffs, [*22] Anselmi and Berry, testified they were not given time to read the form before signing it. 2006 U.S. Dist. LEXIS 32104, [WL] at *7. A fifth Plaintiff never signed the acknowledgment. 2006 U.S. Dist. LEXIS 32104, [WL] at *8. All the Evans Plaintiffs claimed they did not understand how their pay was calculated. Id.

By contrast, Daniels admits he read and electronically signed off on the Centennial's Sales Compensation Plan which not only states that he "will receive his full weekly salary regardless of the number of hours worked" but goes on to provide examples and a detailed explanation of how his overtime pay would be calculated. [47] While § 778.114 does not require employers to obtain signed acknowledgments, "securing such acknowledgments is certainly probative of the employee's clear understanding of the fluctuating workweek plan." Griffin v. Wake County, 142 F.3d 712, 716 (4th Cir. 1998) citing Highlander v. K.F.C. Nat'l Management Co., 805 F.2d 644, 648 (6th Cir. 1986).

[47] Daniels Dep., pp. 78-79, D. Ex. 5, p. 4-5, 15, D. Ex. 6.

Unlike the case in Evans, it is undisputed that Centennial presented its Sales Compensation Plan to Daniels electronically during his training class. [48] Also unlike Evans, it is undisputed that Centennial gives its employees [*23] as much time as is necessary to read the document and ask any questions they might have, before they must acknowledge having read and understood the plan. [49] As noted, if Daniels had not acknowledged having read and understood the plan, Centennial's commission department would not have issued him any commission checks [50] and Daniels did in fact receive commission checks from Centennial. [51]

[48] Filson Dep., p. 7; Daniels Dep., pp. 74-79; D. Ex. 5.
[49] Filson Dep., pp. 8-10.
[50] Filson Dep., pp. 10-11.
[51] D. Ex. 14, pp. 115, 118, 121, 124, 128.

Centennial further points out that, unlike the Plaintiffs in Evans, Daniels clearly understood Centennial's pay plan. Daniels testified that even before he was hired, he knew his starting salary would be $ 18,000 per year and that he would receive "halftime" pay for overtime work. [52] Daniels' offer letter, which he admits he read and signed, spells out, "You will receive a salary of $ 692.30 per pay period, which annualizes to $ 18,000. [53]

[52] Daniels Dep., pp. 19, 34-37.
[53] Daniels Dep., pp. 33, 44; D. Ex. 2.

Centennial urges this court to infer a clear mutual understanding from the fact that Daniels' base salary never varied despite variations in the number [*24] of hours he actually worked. Mayhew v. Wells, 125 F.3d 216, 219 (4th Cir. 1997). The existence of a "clear mutual understanding" may be "based on the implied terms of one's employment agreement if it is clear from the employee's actions that he or she understood the payment plan in spite of after-the-fact verbal contentions otherwise." Id., quoting Monahan v. County of Chesterfield, Va., 95 F.3d 1263, 1281 (4th Cir. 1996). Though his work hours fluctuated, Daniels received his base salary of $ 692.31 every two weeks from pay date June 20, 2008 (pay period June 1 - 14, 2008) through pay date October 24, 2008 (pay period October 5 - 18, 2008). [54] Centennial promoted Daniels to Inside Sales Representative Trainee II effective October 26, 2008 and increased his annual salary to $ 21,000. [55] Thereafter, although his actual hours continued to fluctuate, Daniels was paid a base salary of $ 807.697 every two weeks. [56]

[54] D. Ex. 14, pp. 119, 120, 122, 123, 125-127, 129-131.
[55] D. Ex. 15.
[56] D. Ex. 14, pp. 108-114, 116-117.

Centennial argues that Daniels' "after-the-fact" affidavit contention that: "I believed I was being paid on an hourly basis" is directly contradicted and overridden by the fact [*25] that his weekly base pay remained constant regardless of the number of hours he worked in any given week. Mayhew, 125 F.3d at 219. Moreover, Daniels received a "regular lesson - in the form of [his] paychecks - about how the fluctuating workweek plan operates." Griffin, 142 F.3d at 716-717. Like the Plaintiffs in Monahan and Griffin, Daniels lived with the fluctuating workweek plan for a significant period of time before challenging it in Court - in Daniels' case he lived with the plan throughout his tenure with Centennial and did not sue until after he was terminated for failing to

meet sales goals - "thus, it is clear from [his] actions that 'he understood the payment plan in spite of after-the fact verbal contentions otherwise." Griffin 142 F.3d at 717, quoting Monahan, 95 F.3d at 1281 n. 21.

Centennial next argues that even though Daniels claims in his affidavit that he believed he would be docked pay if he worked less than forty hours in a given week, this claimed lack of understanding does not defeat § 778.114 classification. Centennial points out that nowhere does Daniels dispute that he understood his salary would remain the same regardless of the number of hours above forty [*26] he worked in a given week. Centennial argues that this understanding is all the regulation requires. Lance, 2005 U.S. Dist. Lexis 14949, *21, and thus Daniels' statement that he believed his pay would be docked had he worked less than forty hours in a week, is not sufficient to defeat summary judgment. As set forth above, Centennial could legally dock Daniels' pay for intentional absences. Lance, 2005 U.S. Dist. Lexis 14949, *17. Moreover, as the Fourth Circuit noted, "the regulation does not require an employer to make all employees personnel specialists. Further, we do not find that the FLSA places the burden on the employer to hold an employee's hand and specifically tell him or her precisely how the payroll system works." Id. at *25 quoting Griffin, 142 F.3d at 717 (internal quotations omitted), quoting Monahan, 95 F.3d at 1275. Nor does the law require Centennial to ensure Daniels understood how his overtime pay was calculated. Bailey v. County of Georgetown, 94 F.3d 152, 156 (4th Cir. 1996) ("Neither the regulation nor the FLSA in any way indicates that an employee must also understand the manner in which his or her overtime pay is calculated."); Valerio v. Putnam Associates, Inc., 173 F.3d 35, 40 (1st Cir. 1999). [*27] "It is enough if, as here, the employer provided its employees with a reasonably clear and accurate explanation of their compensation,' and paid its employees according to that system of compensation." Griffin, 142 F.3d at 717, quoting Roy v. County of Lexington, 928 F. Supp. 1406, 1419, vacated in part on other grounds, 948 F. Supp. 529 (D.S.C. 1996) aff'd, 141 F.3d 533 (4th Cir. 1998).

Clearly, even accepting as true Daniels' affidavit testimony that he believed his pay would be docked if he worked less than forty hours in a week - a proposition that is directly contradicted by his own actual experiences on those occasions when he did in fact work less than forty hours a week - this testimony is not sufficient to raise genuine issues of material fact or defeat summary judgment. Accordingly, Centennial's motion for summary judgment will be granted.

Conclusion

On the basis of the foregoing, Centennial's motion for summary judgment [DE 27] is hereby GRANTED.

Entered: May 3, 2010.

/s/ William C. Lee

William C. Lee, Judge

United States District Court

**3**



Analysis
As of: Apr 17, 2013

**KEVIN DELANEY, THOMAS FITZGERALD, JOHN KAPLUN, JOHN LANDI, DAVID MANGENE, KENT MITCHELL, CHRIS PICCOLA, ROBERT SERVISS, JOHN E. SMITH, and PETER WONG, Plaintiffs, - against - RAY LAHOOD, In His Official Capacity as Secretary, United States Department of Transportation, and the UNITED STATES DEPARTMENT OF TRANSPORTATION, Defendants.**

**07-CV-471 (JG) (WDW)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**2009 U.S. Dist. LEXIS 91293**

**September 30, 2009, Decided**
**September 30, 2009, Filed**

**PRIOR HISTORY:** Delaney v. DOT, 319 Fed. Appx. 905, 2009 U.S. App. LEXIS 7181 (Fed. Cir., 2009)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff air traffic controllers sued defendants, the United States Department of Transportation and its Secretary, asserting unlawful sex and race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq. Plaintiffs sought back and front pay, benefits, compensatory damages, and attorney's fees. Defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56.

**OVERVIEW:** After an investigation, it was recommended that the controllers be removed for omitting medical information used to make workers' compensation claims decisions. The controllers elected to proceed with a union grievance, though discrimination claims were not alleged therein. The grievance resulted in a stipulated award whereby the controllers were reinstated and received backpay. The controllers later filed the instant suit. The court held that (1) the controllers were barred from pursuing their discrimination claims because they elected to bring their claims arising out of the removals via a negotiated union grievance procedure under 5 U.S.C.S. § 7121(d); (2) the stipulated award also precluded review of the discrimination claims because the claims were extinguished under the waiver provided for in the stipulation; (3) many of the retaliation claims failed for lack of a materially adverse action, such as claims concerning general reprimands and the denial of shift change requests; and (4) the retaliation claims based on the alleged failure to tender some back pay were unexhausted because the union did not take these claims through the union's three-step grievance procedure.

**OUTCOME:** The court granted defendants' motion for summary judgment in its entirety. The clerk was directed to enter judgment for defendants and to close the case.

**CORE TERMS:** grievance, adverse action, retaliation, materially, summary judgment, protected activity, supervisor, reinstated, arbitration, air, retaliatory, traffic controllers, controller, sick leave, grievance procedures, discrimination claims, negotiated, counselor, removal,

overtime, reinstatement, wrongfully, exhaust, health insurance, termination, engaging, pertain, reasons discussed, terminated, contacted

**LexisNexis(R) Headnotes**

*Transportation Law > Air Transportation > Air Traffic Control > Personnel*
[HN1]Air traffic controllers must obtain medical certification on a regular basis to work. To be medically certified, an air traffic controller must undergo a physical examination by an Federal Aviation Administration (FAA)-approved physician on or about his or her birthday and forward a completed Form 8500 to the FAA flight surgeon for review. Form 8500 states that an air traffic controller must (1) make full voluntary self-disclosure at box 18 of his or her medical history, and (2) list all visits to health professionals within three years at box 19. In addition, by signing his or her name in box 20 of the 8500, an air traffic controller certifies that all statements and answers provided are complete and true to the best of his or her knowledge.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN2]Summary judgment is appropriate only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN3]A moving party must demonstrate that no genuine issue exists as to any material fact. A fact is material within the meaning of Fed. R. Civ. P. 56 when its

resolution might affect the outcome of the suit under the governing law.

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN4]An issue is genuine for summary judgment purposes when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. In determining whether an issue is genuine, the inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion. Therefore, although a court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Opposition > Memoranda in Opposition*
*Civil Procedure > Summary Judgment > Opposition > Supporting Materials*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN5]A party opposing summary judgment may not rely merely on the allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e)(2).

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Opposition > Memoranda in Opposition*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN6]Once a moving party has met its summary judgment burden, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. The nonmoving party cannot survive summary judgment by casting mere metaphysical doubt upon the evidence produced by the moving party. Summary judgment is proper when the moving party can show that little or no evidence may be found in support of

the nonmoving party's case.

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Circumstantial & Direct Evidence*
[HN7]The United States Court of Appeals for the Second Circuit has provided additional guidance regarding motions for summary judgment in discrimination cases: The court has sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. Nonetheless, summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact. It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.

*Governments > Federal Government > Employees & Officials*
*Labor & Employment Law > Collective Bargaining & Labor Relations > General Overview*
*Labor & Employment Law > Discrimination > Federal Employees*
[HN8]Discrimination claims brought by federal employees who are bound by collective bargaining agreements are governed by 5 U.S.C.S. § 7121 and by an Equal Employment Opportunity Commission regulation, 29 C.F.R. § 1614.301(a). Pursuant to 5 U.S.C.S. § 7121(d), an employee covered by a negotiated grievance procedure that permits allegations of discrimination may raise the matter under a statutory procedure or the negotiated procedure, but not both. The statute specifies that an employee shall be deemed to have exercised his option under this subsection at such time as the employee timely initiates an action under the applicable statutory procedure or timely files a grievance in writing, in accordance with the provisions of the parties' negotiated procedure, whichever event occurs first. 29 C.F.R. § 1614.301(a). An election to proceed under a negotiated grievance procedure is indicated by the filing of a timely written grievance.

*Governments > Federal Government > Employees & Officials*
*Labor & Employment Law > Collective Bargaining & Labor Relations > General Overview*
*Labor & Employment Law > Discrimination > Federal Employees*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > General Overview*
[HN9]An EEOC regulation provides that an employee who files a grievance with an agency whose negotiated agreement permits the acceptance of grievances which allege discrimination may not thereafter file an Equal Employment Opportunity complaint on the same matter irrespective of whether the agency has informed the individual of the need to elect or of whether the grievance has raised an issue of discrimination. Moreover, any such complaint filed after a grievance has been filed on the same matter shall be dismissed without prejudice to the complainant's right to proceed through the negotiated grievance procedure including the right to appeal to the EEOC from a final decision. Whichever route the employee chooses, he must exhaust all applicable administrative remedies prior to pursuing his claim in court. In sum, when claims are brought via a negotiated grievance procedure, plaintiffs are barred from raising claims pertaining to the same matter via a statutory procedure and thus, from bringing an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq. 5 U.S.C.S. § 7121(d). By invoking the negotiated procedure, the employee commits to resolving his grievance in accordance with the procedures prescribed in the collective bargaining agreement between his union and his employing agency.

*Governments > Federal Government > Employees & Officials*
*Labor & Employment Law > Collective Bargaining & Labor Relations > General Overview*
*Labor & Employment Law > Discrimination > Federal Employees*
[HN10]When deciding whether a plaintiff may seek a statutory remedy for alleged discrimination after previously invoking negotiated grievance procedures, the critical question is whether the claims pertain to the same matter. 29 C.F.R. § 1614.301(a); 5 U.S.C.S. § 7121(d). Every court that has considered the issue has concluded that the word "matter" in 5 U.S.C.S. § 7121 and 29 C.F.R. § 1614.301 refers to the conduct underlying a plaintiff's claim, as opposed to the legal allegations in the

claim. Under 5 U.S.C.S. § 7121(d) the term "matter" refers to the underlying government action which precipitated the complaint, not the legal theory employed to challenge the government action.

*Governments > Federal Government > Employees & Officials*
*Labor & Employment Law > Collective Bargaining & Labor Relations > General Overview*
*Labor & Employment Law > Discrimination > Federal Employees*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > General Overview*
[HN11]With regard to 29 C.F.R. § 1614.301(a), 5 U.S.C.S. § 7121(d), the fact that plaintiff-employees chose not to raise their discrimination claims in their grievances does not mean that they can later bifurcate their claims and also file Equal Employment Opportunity complaints on the same matters.

*Governments > Federal Government > Employees & Officials*
*Labor & Employment Law > Collective Bargaining & Labor Relations > General Overview*
*Labor & Employment Law > Discrimination > Federal Employees*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > General Overview*
[HN12]29 C.F.R. § 1614.301(a) states that a complaint pertaining to the same matter raised through a union grievance may not later be filed with the EEOC irrespective of whether the grievance has raised an issue of discrimination. 29 C.F.R. § 1614.301(a). A plaintiff makes a binding election even though she may not even know that there were grounds to raise a claim of discrimination until the grievance procedure concludes.

*Governments > Federal Government > Employees & Officials*
*Labor & Employment Law > Collective Bargaining & Labor Relations > General Overview*
*Labor & Employment Law > Discrimination > Disparate Treatment > Exhaustion of Remedies*
*Labor & Employment Law > Discrimination > Federal Employees*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > Federal Employees*

[HN13]Prior to bringing a Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., action in the federal court, an aggrieved employee is required to exhaust his administrative remedies. In a pure discrimination case (one in which solely claims of discrimination are involved), an employee who elects the negotiation grievance procedure under 5 U.S.C.S. § 7121 must appeal the arbitrator's award to the EEOC before bringing a Title VII action. However, in a mixed case--one involving both a claim of discrimination and a challenge to other types of prohibited personnel actions--an employee must appeal the arbitrator's award to the Merit Systems Protection Board prior to seeking judicial review.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Fair Representation*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Breach of Duty of Fair Representation*
[HN14]The settlement of a grievance by a union and an employer is binding upon the individual employee, absent evidence that the union has acted in bad faith in carrying out its duty of full and fair representation.

*Civil Procedure > Settlements > Releases From Liability > Interpretation of Releases*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Interpretation of Agreements*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN15]With respect to individually bargained agreements, as opposed to collective bargaining agreements, the release or waiver of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., claims must be knowing and voluntary. The United States Court of Appeals for the Second Circuit utilizes a totality of the circumstances test to determine whether a waiver of claims under Title VII meets this requirement. The unexhaustive list of factors that may be considered in determining whether a waiver was knowing and willful are: (1) the plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of plaintiff in deciding the terms of the agreement, (4) the clarity of the agreement, (5) whether the plaintiff was represented by or consulted with an attorney, and (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee

was already entitled by contract or law. In addition, courts examine whether an employee was encouraged or discouraged from consulting an attorney and if the employee had a fair opportunity to do so. Not all of the factors need to be satisfied, or examined, for a release to be enforceable. In sum, summary judgment is appropriate where these factors weigh overwhelmingly in favor of defendants.

*Civil Procedure > Settlements > Releases From Liability > General Overview*
*Contracts Law > Remedies > Ratification*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN16]A plaintiff who accepts and neither returns nor offers to return the consideration he or she has received for consideration for executing a release, is deemed to have ratified the release and is thereby barred from challenging its validity. Even if the plaintiff did not knowingly and voluntarily execute the release agreement of his Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., claims, he may since ratify the agreement by inaction. A key element of ratification is the failure of the plaintiff to tender back the consideration that he received in exchange for executing the release.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN17]Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., forbids an employer from retaliating against an employee for, inter alia, complaining of employment discrimination prohibited by Title VII: It shall be an unlawful employment practice for an employer to discriminate against any of his employees because the employee has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C.S. § 2000e-3(a). Whereas Title VII's substantive discrimination provision seeks to prevent injury to individuals based on who they are, i.e., their status, the anti-retaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct.

*Civil Procedure > Summary Judgment > Burdens of*

*Production & Proof > Nonmovants*
*Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof*
*Labor & Employment Law > Discrimination > Retaliation > Elements > General Overview*
[HN18]Retaliation claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., are evaluated under a three-step burden-shifting analysis. The allocation of burdens of proof in retaliation cases follows the general McDonnell Douglas rules. In order to defeat a motion for summary judgment addressed to a claim of retaliation in violation of Title VII, a plaintiff must first present sufficient evidence to make out a prima facie case. Thus, each plaintiff must present evidence sufficient to permit a rational trier of fact to find that (1) he engaged in a protected activity under Title VII; (2) the defendant was aware of this activity; (3) the defendant took an action against him that was so materially adverse a reasonable employee would have been dissuaded from engaging in protected activity; and (4) there is a causal connection between the protected activity and the adverse action--that is, a retaliatory motive played a part in the adverse action. If such evidence is presented, the burden shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for the challenged adverse action. If the defendant articulates such a reason, the burden shifts back to the plaintiff to point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.

*Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof*
*Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions*
[HN19]The United States Supreme Court has established a new Burlington Northern standard for evaluating adverse actions in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation cases. Explaining that the anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm, the Court has decided the level of seriousness to which this harm must rise before it becomes actionable retaliation. It has rejected the prior standards that limited actionable retaliation to so-called ultimate employment decisions and has adopted a broadened standard that requires a plaintiff to show that a reasonable employee would have

found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

*Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions*
[HN20]The material adversity requirement of a Title VII of the Civil Rights Act of 1964, as amended, <u>42 U.S.C.S. § 2000e et seq.</u>, retaliation claim is intended to separate significant from trivial harms. The United States Supreme Court has noted that normally petty slights, minor annoyances, and simple lack of good manners will not suffice because they will not deter victims of discrimination from complaining to the EEOC. In addition, the Court has held that the provision's standard for judging harm must be objective and articulated the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. The Court has also noted that this standard does not require a reviewing court or jury to consider the nature of the underlying discrimination. By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Evidence*
*Evidence > Hearsay > Rule Components > Statements*
*Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof*
[HN21]As an initial matter, on summary judgment, a court evaluating whether a plaintiff has satisfied its initial burden on a Title VII of the Civil Rights Act of 1964, as amended, <u>42 U.S.C.S. § 2000e et seq.</u>, retaliation claim must determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive. Thus, allegations involving statements allegedly made by management or supervisors to other supervisors who communicated those opinions and threats to plaintiffs are dismissed because they are inadmissible hearsay.

*Labor & Employment Law > Discrimination >*

*Retaliation > Elements > Adverse Employment Actions*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > General Overview*
[HN22]Some courts in the United States Court of Appeals for the Second Circuit have held that unrealized threats of termination, warnings, close scrutiny, or hostility, do not meet the material adversity requirement of a Title VII of the Civil Rights Act of 1964, as amended, <u>42 U.S.C.S. § 2000e et seq.</u>, retaliation claim. However, because the Burlington Northern standard requires consideration of an alleged retaliatory act in the context of the plaintiff's particular circumstances, threats may meet this threshold. Because not every action taken by an employer that is adverse to the employee is materially adverse, the plaintiff must demonstrate that the harm suffered was more than mere inconvenience. Thus, because of the need to examine the context and particulars of plaintiffs' assertions that they were threatened, closely scrutinized or treated with hostility, these claims are discussed individually below. When doing so, it is useful to keep in mind that Title VII does not set forth a general civility code for the American workplace.

*Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions*
[HN23]An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. It is the task of courts to filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. A plaintiff cannot make her claim based on personality conflicts, bad manners, or petty slights and snubs. Mockery, nasty looks, and angry silences by other staff members are not adverse actions for purposes of a Title VII of the Civil Rights Act of 1964, as amended, <u>42 U.S.C.S. § 2000e et seq.</u>, retaliation claim.

*Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions*
[HN24]Legitimate requests for medical documentation for sick leave are not materially adverse actions for purposes of a Title VII of the Civil Rights Act of 1964, as amended, <u>42 U.S.C.S. § 2000e et seq.</u>, retaliation claim. Such requests would not dissuade a reasonable worker from engaging in protected activity. Nor would

temporary lapses in medical certification which are remedied in a matter of hours.

*Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions*
[HN25]Actual termination of health benefits and coverage can meet the Burlington Northern standard for Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation claims when such actions could induce an employee to refrain from participating in protected activity. Similarly, the denial of sick leave may meet the standard.

*Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions*
[HN26]Whether a schedule change or reassignment is materially adverse for purposes of a Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation claim depends on the circumstances of the employee. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children.

*Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof*
*Labor & Employment Law > Discrimination > Retaliation > Elements > Causal Link*
[HN27]As part of their burden of making a prima facie case, plaintiffs asserting Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation claims must also show proof of a causal connection between the protected activity and the retaliation. This can be shown either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant; or (2) indirectly by showing that the protected activity was closely followed in time by the adverse action. The United States Court of Appeals for the Second Circuit has not established a bright line rule for determining when retaliatory conduct is said to have closely followed a plaintiff's protected activity. However, a passage of two months between the protected activity and the adverse employment action seems to be the dividing line.

*Evidence > Inferences & Presumptions > Inferences*
*Labor & Employment Law > Discrimination >*

*Retaliation > Burdens of Proof*
*Labor & Employment Law > Discrimination > Retaliation > Elements > Causal Link*
[HN28]There can be no inference of retaliatory animus for purposes of a Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation claim where the adverse employment action occurred prior to the protected activity. The plaintiff's burden at the beginning of the case is a light one, usually demanding only that the protected activity preceded the adverse action in order to satisfy the causation requirement.

*Labor & Employment Law > Collective Bargaining & Labor Relations > General Overview*
*Labor & Employment Law > Discrimination > Retaliation > Elements > Protected Activities*
[HN29]Union grievances that do not allege discrimination do not constitute protected activity within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq.

*Labor & Employment Law > Discrimination > Retaliation > Elements > Protected Activities*
[HN30]Although Equal Employment Opportunity (EEO) counseling is protected activity for purposes of a Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation claim, challenged actions that preceded a plaintiff's contact with an EEO counselor are barred.

*Governments > Federal Government > Employees & Officials*
*Labor & Employment Law > Collective Bargaining & Labor Relations > General Overview*
*Labor & Employment Law > Discrimination > Disparate Treatment > Exhaustion of Remedies*
*Labor & Employment Law > Discrimination > Federal Employees*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN31]Pursuant to 29 C.F.R. 1614.301(a) and 5 U.S.C.S. § 7121(d), claims that are brought as grievances under a collective bargaining agreement and are unexhausted cannot form the basis of a retaliation claim. Before bringing a Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., action in the district court, an aggrieved employee is required to

exhaust his administrative remedies.

**Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions**
[HN32]General reprimands about plaintiff's lateness and other accusations, and alleged excessive scrutiny do not constitute materially adverse actions for purposes of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation claims. Similarly, because the significance of any given act of retaliation will often depend upon the particular circumstances, a denied request for a schedule change and being assigned to work on a holiday on two occasions, without more detail, do not satisfy the material adversity requirement.

**Labor & Employment Law > Discrimination > Retaliation > Elements > Causal Link**
[HN33]For purposes of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation claims, a causal connection can be shown circumstantially based on the temporal proximity of the discriminatory treatment to the protected activity.

**Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions**
[HN34]A request for further medical documentation prior to granting a request for additional medical leave is not a materially adverse action for purposes of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation claims.

**Labor & Employment Law > Wrongful Termination > Constructive Discharge > General Overview**
[HN35]An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily.

**Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata**
[HN36]The doctrine of res judicata bars later litigation if an earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action.

**Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions**
[HN37]Receipt of a misdirected bill is not a materially adverse action for purposes of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation claims.

**Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants**
**Civil Procedure > Summary Judgment > Opposition > Memoranda in Opposition**
**Civil Procedure > Summary Judgment > Opposition > Supporting Materials**
**Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof**
[HN38]Conclusory allegations by a plaintiff are insufficient to make a prima facie case of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation on a summary judgment motion.

**Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions**
[HN39]Schedule changes, without more context as to the harm they caused, are not materially adverse actions for purposes of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation claims.

**Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > General Overview**
[HN40]Because Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., does not set forth a general civility code for the American workplace, it cannot be invoked as a mechanism to regulate personality conflicts.

**Governments > Federal Government > Employees & Officials**
[HN41]Government employees may be subject to certain restrictions related to outside employment.

**Labor & Employment Law > Discrimination > Retaliation > Elements > Causal Link**
[HN42]A passage of two months between a protected activity and an adverse employment action seems to be the dividing line in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq.,

retaliation cases.

*Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions*
[HN43]Mere inconveniences do not fall within the range of harms that the anti-retaliation provision in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., protects against.

*Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions*
[HN44]Denial of shift changes could amount to an adverse action for purposes of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation claims.

*Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions*
[HN45]Failure to give a raise could amount to a materially adverse action for purposes of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e et seq., retaliation claims because this type of action may discourage employees from engaging in protected activity.

**COUNSEL:** [*1] For Plaintiffs: David S. Feather, Esq., THE LAW OFFICES OF DAVID S. FEATHER, Garden City, NY.

For Defendants: Vincent Lipari, United States Attorney, Eastern District of New York, BENTON J. CAMPBELL, Brooklyn, NY.

**JUDGES:** John Gleeson, United States District Judge.

**OPINION BY:** John Gleeson

**OPINION**

MEMORANDUM AND ORDER

JOHN GLEESON, United States District Judge:

Kevin Delaney, Thomas Fitzgerald, John Kaplun, John Landi, David Mangene, Kent Mitchell, Chris Piccola, Robert Serviss, John E. Smith and Peter Wong bring this employment discrimination action against the United States Department of Transportation ("DOT") and

its secretary, Ray LaHood, [1] asserting unlawful sex and race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq. Specifically, plaintiffs allege that (1) they were put on administrative leave in July 2005 and terminated in October 2005 due to discrimination against them because they are white males, and (2) after they were reinstated in December 2005 pursuant to an agreement reached at arbitration, they were subjected to various acts of retaliation. The defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. [*2] For the reasons that follow, the motion is granted.

  1  The action was originally filed against Mary E. Peters, then-Secretary of the DOT.

BACKGROUND [2]

  2  The following facts, except where otherwise noted, are undisputed and are drawn from DOT's Rule 56.1 Statement of Undisputed Material Facts ("DOT's 56.1 Statement").

Plaintiffs are ten past or current air traffic controllers employed by the Federal Aviation Administration ("FAA"), an operating division of the DOT, at the New York Terminal Radar Approach Control ("TRACON") facility in Westbury, New York. For the purposes of the instant motion, I accept the undisputed facts as true and resolve the disputed facts in favor of the plaintiffs where there is evidence to support their versions of the events.

A. *The Investigation Leading to the Administrative Leave and Termination of Plaintiffs*

On July 9, 2002, DOT Deputy Assistant Inspector General for Aviation, David A. Dobbs, notified DOT Assistant Inspector General for Investigations, Charles H. Lee, of the potential abuse of Workers' Compensation traumatic injury claims by TRACON air traffic controllers. As a result of an audit, Dobbs had determined that many primarily stress-related claims, which [*3] involved the same diagnosing physicians, appeared "questionable, at best" and merited investigation. DOT's 56.1 Statement P 7 & Ex. B. The matter was referred to the DOT Inspector General ("DOT IG") for further action. *Id.*

DOT IG Special Agent Daniel Helzner investigated the allegations, focusing on whether Workers'

Compensation claims filed by TRACON air traffic controllers warranted referral to the Department of Labor Inspector General ("DOL IG"). The DOL IG, and not the DOT IG, has the jurisdiction to pursue administrative and criminal action related to Workers' Compensation claims because the DOL administers the Workers' Compensation program. DOT's 56.1 Statement P 8 & Ex. C ("Helzner Dep.") at 28. Helzner conducted his investigation by reviewing documents such as Workers' Compensation claims and supporting medical records. He also visited TRACON on numerous occasions during the period from August 2002 to June 2005, where he met with Irene Grefe, an Employee Development Specialist at TRACON, and other members of management. DOT's 56.1 Statement P 9; Helzner Dep. at 24; Pls.' 56.1 Statement P 9 & Exs. I, S. Helzner did not meet any of the air traffic controllers who were the subjects [*4] of the investigation until he testified at the arbitration in December 2005. DOT's 56.1 Statement P 9; Helzner Dep. at 21-23*. [3]

> 3 Because certain pages of the deposition transcripts were missing from the Exhibit Binder submitted in conjunction with DOT's 56.1 Statement, I ordered the government to supply the missing pages. *See* Docket Entry No. 46. The government produced the missing pages accordingly on May 21, 2009. *See* Docket Entry No. 47. Rather than cite to both submissions when referencing an exhibit that was missing a page, an asterisk (*) will connote a citation that required supplement.

In late 2002 or early 2003, Helzner informed the DOL IG of the TRACON air traffic controllers' questionable Workers' Compensation claims. However, the DOL IG did not indicate that it intended to take any action. DOT's 56.1 Statement P 10; Helzner Dep. at 28. In the beginning of 2003, Helzner shifted the focus of his investigation to determining whether the air traffic controllers had disclosed the medical conditions and treatment underlying their Workers' Compensation claims on their FAA Airmen Medical Certificate Form 8500-8 ("8500"). DOT's 56.1 Statement P 11; Helzner Dep. at 30-32, 40*.

[HN1]Air [*5] traffic controllers must obtain medical certification on a regular basis to work. To be medically certified, an air traffic controller must undergo a physical examination by an FAA-approved physician on or about his or her birthday and forward a completed 8500 to the FAA flight surgeon for review. DOT's 56.1 Statement P 12, Ex. D & Ex. E ("Piccola Dep.") at 15-17. Form 8500 states that an air traffic controller must (1) make full voluntary self-disclosure at box 18 of his or her medical history, and (2) list all visits to health professionals within three years at box 19. In addition, by signing his or her name in box 20 of the 8500, an air traffic controller "certif[ies] that all statements and answers provided ... are complete and true to the best of [his or her] knowledge." DOT's 56.1 Statement P 13 & Ex. D at 1.

Based on his review of Workers' Compensation records, Helzner decided additional investigation was warranted for 20 air traffic controllers. Specifically, the question was whether they disclosed on their 8500s the conditions and treatment underlying their Workers' Compensation claims. Helzner was not aware at that time of the race or ethnicity of these 20 individuals. DOT's [*6] 56.1 Statement P 14; Helzner Dep. at 22-23*. Plaintiffs contest the defendants' assertion that Helzner alone -- without the consult of management officials from TRACON -- determined which 20 individuals would be investigated. DOT's 56.1 Statement P 14; Pls.' 56.1 Statement P 14. Because it does not concern a fact that is material for the purposes of this motion, resolution of this disputed issue is not necessary.

By a March 7, 2003 memorandum to Warren Silberman, the manager of the FAA Aeromedical Certification Division, and a March 24, 2003 memorandum to Dr. Harriet Lester, the regional flight surgeon for the eastern region, Helzner's supervisor, William Owens, requested 8500s for the 20 individuals under investigation, including the 10 plaintiffs in this action. [4] DOT's 56.1 Statement P 15 & Exs. F, G. Owens received 8500s for each of those individuals except for Frederick Jones. Plaintiffs' 56.1 Statement P 15.

> 4 In addition to the 10 named plaintiffs, 8500s were requested for Roger Bender, Joanne Boyer, Mark Boyer, Thomas Crist, Charles Henry, Wuon Hong, Frederick Jones, Steven Lindholm, Manuel Lugris and Raymond Maldonado. DOT's 56.1 Statement P 15.

### B. *The Reports of Investigation*

Based [*7] on a comparison of the Workers' Compensation records to the corresponding 8500s on

which disclosure would be required, Helzner prepared 14 Reports of Investigation ("ROIs"): one for each of the ten plaintiffs here and one each for four non-parties (Hong, Lindholm, Mark Boyer and Henry). The ROIs recited facts, set forth the evidence collected, and attached relevant documents. DOT's 56.1 Statement P 16. They referred the 14 individuals because each had omitted medical information on his 8500 that he had used as the basis for a Workers' Compensation claim with the DOL. The DOT IG's office did not have the authority to take disciplinary action against FAA employees, nor did it make any recommendation as to what action, if any, the deciding officials should take. DOT's 56.1 Statement P 17; Helzner Decl. of May 21, 2009 (submitted as Ex. B to DOT's May 21, 2009 supplemental submission), P 6; Helzner's arbitration testimony of Dec. 5, 2005 (submitted as Ex. C to DOT's May 21, 2009 supplemental submission) at 174-76.

Helzner did not compile an ROI for (or refer) Manuel Lugris or Raymond Maldonado (both of whom allegedly received preferential treatment because they are Hispanic) for any action [*8] because Lugris and Maldonado disclosed on their 8500s their medical conditions and visits underlying their Workers' Compensation claims that were being investigated. DOT's 56.1 Statement P 18-19 & Exs. I, J; Helzner Dep. at 80-81 *. According to defendants, Helzner did not compile an ROI for or refer Frederick Jones (who allegedly received preferential treatment because he is African-American) for any action because Jones's 8500 had not been due, was not completed and thus was not forwarded when the DOT IG requested and received 8500s in March 2003. Jones's 8500 for the pertinent period was not submitted until June 13, 2003. DOT's 56.1 Statement P 20. Plaintiffs dispute the facts about Jones's 8500 and state that Helzner had or should have had Jones's 8500 from years prior to 2003, upon which Jones had omitted information and/or made false statements. Plaintiffs' 56.1 Statement P 20 & Ex. D. Here again, it is not necessary to resolve this dispute because it does not concern a fact that is material to the outcome of the motion.

In addition, ROIs were not compiled and no referrals were made for the three remaining individuals for whom 8500s had been requested in the March 2003 memoranda. [*9] No action was taken with respect to Thomas Crist because he had disclosed on his 8500 the medical condition that was the basis for his Workers'

Compensation claim. Roger Bender retired in April 2004, before the ROIs were compiled and sent. Joanne Boyer was in the process of being removed from the FAA as of February 2004, before the ROIs were compiled and sent. DOT's 56.1 Statement P 21 & Ex. C at 67, 108*; Helzner Decl. of May 21, 2009, P 4.

## C. The Administrative Leaves and Removals of Plaintiffs

In July 2005, ROIs for the ten plaintiffs and for non-plaintiff Wuon Hong, all of whom continued to work at the New York TRACON, were directed to Jeffrey Clarke, the Air Traffic Manager of the New York TRACON. The ROIs for non-plaintiffs Lindholm, Henry and Boyer were not forwarded to Clarke because they were no longer employed at New York TRACON. DOT's 56.1 Statement P 22 and Ex. L; Helzner arbitration testimony of Dec. 5, 2005 at 176-77; Helzner Decl. of May 21, 2009, PP 7-9. [5]

> 5    The parties dispute whether Clarke had involvement in or knowledge of DOT IG's investigation prior to July 2005, when he received the ROIs. DOT's 56.1 Statement P 23; Pls.' 56.1 Statement P 23. This fact is not material [*10] to the resolution of this motion, so I need not resolve the dispute.

After consulting with Human Resources and regional counsel, Clarke issued Notices of Proposed Removal, dated July 28, 2005, to each of the 11 air traffic controllers whose ROIs were referred to him. The notices specified the basis for the proposed removal (failure to disclose on the 8500 medical information used to make Workers' Compensation claims) and provided an opportunity to contest the proposed action. A few days later, the air traffic controllers were placed on paid administrative leave pending a final decision. DOT's 56.1 Statement P 24 & Ex. L at 103-107*.

By notice dated August 19, 2005, Dean Iacopelli, the president of the plaintiffs' union, the National Air Traffic Controllers Association ("NATCA"), filed a grievance regarding the proposed removal under the provisions of Article 9 of the parties' collective bargaining agreement. DOT's 56.1 Statement P 25 & Exs. N, O. In relevant part, Article 9, section 4, allows allegations of discrimination to be raised in the grievance procedures. It states:

> In matters relating to Title 5 U.S.C. 2302(b)(1) dealing with certain

discriminatory practices, an aggrieved employee [*11] shall have the option of utilizing this grievance procedure or any other procedure available in law or regulation, but not both.

DOT's 56.1 Statement P 25. However, discrimination claims were not alleged in the grievance.

In a letter dated September 9, 2005, William W. Osborne, Jr., NATCA-appointed counsel for the 10 plaintiffs and Wuon Hong, responded to the 11 notices of proposed removal. He argued, among other things, that the TRACON controllers had not committed any misconduct and that the discipline imposed was too severe and violative of the factors set forth in _Douglas v. Veterans Administration, 5 M.S.P.B. 313, 5 M.S.P.R. 280 (MSPB 1981)_. DOT's 56.1 Statement P 26 & Ex. P. Clarke rejected those contentions and terminated the 11 air traffic controllers by Notices of Removal dated October 14, 2005. DOT's 56.1 Statement P 27 & Ex. Q. As a result, NATCA requested and received consolidation and expedited arbitration of the 11 cases. DOT's 56.1 Statement P 28 & Ex. R.

### D. The Arbitration

Arbitration proceedings were held on November 7 and December 5, 7 and 8, 2005. DOT's 56.1 Statement P 29 & Ex. S. At the arbitration, plaintiffs did not raise any allegations of discrimination. On December [*12] 7, 2005, plaintiffs' counsel, Osborne, asked Clarke, who is African-American, the following questions on cross-examination:

[BY MR. OSBORNE]: Did you ever talk to [Dean Iacopelli, the president of NATCA] about controllers Jones and Maldonado?

A: Yes, we have had a discussion about Jones and Maldonado.

Q: That they were on one of these lists and yet they weren't disciplined? A: Yes.

Q: I am not suggesting you to tell me that that is accurate, but there was a discussion about a Mr.

Jones and a Mr. Maldonado?

A: Yes there was a discussion about it.

Q: They are working today?

A: Yes.

...

Q: There was some question about them [Jones and Maldonado] being on an IG list with respect to

their 8500 forms?

A: Kind of like that. I called him [Dean Iacopelli] about a rumor I heard. Q: Fair enough. I am not trying to get into it more than that.

DOT's 56.1 Statement P 30 & Ex. S at 490-92. On redirect examination by the FAA's attorney, Elizabeth Head, Clarke testified about the relevance of Mr. Iacopelli's inquiry:

[BY MS. HEAD]: What was the point of Mr. Iacopelli's inquiry to you about those two individuals [Jones and Maldonado]? Do you remember that?

A: He really didn't inquire to me. I inquired to him. I asked [*13] him -- I told him I heard a very ugly rumor.

Q: What was the rumor?

A: The rumor was that I had manipulated the list of people and I did not want to take disciplinary action against any black people so I took the names Ray Maldonado, and I believe it is, Freddy Jones, off the list. So I told him that that was a pretty ugly rumor and it was pretty offensive to me that anyone would start a rumor like that. And he said that he had also heard that rumor. He says, "I want to assure you that NATCA did not start that rumor."

MR. OSBORNE: That is not a position we have taken or are taking in this

case, period.

ARBITRATOR JAFFE: Thank you for that clarification.

DOT's 56.1 Statement P 31 & Ex. S at 538-39.

When the testimony concluded on December 8, 2005, the parties jointly asked the arbitrator to mediate settlement discussions, which included *ex parte* discussions addressing the merits. DOT's 56.1 Statement P 32 & Ex. S at 616, 619. Before proceeding to mediate a settlement, the arbitrator detailed how the process would be conducted and specifically requested and received the consent of each individual plaintiff. DOT's 56.1 Statement P 32 & Ex. S at 627-631.

The mediated settlement discussions were [*14] successful. On December 9, 2005, the parties entered into, and the arbitrator signed, a Stipulated Award under which plaintiffs would be reinstated, with certain back pay, less an agreed-upon unpaid suspension. The Stipulated Award provided:

> At the close of the evidentiary record on December 8, 2005, the Parties requested that I attempt to facilitate a resolution of these disputes. ... After protracted mediation, the Parties reached an agreement settling each of the grievances and asked that I memorialize their agreement in the form of a Stipulated Award. The Parties are to be commended for finding terms that resolved this dispute. I find that these terms are eminently fair, reasonable, and responsible given the facts and circumstances which led to the removals in these cases. It should also be noted that each of the individual Grievants expressly noted their consent to the terms of the settlement and to the entry of this Stipulated Award. ... This Stipulated Award resolves, in full, all claims arising out of the removals of the Grievants or the instant grievances.

DOT's 56.1 Statement P 33 & Ex. T.

### E. *Plaintiff's EEO Proceedings*

The plaintiffs returned to work on December 12, 2005. Thereafter, [*15] each plaintiff contacted an Equal Employment Opportunity ("EEO") counselor and filed an EEO complaint, alleging that: (1) their removals had been motivated by discrimination against them because they are all white males; and (2) upon returning to work they had been subjected to various acts of discrimination and retaliation. DOT's 56.1 Statement P 34 & Exs. U1-U10. The following plaintiffs first contacted an EEO counselor on the following dates:

John Kaplun - January 19, 2006 (DOT's 56.1 Statement, Ex. V7)

John Landi - January 19, 2006 (*Id.* Ex. V8)

John Smith - January 19, 2006 (*Id.* Ex. V 10)

Kevin Delaney - January 20, 2006 (*Id.* Ex. V6)

Robert Serviss - January 20, 2006 (*Id.* Ex. V9)

Christopher Piccola - January 23, 2006 (*Id.* Ex. V4)

Peter Wong - January 24, 2006 (*Id.* Ex. V5)

Thomas Fitzgerald - February 6, 2006 (*Id.*, Ex. V1)

Kent Mitchell - February 9, 2006 (*Id.* Ex. V3)

David Mangene - February 23, 2006 (*Id.* Ex. V2)

Each of the plaintiffs' EEO complaints was dismissed, and with the exception of Delaney's, all the complaints were consolidated for the purposes of appeal to the E.E.O.C. Office of Federal Operations, which then affirmed the dismissal, initially by decision dated November 6, 2006, [*16] and on reconsideration by decision dated January 25, 2007. DOT's 56.1 Statement P 37 & Exs. W, X. In relevant part, the E.E.O.C. ruled that: (1) plaintiffs elected to challenge their dismissal through the negotiated grievance procedures, which permitted them to raise allegations of discrimination, and thus could not maintain claims under the statutory procedures, *i.e.*, Title VII, 42 U.S.C. § 2000e, *et seq.*; and (2) plaintiffs' claims of retaliation were meritless as a matter of law.

Delaney, who claimed, among other things, that he had been constructively discharged, appealed the dismissal of his EEO complaint in a proceeding before the Merit Systems Protection Board, *Delaney v. Department of Transportation*, NY-0752-07-0128-1-1. In a decision dated June 10, 2008, the board affirmed the

administrative law judge's decision that Delaney failed to prove a constructive discharge. DOT's 56.1 Statement P 38 & Ex. Y. Delaney appealed that decision to the United States Court of Appeals for the Federal Circuit, which, on April 3, 2009, affirmed the dismissal. DOT's 56.1 Statement P 38 & Ex. Z.

The issue of back pay was raised in the grievance that led to the arbitration, and back pay was ordered [*17] by the arbitrator's Stipulated Award. DOT's 56.1 Statement P 43 & Ex. T. On January 13, 2006, plaintiffs filed another grievance challenging the defendants' calculation of back pay. DOT's 56.1 Statement P 43 & Ex. CC. The grievance was denied on February 2, 2006, and the parties did not appeal the denial. DOT's 56.1 Statement P 43 & Ex. DD.

### F. The Instant Action

Plaintiffs filed their complaint on February 2, 2007. An amended complaint (adding Delaney as a plaintiff) was filed on October 5, 2007, alleging (1) discrimination based on race and gender and (2) retaliation. Plaintiffs seek back pay, front pay, benefits and compensatory damages in an amount to be determined at trial, plus attorney's fees. In addition, they seek a money judgment for nonpecuniary losses such as mental anguish and pain and suffering.

### 1. Plaintiffs' Individual Claims of Retaliation

Plaintiffs alleged 29 incidents of retaliation in their amended complaint (though they failed to specify the target of each retaliatory act). They alleged additional incidents of retaliation in their responses to question 3 of Defendants' First Set of Interrogatories ("Interrogatory Response" or "IR"). DOT's 56.1 Statement P 39 & Exs. [*18] A, AA. Some plaintiffs added further claims in their affidavits submitted in connection with their opposition to the instant motion. [6] Plaintiffs' individual claims of retaliation are set forth below.

> [6] Numerous plaintiffs allege acts of retaliation in their affidavits filed in connection with their opposition to the instant motion that were not alleged previously in their EEO complaints, the amended complaint in this action or in the Interrogatory Response. Accordingly, they are not properly before me now. Nevertheless, these claims are all dismissed for the various reasons stated below.

#### a. John Landi

Landi alleged the following acts of retaliation in his EEO complaint, dated April 26, 2006: (1) after he was reinstated, he received comments from his supervisors that he must have done something wrong to have been fired; (2) he did not receive all of the back pay allegedly owed to him under the Stipulated Award; and (3) he had to "rectify a situation concerning [his] lack of health insurance, whereby there should have been no lapse in coverage." [7] DOT's 56.1 Statement P 41 & Ex. U4. In the IR, Landi adds claims that (4) "he was pressured to recertify too quickly after his reinstatement [*19] in December 2005"; and (5) in October 2006, William Allen, a supervisor, told him that he "should retire as soon as [he was] eligible -- it's the best thing for you." DOT's 56.1 Statement P 46-47 & Ex. AA at 13. In his affidavit filed in this case, Landi added the following claim: (6) that he was forced to complete "an extraordinary amount of extra training" for an operational error. Landi Aff. P 14.

> [7] In the IR and his affidavit, Landi explains that his health insurance was "wrongfully" terminated in or about April 2006, even though he continued to pay premiums out of his wages. DOT's 56.1 Statement, Ex. AA at 13; Landi Aff. P 14.

#### b. Christopher Piccola

Piccola did not expressly allege any acts of retaliation in his EEO complaint dated April 28, 2006, other than claiming that (1) he did not receive all of the back pay that was due to him under the Stipulated Award. DOT's 56.1 Statement P 48 & Ex. U7. In addition, in the IR, Piccola alleges that (2) he was retaliated against when his request for a week off with pay in March 2006 was denied. DOT's 56.1 Statement P 48 & Ex. AA at 16.

#### c. Kent Mitchell

In an EEO complaint dated May 1, 2006, Mitchell alleged the following retaliatory acts: (1) [*20] he did not receive all of the back pay due to him under the Stipulated Award; (2) he did not receive a timely response to his request for an estimate of his retirement benefits (i.e., whereas other controllers received a response within two to four weeks, Mitchell had yet to receive a response after 2 months); and (3) he was subjected to comments by his supervisors and fellow controllers questioning his "veracity and [] work

experience." DOT's 56.1 Statement P 50 & Ex. U6. Mitchell alleged no retaliation in his IR. In his affidavit filed in this case, Mitchell added the following claims: (4) after his reinstatement he was told to "watch [his] ass" and that the reinstated controllers were being watched; (5) Ed Sosa, a supervisor, said that the reinstated controllers should not have been reinstated; (6) he overheard comments that FAA would be better off if the reinstated controllers had remained terminated; (7) he was assigned to work on a holiday twice; and (8) he was denied a schedule change in February-April 2006. Mitchell Aff. P 15.

#### d. *David Mangene*

Mangene alleged the following retaliatory acts in his EEO complaint dated April 30, 2006: (1) failure to receive the full amount of back [*21] pay that he was due under the Stipulated Award within the required 30 days; and (2) improper denial of leave as well as improper questioning as to the reason for the requested leave. DOT's 56.1 Statement P 52 & Ex. U5. In the IR, Mangene added the following claims of retaliation: (3) Kevin Watson, his supervisor, told him throughout 2006, "You better watch out -- downstairs [management] hates you and will do anything they can to fire you" and "I'm just warning you, they're after you"; and (4) Enzio Powell, a supervisor, followed him in the parking lot on numerous occasions over a six-month period, and on one occasion Powell sat behind him while he was on "position" (directing air traffic); (5) he was charged for leave without pay in November 2005, even though he was terminated as of that time; and (6) his health insurance was wrongfully terminated in approximately April 2006. DOT's 56.1 Statement PP 53, 55-56 & Ex. AA at 18-19. In his affidavit filed in this case, Mangene adds the following claims: (7) on his first day back after reinstatement, he was wrongfully accused of having an operational error prior to August 2005 and was forced to undergo additional training as a result; and [*22] (8) he was wrongfully counseled for sick leave abuse in January/February 2006. Mangene Aff. P 12.

#### e. *Thomas Fitzgerald*

In an EEO complaint dated April 27, 2006, Fitzgerald alleged the following acts of retaliation, some of which were elaborated upon in his affidavit and IR: (1) he did not receive the proper amount of back pay that he was due under the Stipulated Award; (2) he was not accorded proper breaks of 40-45 minutes (instead he was

allowed only 20-25 minutes) during December 2005/January 2006; (3) he was told by members of management that his name had been brought up in a derogatory fashion during management meetings and that supervisors had been told to "keep an eye on him"; (4) in December 2005/January 2006 he was told by a supervisor from the Newark area, Steve Marotta, to "watch [his] back, they're gunning for you" and by another supervisor, Roger Bender, that management was "gunning for them" and that he should "watch [his] ass"; and (5) he was informed in March 2006 by fellow air traffic controller, Jim Gummerson, that area manager Pete Pellaconi told Fitzgerald's co-workers not to cover for Fitzgerald when he was on break because he "wasn't worth it." DOT's 56.1 Statement [*23] P 57 & Ex. U2. Fitzgerald's IR added the following claims of retaliation, some of which were elaborated on in his affidavit: (6) a March 2006 request to move from a night shift to a day shift for one day was denied first by Jim Giotta, a supervisor, and then his immediate supervisor, Keith McDonald, who told him he was instructed "to deny any requests from you guys"; (7) he was improperly questioned about his need to take sick time; (8) in connection with donations of annual sick time to him, in November 2006 Clarke sent Fitzgerald a letter stating that he had failed to substantiate his need for leave and forcing Fitzgerald to resubmit medical documentation; (9) in December 2005, Keith McDonald, a supervisor, told Fitzgerald that he had been instructed "to keep an eye for anything out of the ordinary" with respect to him; and (10) he was informed that at a meeting held two days after he was reinstated management had expressed the view that the arbitration was a "huge victory." DOT's 56.1 Statement P 57-62 & Ex. AA at 13-16; Fitzgerald Aff. P 31.

#### f. *Kevin Delaney*

Delaney worked only three days, December 12, 13 and 20, 2005, after being reinstated. On January 3, 2006, after being out on [*24] sick leave, he submitted his written resignation, subsequently claiming constructive discharge. DOT's 56.1 Statement P 63. He contacted an EEO counselor on January 20, 2006. DOT's 56.1 Statement P 63 & Ex. V6. Delaney alleged the following acts of retaliation in his EEO complaint, dated April 19, 2006: (1) on December 13, 2005, he was "medically decertified" (his medical clearance to control air traffic was removed) because he had not updated his medical information; (2) he was not paid for sick leave he "was on prior to his resignation"; (3) he was not properly paid

during his last weeks of employment; and (4) his requests for leave without pay and a part time work schedule were unreasonably denied upon his reinstatement. DOT's 56.1 Statement PP 63-64 & Ex. U1. In his IR, Delaney asserts the following additional claims of retaliation: (5) following his resignation, from March 13, 2006 to August 2008, he was sent notices from the Department of the Interior and DOT claiming that he was overpaid thousands of dollars in salary and demanding refunds because his leave time had been miscategorized when he resigned; (6) he was constructively discharged in January 2006; and (7) he received [*25] a bill from the Department of the Interior for a different individual with the same name. DOT's 56.1 Statement P 66 & Ex. AA at 16-18; Delaney Aff. P 14.

### g. *John Kaplun*

In his May 6, 2006 EEO complaint, Kaplun alleges the following acts of retaliation: (1) back pay and leave were improperly withheld; (2) he was subjected to schedule changes "made for no reason, against the contract;" (3) he was singled out without reason for retraining around the same time he filed his EEO report; and (4) he had "retraining administered against the FAA's own orders." DOT's 56.1 Statement P 67 & Ex. U3. In the IR, Kaplun added the following additional claims of retaliation: (5) he was "wrongfully written up for an operational error in February 2006"; (6) he was denied instructions on completing the application for medical certification in December 2006; (7) he was wrongfully denied FMLA leave in March/April 2007; (8) after reinstatement in 2005 he was told by supervisors to "keep [his] head low," "don't get into trouble," "I don't want to see you get hurt," "you got a year and ten months to go until you're retirement eligible; I don't want to see you getting into trouble;" (9) he was harassed for taking [*26] one day of FMLA leave in November 2006 for the death of his father-in-law; and (10) he was wrongfully given a sick leave restriction letter in May/June 2007. DOT's 56.1 Statement PP 70-72 & Ex. AA at 5-6. In his affidavit filed in this case, Kaplun adds the following claim: (11) that his health insurance was cancelled in the Spring of 2006 and that Ms. Tracy told him never to come to her office again when he went to complain. Kaplun Aff. P 13.

### h. *John Smith*

Smith alleged that he suffered the following retaliatory acts in his EEO complaint dated May 8, 2006:

(1) after returning to work he heard a supervisor say, referring to Smith and the other 11 individuals who were removed, that they "were all 'criminals and scumbags and should never have been allowed to return to service with the FAA'"; (2) on February 16, 2006, he overheard another controller on his cell-phone make a similar remark; (3) no action was taken regarding these comments when Smith complained about the comments to his supervisors; and (4) he did not receive the back pay he was due under the Stipulated Award. DOT's 56.1 Statement P 73 & Ex. U8. Smith alleged in the IR that: (5) in 2006 he was wrongfully precluded from meeting [*27] with an EEO counselor; (6) in or about January/February 2006, Smith overheard Ed Sosa, one of his supervisors, state that the individuals who were rehired were "just a bunch of scumbags - they never should have been reinstated;" (7) a fellow traffic controller, Kahil Smith, made similar remarks; (8) his health insurance lapsed in the spring of 2006 and then was wrongfully terminated in May 2006 and as a result he received invoices directly from health care providers; (9) on February 1, 2006, Clarke told Smith, while they approached each other from different ends of the hallway "how are you doing now?" in a "laughing, derogatory manner" that was "extremely intimidating" to Smith; (10) in the spring of 2006, Charlie Hannen, a supervisor, told Smith that the management was told to "watch" the 11 reinstated controllers; (11) in mid- to late-2006, when Smith, who was out with a cold, called in to ask whether he could control air traffic even though he was taking the medication Cipro, his supervisor Ben LeFleur announced on the floor that Smith was contagious and was not allowed back into the sector for 24 hours; (12) Smith's name not relisted on the "Read and Initial" list after he was [*28] reinstated and his complaints about the situation to management were ignored; (13) Smith's name was not placed back on his mailbox when he was reinstated and he had to place his name back on his mailbox himself approximately one month later; (14) upon reinstatement, money was not automatically deducted from his paycheck to pay his Thrift Savings Plan ("TSP") loan, and he later had to make payments manually and ultimately was told he had to pay back the entire TSP loan by December 29, 2006, forcing him to take out a home equity loan with a higher interest rate; and (15) his requests for a special chair because he had a back injury were denied. DOT's 56.1 Statement P 74-77 & Ex. AA at 7-10; Smith Aff. P 13.

### i. *Robert Serviss*

In his April 28, 2006 EEO complaint, Serviss asserted the following claims of retaliation: (1) in December 2005, he was denied leave to which he was entitled and, in violation of his union contract, he was questioned regarding the need for the requested leave; (2) he was denied an adequate training program upon his reinstatement in December 2005; (3) in February 2006, three of Serviss's training reports were rejected because he was assigned to train with an instructor [*29] who had not met the training requirements (as a result, he was required to complete the training again); (4) he did not receive his back pay under the Stipulated Award; and (5) in mid-January 2006, Clarke sought an ethics violation against him for appearing in a movie about 9/11. DOT's 56.1 Statement P 79 & Ex. U9. In his IR, Serviss alleged three additional incidents of retaliation: (6) in January 2006, defendants violated an oral agreement with NATCA regarding "prime time leave" for the reinstated controllers; (7) on March 28, 2007 he was forced to take sick leave because defendants claimed to have no other facility duties available; (8) in June/July 2007, Serviss was called on numerous occasions to work overtime in violation of applicable rules; and (9) on December 6, 2006, he requested a transfer within the building to a busier sector but never received a response. DOT's 56.1 Statement P 82 & Ex. AA at 6-7; Serviss Aff. P 15 (elaborating on claims previously raised).

### j. *Peter Wong*

Wong asserted that he suffered the following retaliatory acts in his EEO complaint dated May 10, 2006, to which he added additional detail in the IR: (1) he was not given the back pay due under the Stipulated [*30] Award; (2) his health insurance was cancelled in April 2006; and (3) upon his reinstatement he was charged with 56 hours of annual leave that he had never used. DOT's 56.1 Statement P 84 & Ex. U10. In the IR, Wong alleged 17 additional incidents of retaliation: (4) after reinstatement in December 2005, defendants made an error on his W2, which necessitated a delay in the filing of his tax return; (5) he was denied annual leave in December 2005; (6) he was medically decertified and was not certified on radar in December 2005; (7) he was denied leave in December 2005; (8) he was wrongfully charged two days of sick leave in December 2005; (9) he was denied shift changes and/or swaps; (10) in December 2005 he was initially denied leave to make the film "Flight 93" (but was eventually granted leave without pay) and his request for an additional week of vacation

was denied; (11) he did not get his TSP contribution reinstated until four months after his reinstatement; (12) he was wrongfully counseled regarding sick leave abuse in July 2006; (13) he was denied annual leave during the summer of 2006 and on other occasions; (14) his requests to wear sneakers to work after undergoing knee-surgery [*31] were denied; (15) his request to cancel his annual leave in November 2006 was denied; (16) he was denied overtime pay in January 2008; (17) he was given an inadequate raise in January 2008; (18) he was wrongfully given an Operational Error Development Procedure in May 2007, which was place in his personnel file without his knowledge; (19) he was called at home on November 9, 2008 and informed that he lost his medical clearance; and (20) on June 26, 2008 his scheduled overtime for July 28, 2008 was cancelled due to an operational error he had made while training a developmental controller. DOT's 56.1 Statement PP 85-93 & Ex. AA at 10-12.

### DISCUSSION

#### A. *The Summary Judgment Standard of Review*

[HN2]Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see also, e.g., Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009)*. [HN3]The moving party must demonstrate that no genuine issue exists as to any material fact. *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994)*. A fact [*32] is "material" within the meaning of *Rule 56* when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

[HN4]An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995)* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)* (per curiam); *Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)*). Therefore, although a court "should review the record as a whole, it must disregard all evidence favorable to the

moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). However, [HN5]the party opposing summary judgment "may not rely merely on the allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial." *Fed. R. Civ. P. 56(e)(2)*.

[HN6]Once [*33] the moving party has met its burden, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Id. at 586*. Summary judgment is proper when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo, 22 F.3d at 1223-24*.

[HN7]The Second Circuit has provided additional guidance regarding motions for summary judgment in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); [*34] *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

### B. *Plaintiffs' Discrimination Claims*

1. *Plaintiffs' Election to Challenge Their Leave and Termination Claims Under the Negotiated Grievance Procedure Precludes Judicial Review of Those Claims*

The defendants argue that the plaintiffs are precluded from pursuing their discrimination claims under Title VII in federal court because they elected to bring their claims arising out of the administrative leave and removals via a negotiated union grievance procedure. I agree.

[HN8]Discrimination claims brought by federal employees who are bound by collective bargaining agreements are governed by 5 U.S.C. § 7121 and by an Equal Employment Opportunity Commission ("EEOC") regulation, 29 C.F.R. § 1614.301(a). Pursuant to 5 U.S.C. § 7121(d), an employee covered by a negotiated grievance procedure that permits allegations of discrimination "may raise the matter [*35] under a statutory procedure or the negotiated procedure, but not both." *Id.* The statute specifies that an employee "shall be deemed to have exercised his option under this subsection ... at such time as the employee timely initiates an action under the applicable statutory procedure or timely files a grievance in writing, in accordance with the provisions of the parties' negotiated procedure, whichever event occurs first." *Id.*; *see also* 29 C.F.R. § 1614.301(a) ("An election to proceed under a negotiated grievance procedure is indicated by the filing of a timely written grievance.").

[HN9]The applicable EEOC regulation provides that an employee who files a grievance with "an agency whose negotiated agreement permits the acceptance of grievances which allege discrimination may not thereafter file a[n EEO] complaint on the same matter ... irrespective of whether the agency has informed the individual of the need to elect or of *whether the grievance has raised an issue of discrimination." Id.* (emphasis added). Moreover, "[a]ny such complaint filed after a grievance has been filed on the same matter shall be dismissed without prejudice to the complainant's right to proceed through the negotiated [*36] grievance procedure including the right to appeal to the Commission from a final decision." *Id.* Whichever route the employee chooses, he must exhaust all applicable administrative remedies prior to pursuing his claim in court. *See O'Dwyer v. Snow*, No. 00 CIV 8918, 2004 U.S. Dist. LEXIS 3528, 2004 WL 444534, at *7 (S.D.N.Y. Mar. 10, 2004). In sum, when claims are brought via a negotiated grievance procedure, plaintiffs are barred from

raising claims pertaining to the same matter via a "statutory procedure" and thus, from bringing an action under Title VII. *See* 5 U.S.C. § 7121(d); *Fernandez v. Chertoff*, 471 F.3d 45, 52 (2d Cir. 2006) ("By invoking the negotiated procedure, the employee commits to resolving his grievance in accordance with the procedures prescribed in the collective bargaining agreement between his union and his employing agency.").

[HN10]When deciding whether a plaintiff may seek a statutory remedy for alleged discrimination after previously invoking negotiated grievance procedures, the critical question is whether the claims pertain to the same "matter." *See* 29 C.F.R. § 1614.301(a); 5 U.S.C. § 7121(d). "Every court that has considered the issue has concluded that the word 'matter' in 5 U.S.C. § 7121 [*37] and 29 C.F.R. § 1614.301 refers to the *conduct* underlying a plaintiff's claim, as opposed to the *legal allegations* in the claim." *Wright v. Snow*, No. 02 Civ. 7615, 2004 U.S. Dist. LEXIS 17048, 2004 WL 1907687, at *5 (S.D.N.Y. Aug. 25, 2004) (collecting cases); *see also Redmon v. Mineta*, 243 F. App'x 920, 924 (6th Cir. 2007) (plaintiff's EEO charge that alleged discrimination and union grievance dealt with the "same matters" within the meaning of 5 U.S.C. § 7121(d); it was "inconsequential" that "she advanced different legal theories to challenge these actions"); *Giove v. U.S. Dept. of Transp.*, 178 F. App'x 814, 818 (10th Cir. 2006) (under 5 U.S.C. § 7121(d) the term "matter" "refer[s] to the underlying government action which precipitated the complaint," not the legal theory employed to challenge the government action); *Guerra v. Cuomo*, 176 F.3d 547, 550, 336 U.S. App. D.C. 121 (D.C. Cir. 1999) (under 5 U.S.C. § 7121(d) "courts have tended to construe the term 'matter' to encompass more than a legal claim and instead to encompass the 'underlying action' ... or the 'topics' raised"); *Bonner v. Merit Sys. Protection Bd.*, 781 F.2d 202, 204-05 (Fed. Cir. 1986) (the word "matter" as used in 5 U.S.C. § 7121 [*38] refers to the "underlying [employment] action"); *O'Dwyer*, 2004 U.S. Dist. LEXIS 3528, 2004 WL 444534, at *8 (statutory claim barred notwithstanding the fact that the plaintiff had not actually raised the issue of discrimination in her previous grievances).

As NATCA members, the plaintiffs are covered by NATCA's collective bargaining agreement with the DOT, which permits employees to file grievances alleging discrimination. DOT's 56.1 Statement P 25 & Ex. O at 20-21 (with respect to matters "dealing with certain discriminatory practices, an aggrieved employee shall have the option of utilizing this grievance procedure or any other procedure available in law or regulation, but not both"). Plaintiffs elected to raise the matter of their administrative leaves and removals via the negotiated grievance procedures of the collective bargaining agreement when they filed a grievance on August 19, 2005. DOT's 56.1 Statement P 25 & Ex. N. Although they could have alleged discrimination claims in their grievance, they argued only that they committed no misconduct, and that the discipline imposed was too severe and violative of the factors set forth in *Douglas v. Veterans Administration*, 5 M.S.P.B. 313, 5 M.S.P.R. 280 (MSPB 1981). DOT's 56.1 Statement P 26 & Ex. [*39] P. Only after going to arbitration, entering into the Stipulated Award and being reinstated did plaintiffs raise discrimination claims by filing EEO complaints, which, in addition to retaliation charges, alleged race discrimination as the basis for their suspension and removal. Because the discrimination claims in the EEO complaints pertained to the same "matter" addressed through the negotiated grievance procedures -- plaintiffs' administrative leaves and removals -- the EEOC affirmed the agency's dismissal of the EEO complaints. *Kaplun v. Peters*, 2006 EEOPUB LEXIS 6423, 2006 WL 3357961, at *1 (E.E.O.C. Nov. 6, 2006) ("The complainants argue that they did not raise discrimination in their grievances. However, [HN11]the fact that they chose not to raise their discrimination claims in their grievances does not mean that they can now bifurcate their claims and also file EEO complaints on the same matters."). Plaintiffs' motion for reconsideration of this decision was denied on January 25, 2007. DOT's 56.1 Statement P 37 & Ex. X. For the same reasons articulated by the EEOC, the plaintiffs are barred in this court from bringing discrimination claims under Title VII.

Plaintiffs argue that they "did not learn of a potential [*40] discriminatory reason for their suspensions and eventual termination until, at the earliest, at or near the end of the arbitration hearing in December, 2005." Pls.' Br. at 4. Moreover, they contend that the delay was "due solely to the Defendants' deliberate withholding of ... an unredacted list of names of other air traffic controllers who had been investigated for the same infraction for which the plaintiffs were ultimately disciplined." *Id.* This list included the name of Mr. Frederick Jones, an African-American male, who was not disciplined and who plaintiffs allege was treated favorably as compared to them because of his race.

Plaintiffs' argument fails under the plain language of [HN12]29 C.F.R. § 1614.301(a), which states that a complaint pertaining to the same matter raised through a union grievance may not later be filed with the EEOC "irrespective ... of *whether the grievance has raised an issue of discrimination.*" 29 C.F.R. 1614.301(a) (emphasis added); *see also Wright*, 2004 U.S. Dist. LEXIS 17048, 2004 WL 1907687, at *6 (finding that plaintiff made a binding election even though "she did not even know that there were grounds to raise a claim of discrimination" until she examined certain documents that she won [*41] the right to examine by grieving her promotion denial) (emphasis omitted); *Garcia v. MSBP*, 155 F.3d 570 (Fed. Cir. 1998) (per curiam) (unpublished) (despite plaintiff's assertion that new evidence of discrimination should allow him an appeal to the MSPB, MSPB correctly ruled that it lacked jurisdiction over plaintiff's appeal pursuant to 5 U.S.C. § 7121(d) because plaintiff had elected to file a grievance in which he omitted his discrimination claim); *Nouraie v. Sullivan*, 61 F.3d 912 (9th Cir. 1995) (unpublished) (no federal court jurisdiction under Title VII to consider discrimination claims brought for the first time via an EEO complaint challenging plaintiff's termination subsequent to plaintiff challenging his termination through the negotiated union grievance procedure).

Plaintiffs' contention that they "had no reason to believe that the actions against them by the Defendants were motivated in any fashion by discrimination" until late December 2005-early January 2006 rings hollow given the record in this case. Most plaintiffs indeed testified that they had no knowledge until after the arbitration of the names on the list other than their own because the lists they received [*42] were redacted. But plaintiffs' counsel, Osborne, obviously had such knowledge and was acutely aware of the possible race discrimination claim before the arbitration. He specifically questioned Clarke at the hearing about why Maldonado and Jones were on the list but were not disciplined. [8] In addition, Piccola testified that he suspected he had been discriminated against when Osborne showed him and the other terminated controllers the redacted list, on which they could make out the names of Frederick Jones and Ray Maldonado. Lipari Decl. dated May 5, 2009, Ex. D at 36-37, 39-43; *see also* Landi Dep. at 36-37 (Ex. CC to Feather Affirmation dated Apr. 24, 2009) (Landi testifying that he came to believe the terminated controllers were discriminated against "[t]owards the middle of the third day of the arbitration"

when "we became aware of the list"); Mangene Dep. at 26 (testifying that he first believed discrimination had occurred at the arbitration when Osborne asked about Jones and Maldonado and the redacted list). Although it is disputed by the other plaintiffs, according to Piccola, Osborne discussed the redacted list with the men and whether to bring it up at the arbitration. *Id.* at 43. [*43] Furthermore, Piccola testified that at a meeting in approximately August of 2005 of air traffic controllers who had been placed on leave, he had expressed his belief that he had been singled out because of his race and gender. *Id.* at 27-30. He also stated that more than one other person at the meeting agreed with him. *Id.*

8 Osborne's questioning of Clarke is set forth on page 8, *supra*.

It is not necessary to resolve the factual question of whether the plaintiffs had reason to believe they had been subjected to race discrimination at the time they filed their grievance. Based on the questioning of Clarke at the arbitration (for which the plaintiffs were present) plaintiffs had reason to know there were grounds to raise a claim of discrimination at the latest on December 8, 2005, the last day of the arbitration (when Clarke was questioned). And plaintiffs concede as much in their brief. Pls.' Br. at 4 ("It is undisputed that the Plaintiffs herein did not learn of a potential discriminatory reason for their suspensions and eventual termination until, at the earliest, at or near the end of the arbitration hearing in December, 2005."). Nonetheless, plaintiffs made no efforts during the arbitration [*44] to amend their grievance to include discrimination claims. To the contrary, Osborne clarified that plaintiffs were *not* alleging discrimination. Responding to Clarke's statement about the rumor that he had manipulated the list of people because he did not want to take disciplinary action against minorities, Osborne stated, "That is not a position we have taken or are taking in this case, period." Ex. S. at 539. That disclaimer made it clear that plaintiffs' counsel was both aware of the possibility of a race discrimination claim and had consciously chosen not to assert it.

Plaintiffs did not appeal or otherwise challenge the Stipulated Award, which resolved the "matter." Rather, they accepted all of the benefits under it. Moreover, their failure to exhaust the available administrative remedies on the grievances precludes judicial review. [9] Because this court lacks jurisdiction to review plaintiffs' claims that their administrative leaves and terminations were due

to discrimination in violation of Title VII, summary judgment is granted for defendants with respect to these claims.

> 9 [HN13]Prior to bringing a Title VII action in the federal court, an aggrieved employee is required to exhaust his [*45] administrative remedies. In a "pure" discrimination case (one in which solely claims of discrimination are involved), an employee who elects the negotiation grievance procedure must appeal the arbitrator's award to the EEOC before bringing a Title VII action. *See Fernandez v. Chertoff, 471 F.3d 45, 53-54 (2d. Cir. 2006)*. However, in a mixed case -- one involving both a claim of discrimination and a challenge to other types of prohibited personnel actions -- an employee must appeal the arbitrator's award to the MSPB prior to seeking judicial review. *Id. at 53-55*. Here, plaintiffs could have appealed the award to the MSPB, but declined to do so.

## 2. The Stipulated Award Precludes Review of Plaintiffs' Discrimination Clams

Plaintiffs' discrimination claims also fail because they were extinguished by the Stipulated Award, which provides, in relevant part: "This Stipulated Award resolves, in full, *all claims* arising out of the removals of the Grievants or the instant grievances." DOT's 56.1 Statement P 33 & Ex. T at 3 (emphasis added).

Plaintiffs were represented by counsel, Mr. Osborne, at the arbitration. Osborne, together with DOT counsel, asked the arbitrator to mediate settlement discussions [*46] and negotiations, the result of which was the Stipulated Award. *Id.* [10] Each plaintiff expressly agreed to the terms of the Stipulated Award. *Id.*; *see also Lipari Decl. dated May 5, 2009, Ex. D at 46*. Thereafter, plaintiffs accepted the benefits of the Stipulated Award: they were reinstated, they received back pay (for the time they had been terminated, less an agreed suspension of a week for all plaintiffs except Fitzgerald, who agreed to a suspension of 30 days), and the Removal Letters in their personnel files were replaced with letters of official reprimand, which could be expunged nine months later.

> 10 The Stipulated Award provides, in relevant part:
>
> At the close of the evidentiary

record on December 8, 2005, the Parties requested that I attempt to facilitate a resolution of these disputes.... After protracted mediation, the Parties reached an agreement settling each of the grievances and asked that I memorialize their agreement in the form of a Stipulated Award. The parties are to be commended for finding terms that resolved the dispute. I find that these terms are eminently fair, reasonable, and responsible given the facts and circumstances that led to the removals in these cases. [*47] It should also be noted that each of the individual Grievants expressly noted their consent to the terms of the settlement and the entry of this Stipulated Award.

DOT's 56.1 Statement P 33, Ex. T.

I see no reason why the Stipulated Award should not preclude plaintiffs' discrimination claims. Plaintiffs' argument that the Stipulated Award should not be enforced because they did not personally sign it and were not "parties" to the agreement is meritless. As memorialized in the Stipulated Award, each plaintiff orally agreed to its terms and both Osborne and Natalie C. Moffett, who had the authority to do so as their counsel, signed it "For NATCA and for the Grievants." [11] DOT's 56.1 Statement, Ex. T at 3.

> 11 At oral argument on May 15, 2009, plaintiffs' counsel argued for the first time that Osborne did not represent the plaintiffs at the arbitration, but rather the union. This argument is frivolous. First, plaintiffs' counsel himself invoked the attorney-client privilege (between Osborne and plaintiffs) no fewer than 10 times during depositions in this case. *See* Defs'. May 21, 2009 Supplemental Submission, Ex. F1-F5. Second, putting aside the fact that plaintiffs themselves expressly agreed [*48] to the Stipulated Award, they are bound by its provisions because [HN14]the "settlement of a grievance by the union and the employer is binding upon the individual employee, absent evidence that the

union has acted in bad faith in carrying out its duty of full and fair representation." *Suissa v. American Export Lines, Inc.*, 507 F.2d 1343, 1347 (2d Cir. 1974). Plaintiffs have failed to demonstrate that Osborne or the Union acted in bad faith. In fact, the record shows that NATCA vigorously represented plaintiffs, successfully requesting expedited review of the grievance arising out of the termination and negotiating a settlement under which all of the air traffic controllers were reinstated.

Plaintiffs' contention that they were never informed they were releasing their Title VII claims by agreeing to the Stipulated Award is also unpersuasive. [HN15]With respect to individually bargained agreements, as opposed to collective bargaining agreements, the release or waiver of Title VII claims must be knowing and voluntary. *See Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 121 (2d Cir. 2008); *Bormann v. AT & T Commc'ns, Inc.*, 875 F.2d 399, 402 (2d Cir. 1989). The Second Circuit utilizes [*49] a "totality of the circumstances" test to determine whether a waiver of claims under Title VII meets this requirement. *See Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 438 (2d Cir. 1988). The unexhaustive list of factors that may be considered in determining whether a waiver was knowing and willful are:

> (1) the plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of plaintiff in deciding the terms of the agreement, (4) the clarity of the agreement, (5) whether the plaintiff was represented by or consulted with an attorney, and (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

*Bormann*, 875 F.2d at 403 (quoting *EEOC v. American Express Publishing Corp.*, 681 F. Supp. 216, 219 (S.D.N.Y. 1988); *accord Livingston*, 141 F.3d at 438. In addition, courts examine whether an employee was encouraged or discouraged from consulting an attorney and if the employee had a fair opportunity to do so. *Bormann*, 875 F.2d at 403. Not all of the factors need to be satisfied, or examined, for a [*50] release to be

enforceable. In sum, summary judgment is appropriate where the *Bormann* factors weigh overwhelmingly in favor of defendants. *See, e.g., Tung v. Texaco, Inc.*, 150 F.3d 206, 208 (2d Cir. 1998) (affirming a district court's dismissal of plaintiff's claim because "[w]e agree that, under the totality-of-the-circumstances analysis, [plaintiff]'s waiver of his right to sue under Title VII was knowing and voluntary"); *see also McKoy v. Potter*, No. 01 Civ. 1984, 2002 U.S. Dist. LEXIS 16991, 2002 WL 31028691, at *7-9 (S.D.N.Y. Sept. 12, 2002), *aff'd*, 98 F. App'x 28 (2d Cir. 2004).

Considering the *Bormann* factors, I conclude as a matter of law that under the totality of the circumstances plaintiffs knowingly and willfully waived their Title VII claims. Although the extent of plaintiffs' education and business experience is not clear from the record, plaintiffs are not unsophisticated parties. Most plaintiffs state in their affidavits that they were not given the opportunity to review the Stipulated Award prior to the conclusion of the arbitration, *see, e.g.*, Delaney Aff. P11, but at least one plaintiff, Piccola, testified to having its contents described to the group of plaintiffs by Osborne, *see* Lipari Decl. [*51] dated May 5, 2009, Ex. D at 45-46, and another testified that he read it before it was agreed to. Pls.' Ex. CC ("Landi Oct. 21, 2008 Dep."), at 36; *but see* Landi Aff. P 11 ("I was not given the opportunity to review the Stipulated Award before union officials signed it."). Most importantly, the agreement was clearly written. The language of the Stipulated Award plainly states that it resolves "all claims" arising out of the removals and subsequent grievances of plaintiffs. Moreover, the plaintiffs were represented by counsel, and they were given consideration in exchange for the waiver that exceeded benefits to which they were already entitled.

In sum, a jury could reach but one conclusion based on the facts viewed in the light most favorable to the plaintiffs: they knowingly and voluntarily waived their Title VII claims by entering into the Stipulated Award and collecting the benefits to which it entitled them.

Finally, even if the plaintiffs' waivers of their Title VII claims were not knowing and willful, the doctrines of ratification and tender would bar them from challenging the Stipulated Award. [HN16]"[A] plaintiff who accepts and neither returns nor offers to return the consideration [*52] he or she has received for consideration for executing a release, is deemed to have ratified the

Release and is thereby barred from challenging its validity." *Tung v. Texaco, Inc ., 32 F. Supp. 2d 115, 118 (S.D.N.Y. 1997)*, aff'd in part and vacated in part, *150 F.3d 206, 208 (2d Cir. 1998)* (vacating with respect to ADEA claim); *see also Livingston v. Bev-Pak, Inc., 112 F. Supp. 2d 242, 249 (N.D.N.Y. 2000)* ("[E]ven if Plaintiff did not knowingly and voluntarily execute the release agreement [of his Title VII claims], he has since ratified the agreement by inaction."). A "key element" of ratification "is the failure of the plaintiff to tender back ... the consideration that he received in exchange for executing the release." *Id.* Plaintiffs ratified the Stipulated Award by failing to tender back the benefits they received. There is no fairness is permitting them to challenge the settlement terms now.

For the foregoing reasons, summary judgment is granted with respect to plaintiffs' discrimination claims. [12]

> 12 Because the substantive discrimination claims are dismissed on jurisdictional grounds, I decline to address defendants' additional arguments regarding the timeliness of plaintiffs' [*53] invocation of the EEOC remedies or the merits of plaintiffs' discrimination claims.

## C. *Plaintiffs' Retaliation Claims*

[HN17]Title VII forbids an employer from retaliating against an employee for, *inter alia*, complaining of employment discrimination prohibited by Title VII:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*42 U.S.C. § 2000e-3(a)*. Whereas Title VII's "substantive [discrimination] provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status[,]" the anti-retaliation provision "seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct." *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53,*

*63, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)*.

[HN18]"Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis." *Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005); see also Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)* [*54] ("The allocation of burdens of proof in retaliation cases follows the general rules enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*."). In order to defeat a motion for summary judgment addressed to a claim of retaliation in violation of Title VII, a plaintiff must first present sufficient evidence to make out a prima facie case. Thus, each air traffic controller must present evidence sufficient to permit a rational trier of fact to find that (1) he engaged in a protected activity under Title VII; (2) DOT was aware of this activity; (3) DOT took an action against him that was so materially adverse a reasonable employee would have been dissuaded from engaging in protected activity; and (4) there is a causal connection between the protected activity and the adverse action -- that is, a retaliatory motive played a part in the adverse action. *See Kessler v. Westchester County Dep't of Social Servs., 461 F.3d 199, 205-06 (2d Cir. 2006)*.

If such evidence is presented, the burden shifts to the defendant to demonstrate a "legitimate, nondiscriminatory reason" for the challenged adverse action. *See McDonnell Douglas, 411 U.S. at 802; Jute, 420 F.3d at 173.* [*55] If the defendant articulates such a reason, the burden shifts back to the plaintiff to "point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001); see also Taitt v. Chem. Bank, 849 F.2d 775, 777 (2d Cir. 1988)* (applying *McDonnell Douglas* to retaliation claim).

### 1. *General Principles*

As indicated above, the plaintiffs have alleged numerous incidents of retaliation. In response, defendants advance various bases for summary judgment. Thus, it seems appropriate to discuss generally the principles implicated by these arguments before applying them to each plaintiff's alleged incidents of retaliation.

#### a. *The Materially Adverse Action Requirement Under* Burlington Northern

Defendants argue that many of plaintiffs' allegations are insufficient as a matter of law because they do not constitute actions sufficiently "materially adverse" to support a claim of retaliation. For example, defendants contend that allegations of hostile words, requests for certain medical documents, and letters of warning that did not result in any discipline [*56] are not adverse actions.

[HN19]The Supreme Court established a new standard for evaluating adverse actions in Title VII retaliation cases in *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). Explaining that the "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm," the Court decided "the level of seriousness to which this harm must rise before it becomes actionable retaliation." *Id.* at 67. It rejected the prior standards that limited actionable retaliation to "so-called 'ultimate employment decisions,'" *id.*, and adopted a broadened standard that requires a plaintiff to "show that a reasonable employee would have found the challenged action *materially adverse*, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks and citations omitted) (emphasis added).

[HN20]The material adversity requirement is intended "to separate significant from trivial harms." *Id.* The Court noted that "normally petty slights, minor annoyances, and simple lack of good manners" will not suffice because they will not [*57] deter victims of discrimination from complaining to the EEOC. *Id.* In addition, the Court held that the provision's standard for judging harm must be objective and articulated the standard in general terms "because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69 ("Context matters."). The Court also noted that this standard does not require a reviewing court or jury to consider the nature of the underlying discrimination. "By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, ... this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.* at 69-70.

i. *"Friendly" Warnings*

Plaintiffs' claims that some supervisors -- acting out of concern for plaintiffs -- "warned" them that members of management were closely scrutinizing them, or that other supervisors disagreed with the outcome of the arbitration and wanted them to be fired again, do not constitute materially adverse actions. [HN21]As an initial matter, on summary judgment, a [*58] court evaluating whether a plaintiff has satisfied its initial burden must "determine only whether proffered *admissible* evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173 (emphasis added). Thus, allegations involving statements allegedly made by management or supervisors to other supervisors who communicated those opinions and "threats" to plaintiffs are dismissed because they are inadmissible hearsay. *See Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 366 (S.D.N.Y. 2006) (threats that plaintiff's job was in jeopardy made in the form of hearsay comments to third parties are not materially adverse actions); *see also Holloway v. Dep't of Veterans Affairs*, 309 F. App'x 816, 819 (5th Cir. 2009) ("when a supervisor makes a challenged comment not to the plaintiff-employee but to his co-workers, the comment's hearsay nature militates against a finding of materiality") (internal quotation marks and citation omitted). Moreover, these statements are not materially adverse because they caused no harm, but rather were shared with plaintiffs out of concern for them. Plainly, such comments are not retaliatory.

ii. *Threats, Warnings,* [*59] *Close Scrutiny and Hostility*

[HN22]Some courts in this circuit have held that unrealized threats of termination, warnings, close scrutiny, or hostility, do not meet the material adversity requirement. *See Chang v. Safe Horizons*, 254 F. App'x 838, 839 (2d Cir. 2007) (oral and written warnings applying employer's disciplinary policies to the employee were not materially adverse); *Byra-Grzegorczyk v. Bristol-Myers Squibb Co.*, 572 F. Supp. 2d 233, 252 (D. Conn. 2008) (neither poor performance reviews nor requirement to attend weekly meetings reached the level of being materially adverse); *Sangan v. Yale Univ.*, No. 06CV00587, 2008 U.S. Dist. LEXIS 8973, 2008 WL 350626, at *5 (D. Conn. Feb. 7, 2008) (being yelled at and criticized about work is not an adverse action); *Pugni v. Reader's Digest Ass'n, Inc.*, No. 05 Civ. 8026, 2007 U.S. Dist. LEXIS 26284, 2007 WL 1087183, at *23 (S.D.N.Y. Apr. 9, 2007) ("Under [the *Burlington*

Northern] standard, it is clear that [a supervisor's] alleged 'threat' that plaintiff's days at Reader's Digest were numbered did not constitute a materially adverse action. The alleged threat, assuming it happened, was never carried out."); *Scott v. Cellco P'ship*, No. 98 Civ. 7245, 2007 U.S. Dist. LEXIS 29063, 2007 WL 1051687, at *2 (S.D.N.Y. Apr. 3, 2007) (reconsidering [*60] previous order in light of *Burlington Northern* and declining to alter conclusion that plaintiff's assertions of "general reprimands about plaintiff's lateness and other accusations, and alleged excessive scrutiny" do not constitute adverse action). However, because the *Burlington Northern* standard requires consideration of an alleged retaliatory act in the context of the plaintiff's particular circumstances, threats may meet this threshold. *See, e.g., Scott*, 2007 U.S. Dist. LEXIS 29063, 2007 WL 1051687, at *2 (denying summary judgment on claim pertaining to threat of transfer to equivalent position in a different store location where three of the persons accused of prohibited conduct had also been transferred); *Thomas*, 438 F. Supp. 2d at 366 (noting that "[t]hreats could also potentially be a materially adverse action," but finding no materially adverse action where threats were either made indirectly to plaintiff or did not clearly imply that plaintiff would be fired). Because "not every action taken by an employer that is adverse to the employee is *materially* adverse," *Byra-Grzegorczyk*, 572 F. Supp. 2d at 252, the plaintiff must demonstrate that the harm suffered was more than mere inconvenience. Thus, because [*61] of the need to examine the context and particulars of plaintiffs' assertions that they were threatened, closely scrutinized or treated with hostility, these claims are discussed individually below.

When doing so, it is useful to keep in mind that "Title VII, ... does not set forth a general civility code for the American workplace." *Burlington Northern*, 548 U.S. at 68 (internal quotation marks omitted). [HN23]"An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* It is the task of courts to "'filter ' out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)); *see also Higgins v. Gonzales*, 481 F.3d 578, 591 (8th Cir. 2007) (noting that plaintiff "cannot make her claim based on personality conflicts, bad manners, or petty slights and snubs"); *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05 Civ. 5109, 2007 U.S. Dist. LEXIS 28274, 2007 WL 1149979, at *9 (S.D.N.Y. Apr. 18, 2007) (mockery, "nasty looks" and "angry [*62] silences" by other staff members are not adverse actions).

iii. *Requests for Medical Documentation & Health Benefits*

[HN24]Legitimate requests for medical documentation for sick leave are not "materially adverse" actions. Such requests would not dissuade a reasonable worker from engaging in protected activity. *See, e.g., Wells v. Gates*, No. 08-1358, 336 Fed. Appx. 378, 2009 U.S. App. LEXIS 15307, 2009 WL 1991212, at *4 (4th Cir. July 10, 2009) (per curiam) (unpublished) (agreeing with district court's finding that request for further medical documentation prior to granting request for additional medical leave was not a materially adverse action); *see also Byrne v. Telesector Res. Group, Inc.*, No. 04-CV-0076, 2007 U.S. Dist. LEXIS 23195, 2007 WL 962929, at *15-16 (W.D.N.Y. Mar. 29, 2007), *aff'd*, No. 08-0101, 339 Fed. Appx. 13, 2009 U.S. App. LEXIS 15493, 2009 WL 2019951 (2d Cir. July 14, 2009) (summary order) (request that employee whose mother was in the hospital work during the weekend did not rise to the level of materially adverse action under *Burlington Northern*). Nor would temporary lapses in medical certification which are remedied in a matter of hours. *See Messer v. Bd. of Educ. of City of New York*, No. 01-CV-6129, 2007 U.S. Dist. LEXIS 3055, 2007 WL 136027, at *18 (E.D.N.Y. Jan. 16, 2007) (where plaintiffs' health benefits were reinstated [*63] after they complained, "[b]ecause plaintiffs were not actually denied health care coverage during the relevant time period, they are unable to demonstrate that the ... health benefit termination constituted a materially adverse employment action").

However, [HN25]actual termination of health benefits and coverage can meet the *Burlington Northern* standard when such actions could induce an employee to refrain from participating in protected activity. Similarly, the denial of sick leave may meet the standard. *See, e.g., Wells*, 2009 U.S. App. LEXIS 15307, 2009 WL 1991212, at *5 ("Based on the financial impact, we cannot say that a reasonable worker would not be dissuaded from engaging in protected conduct by the loss of ... compensation from denial of sick leave.").

iv. *Schedule Changes, Transfers and Reassignments*

[HN26]Whether a schedule change or reassignment is materially adverse depends on the circumstances of the employee. *See Burlington Northern*, 548 U.S. at 69 ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children."); *see also Cruz v. Liberatore*, 582 F. Supp. 2d 508, 523-24 (S.D.N.Y. 2008) ("[W]ere [Plaintiff's] retaliation [*64] claim predicated solely on his change of schedule, he would face a difficult, if not Sisyphean, task. ... [However,] a transfer that affects a parent's ability to spend time with and care for a child is the type of employment action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" (quoting *Burlington Northern*, 548 U.S. at 57)); *Montgomery v. Chertoff*, No. 03-CV-5387, 2007 U.S. Dist. LEXIS 30519, 2007 WL 1233551, at *17-18 (E.D.N.Y. Apr. 25, 2007) (although her salary did not change, U.S. Customs Officer's allegations that she was restricted from using her weapon and was unable to work overtime as a result of her reassignment met the material adversity requirement under *Burlington Northern*, noting that "carrying a weapon goes to the heart of plaintiff's job responsibilities"); *Guerrero v. Lowe's Home Centers, Inc.*, 462 F. Supp. 2d 399, 410 (W.D.N.Y. 2006) (transfer materially adverse where plaintiff was required "to work shifts that were sometimes earlier and sometimes later than her previous schedule, as well as some weekends" and plaintiff was the mother of school-age children); *but see Sibilia v. Snow*, No. 05-10096, 2006 U.S. Dist. LEXIS 76409, 2006 WL 2990479, at *7 (D. Mass. Oct. 20, 2006) [*65] (a *denial* of transfer which resulted in an increased commuting time was not materially adverse).

b. *The Causal Connection and The Need For Protected Activity That Precedes the Alleged Retaliation*

[HN27]As part of their burden of making a prima facie case, plaintiffs must also show proof of a causal connection between the protected activity and the retaliation. This can be shown either (1) "directly, through evidence of retaliatory animus directed against the defendant," *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (citing *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993)); or (2) indirectly, "by showing that the protected activity was closely followed in time by the adverse action." *Cifra*, 252 F.3d at 217 (internal quotation marks and citation omitted). The Second Circuit has not established a bright line rule for determining when

retaliatory conduct is said to have "closely followed" a plaintiff's protected activity. *See Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001). However, "a passage of two months between the protected activity and the adverse employment action seems to be the [*66] dividing line." *Cunningham v. Consol. Edison, Inc.*, No. 03 CV 3522, 2006 U.S. Dist. LEXIS 22482, 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (collecting cases).

Defendants correctly contend that some of plaintiffs' claims are barred because they are based on alleged acts that occurred prior to plaintiffs engaging in protected activity and thus fail to show a causal connection. [HN28]"There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity." *Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)); *see also Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001) ("The plaintiff's burden at the beginning of the case is a light one, usually demanding only that the protected activity preceded the adverse action in order to satisfy the causation requirement.").

Plaintiffs' union grievances challenging their administrative leaves and terminations did not include allegations of discrimination. In fact, as addressed above, Osborne expressly denied the existence of any discrimination claims at the arbitration. *See* DOT's 56.1 Statement P 31 & Ex. S at 539 [*67] ("MR. OSBORNE: That is not a position we have taken or are taking in this case, period."). It is well settled that [HN29]union grievances that do not allege discrimination do not constitute protected activity within the meaning of Title VII. *See, e.g., Clemente v. New York State Div. of Parole*, No. 01 Civ. 3945, 2004 U.S. Dist. LEXIS 16881, 2004 WL 1900330, at *13 (S.D.N.Y. Aug. 24, 2004) (union grievances that fail to allege discrimination do not qualify as protected conduct under Title VII); *Marshall v. Nat'l Ass'n of Letter Carriers Br. 36*, Nos. 00 Civ. 3167 & 01 Civ. 3086, 2003 U.S. Dist. LEXIS 1427, 2003 WL 223563, at *9 (S.D.N.Y. Feb. 03, 2003) (same). Thus, [HN30]although EEO counseling is protected activity, *see, e.g., McGuire v. U.S. Postal Service*, 749 F. Supp. 1275, 1282 (S.D.N.Y. 1990), challenged actions that preceded a plaintiff's contact with an EEO counselor are barred.

c. *The Need To Fully Exhaust Claims Brought under the Negotiated Grievance Procedure and Plaintiffs' Claim for Back Pay*

[HN31]Pursuant to 29 C.F.R. 1614.301(a) and 5 U.S.C. § 7121(d), claims that are brought as grievances under a collective bargaining agreement and are unexhausted cannot form the basis of a retaliation claim. *See Fernandez, 471 F.3d at 54* ("Before bringing a [*68] Title VII action in the district court, an aggrieved employee is required to exhaust his administrative remedies."). Here, some plaintiffs filed grievances that pertain to the same allegations they brought in this case, which remain unexhausted. Plaintiffs contend that "the special circumstances" of this case should allow them to bring their claims in this forum despite their failure to meet the exhaustion requirement. Pls.' Br. at 24. They argue that any failure to exhaust claims brought via the negotiated grievance procedure should be excused because the defendants have rejected every grievance filed by NATCA members since September 2006 and thus, they contend, it will be impossible to exhaust these grievances.

Plaintiffs explain that in September 2006, the defendants suspended the 2003 CBA and "unilaterally imposed work rules upon the NATCA membership." Pls.' Br. at 25; *see* Barbarello Aff. PP 7-8 (submitted with plaintiffs' memorandum in opposition to the instant motion). As a result, NATCA files all of its grievances under the former 2003 collective bargaining agreement, which defendants refuse to recognize. *Id.* P 10. Consequently, plaintiffs claim, defendants have found every grievance [*69] filed under the 2003 CBA to be "procedurally defective." *Id.* PP 9-10. According to NATCA Vice-President Phil Barbarello, there are approximately 400,000 grievances presently pending nationwide and no arbitrations are currently taking place. *Id.* PP 11-14. Plaintiffs argue that as a result, they are precluded from exhausting the union grievance procedure.

Plaintiffs cite to *Fernandez* in support of their position. In that case, the Second Circuit addressed what avenue of relief was available to a plaintiff whose grievance was abandoned by his union after the plaintiff unilaterally withdrew from arbitration, which occurred after he had rejected a proposed settlement that his union viewed to be reasonable. The Circuit rejected the government's argument that the plaintiff was precluded from bringing his action based on his filing of a grievance on the same issue and remanded the case to this Court to consider whether his failure to exhaust EEOC remedies could be excused. In so doing, the Circuit instructed this Court to consider whether Fernandez's failure to exhaust administrative remedies under the agreement was attributable to his union's actions in preventing a "final decision" from which [*70] he could have otherwise appealed. *Fernandez, 471 F.3d at 57-58*.

I need not reach the question whether plaintiffs' failure to exhaust the union grievance procedure should be excused. Some plaintiffs' claims pertain to grievances that were filed and denied months before the September 2006 suspension of the 2003 CBA. Because the complained of "special circumstances" did not exist at that time and thus could not have prevented or discouraged plaintiffs from appealing the denials, their failure to exhaust the administrative process with respect to those claims precludes my consideration of them here. With respect to those grievances that were filed after September 2006, those claims are nevertheless denied for the reasons discussed below.

d. *The Issue of Back Pay*

Plaintiffs allege that the defendants retaliated against them by not paying them the full amount they believed they were owed under the Stipulated Award from the period between their termination and their reinstatement (October 2005 to December 12, 2005). On January 13, 2006, NATCA filed a grievance pursuant to Section 11 of the CBA on behalf of plaintiffs against FAA, seeking compliance with the back pay award. DOT's 56.1 Statement, [*71] Ex. CC. That grievance was denied on February 3, 2006. *Id.*, Ex. DD. Under Section 11 of the CBA, grievances filed by the Union are subject to a three-step process. First, a grievance must be filed, to which a written response is due within 20 days. Second, if the moving party is not satisfied with the answer, it may refer the matter to the respondent at the regional level within 20 days of receiving the answer. The responding party must answer within 20 days. If the moving party desires the matter to be submitted to arbitration, it must advise the respondent at the national level by certified mail within 30 days. The third and final step is an arbitrated grievance hearing. *Id.*, Ex. O, at 25-26.

The determination denying the back pay grievance was not exhausted because NATCA did not refer the

Page 27

matter to the regional level or seek arbitration. Plaintiffs' contention that "special circumstances" should excuse their failure to exhaust is meritless. Pls.' Br. at 24. Plaintiffs' grievance pertaining to the back pay award was denied on February 2, 2006, more than six months before the Agency suspended the 2003 CBA, allegedly making it "impossible" for the plaintiffs to exhaust the grievance [*72] procedures. *Id.* at 25. Had plaintiffs appealed the decision or sought arbitration, their argument may have merited additional consideration. However, under the undisputed facts, plaintiffs cannot revive their back pay claim by bringing it as a retaliation claim under Title VII.

In addition, the back pay claim fails because of the causation requirement. NATCA filed the back pay grievance on behalf of plaintiffs on January 13, 2006. Thus, the defendants were allegedly noncompliant with the terms of the back pay award prior to that date. But none of the plaintiffs engaged in protected activity until -- at the earliest -- January 19, 2006, when Kaplun, Landi and Smith first contacted EEO counselors. Therefore, notwithstanding the plaintiffs' failure to exhaust the negotiated grievance procedure, the back pay claim raised in the grievance cannot be retaliatory because it preceded any protected activity.

### 2. The Plaintiffs' Individual Retaliation Claims

#### a. John Landi

Defendants are entitled to summary judgment with respect to all of Landi's claims for the following reasons.

Landi's claim (1), that he "overheard FAA management stating that 'the reinstated air traffic controllers must have done [*73] something wrong or else [they] would not have been fired,'" Landi Aff. P 14, does not meet the material adversity requirement. At most, such a statement -- which was not even directed at Landi -- falls within the category of non-actionable behavior characterized by "petty slights" and "bad manners," rather than that which would cause someone to refrain from engaging in protected activity. DOT's 56.1 Statement, Ex. BB ("Landi Dep."), at 89-90.

For the reasons discussed above, defendants are entitled to summary judgment with respect to Landi's claim (2) pertaining to back pay.

With respect to Landi's claim (3) -- that his health insurance lapsed in April 2006 -- the defendants do not

contend that cutting off health insurance can never qualify as a materially adverse action. Rather, they provide a non-discriminatory reason for the "lapse" that occurred during the period from December 2005 to April 2006, which plaintiffs have not rebutted. When plaintiffs were terminated, they enrolled in COBRA because they were no longer eligible for health insurance as FAA employees. After reinstatement, they were reimbursed for COBRA expenses and reenrolled in the FAA employee benefits plan. However, [*74] the administrative process of reenrolling plaintiffs did not go smoothly due to a "disconnect" between the regional HR management office at JFK and the service center in Atlanta. As a consequence, from December 2005 to April 2006, the reinstated air traffic controllers were not yet reenrolled with the FAA employment health insurance. *Id.*, Ex. EE ("Grefe Dep."), at 50-52; Ex. FF ("Tracy Dep."), at 109-11. The matter was resolved for all affected air traffic controllers around April 2006. Notwithstanding the "lapse," neither Landi nor his family was denied medical care during the "lapse" period. When coverage was reinstated, it was made retroactive; Landi never paid any additional costs beyond those required under the FAA employee insurance, and all of his bills were covered. Landi Dep. at 91-96. The gist of Landi's complaint seems to be that it was inconvenient to have to bring bills to the TRACON department, which handled the bills until he was reenrolled, and that the reenrollment process was unreasonably prolonged. *Id.*

The defendants have therefore met their burden of articulating a legitimate, nondiscriminatory reason for the lapse. Landi asserts in conclusory fashion he "suspect[ed] [*75] that someone didn't do their job as an act of reprisal." *Id.* at 95. This mere suspicion -- without more -- does not suffice to show that the explanation offered by the defendants is in fact a pretext for retaliation. Moreover, the undisputed facts show that Landi did not suffer a significant harm as a result of this lapse in coverage. Therefore, his claim also fails on the facts of this case for the additional reason there was no materially adverse action. Accordingly, summary judgment is granted with respect to Landi's claim (3).

Landi first contacted an EEO counselor on January 19, 2006. Because claims (4) and (6) relate to alleged acts (retraining "every second of every day") preceding that date (Landi testified that the training was completed "after a month or so", *id.* at 58), defendants are entitled to summary judgment on these claims. [13]

13   Moreover, Landi has not demonstrated that the additional training amounted to an adverse action. At his deposition, Landi testified that he did not have to "recertify" (demonstrate proficiency in air traffic control and be approved after monitoring by a supervisor), but rather had to become current when he was reinstated (work a certain number [*76] of hours in a certain time period in order to work under general supervision). Landi Dep. at 53-58. He agreed that because of the time between the administrative leave and the reinstatement, none of the 11 controllers were current at the time they were reinstated. *Id.* at 53. Thus, they were required to become current. He also explained that after becoming current he was required to do a training program based on an error he made the previous March. Finally, Landi stated that he believed the intensity of retraining was in retaliation for getting his job back, *i.e.*, for successfully grieving his termination. *Id.* at 55. Title VII prohibits retaliation for engaging in protected activity. However, as discussed above, filing a grievance that does not allege discrimination is not protected activity under Title VII. Thus, any animus shown towards the reinstated controllers because they prevailed in their grievances is not actionable under Title VII.

Landi's claim (5) does not allege retaliatory conduct. This claim alleges that in October 2006, William Allen, a supervisor with whom Landi had a good relationship, told him "you should retire as soon as you are eligible -- it's the best thing for [*77] you." *Id.* at 102-03. Landi testified that Allen told him this because "[h]e believed it would be in my best interest, cause me less aggravation." *Id.* at 103. This claim does not involve adverse action at all -- let alone a materially adverse one. Accordingly, it does not survive summary judgment.

*b. Christopher Piccola*

Summary judgment is granted for defendants with respect to both of Piccola's claims. For the reasons discussed above, defendants are entitled to summary judgment with respect to Piccola's claim (1), which pertains to back pay.

Piccola's other claim, raised for the first time in his IR, alleges that his request for a week off with pay in March 2006 was denied. [14] Piccola testified that Terry

Tracy denied the request because the doctor's note was insufficient. Piccola's doctor then refused to write a different note because he believed the first one was sufficient. As discussed above, legitimate requests for medical documentation are not materially adverse actions. And even if they were, Piccola has not offered any admissible evidence that Tracy's request for a doctor's note was a pretext for impermissible retaliation. Accordingly, this claim fails as well.

14   At his deposition, [*78] Piccola indicated that he had in fact requested a week without pay in late February or March of 2006. Piccola Dep. at 54-55.

*c. Kent Mitchell*

Defendants are entitled to summary judgment with respect to all of Mitchell's claims.

For the reasons discussed above, defendants are entitled to summary judgment with respect to Mitchell's claim (1), which pertains to back pay.

Mitchell's remaining claims are based on actions that were not materially adverse. Mitchell claims that his failure to receive a timely response to his request for an estimate of his retirement benefits was a retaliatory act (claim (2)). Mitchell, who testified that this "may" have delayed his retirement by a few months, DOT's 56.1 Statement, Ex. GG ("Mitchell Dep.") at 75-76, has not shown that he suffered any "injury or harm" as a result of this failure. *Burlington Northern*, 548 U.S. at 67. [15] Claims (5) and (6) pertain to comments he overheard to the effect that plaintiffs should not have been reinstated. These claims are not materially adverse for the reasons discussed above regarding Landi's claim (1). Nor are Mitchell's claims that his "veracity and ... work experience" were questioned by his supervisors after reinstatement [*79] (claim (3)) or that he was told to "watch [his] ass" and that the reinstated controllers were being watched (claim (4)), so adverse that they would dissuade a reasonable employee from engaging in protected activity. While such questioning and scrutiny may have been unpleasant, these statements did not cause Mitchell to suffer any significant harm. *See, e.g., Scott v. Cellco P'ship*, No. 98 CIV 7245, 2007 U.S. Dist. LEXIS 29063, 2007 WL 1051687, at *2 (S.D.N.Y. Apr. 3, 2007) ([HN32]"general reprimands about plaintiff's lateness and other accusations, and alleged excessive scrutiny" do not constitute materially adverse actions). Similarly, because

"the significance of any given act of retaliation will often depend upon *the particular* circumstances" *Burlington Northern*, 548 U.S. at 69 (emphasis added), a denied request for a schedule change (claim (8)) and being assigned to work on a holiday on two occasions (claim (7)), [16] without more detail, do not satisfy the material adversity requirement. *See id. at 69* (noting that "[a] schedule change ... may make little difference to many workers, but may matter enormously to a young mother with school age children").

15 Mitchell testified that he had a difficult time contacting representatives [*80] at the Washington D.C. office, which was responsible for handling his request regarding retirement benefits. He "assumed" these people knew him or of him because they were in the "management chain" and discriminated against him "[u]nder the direction of the FAA management." Mitchell Dep. at 76. No genuine issue of material fact exists with respect to this claim because this speculative evidence is not sufficient for a reasonable jury to return a verdict for Mitchell.

16 In addition, Mitchell has not demonstrated that his claim (7) is causally connected to his participation in protected activity. Although [HN33]causal connection can be shown circumstantially based on the temporal proximity of the discriminatory treatment to the protected activity, Mitchell has failed to allege the dates of the holidays he was required to work. He has also failed to demonstrate causal connection directly, through evidence of "retaliatory animus" directed at him by defendants. Without more than the bare allegation itself, Mitchell has failed to make a prima facie retaliation claim based on these events.

d. *David Mangene*

Defendants are entitled to summary judgment with respect to all of Mangene's claims.

For the [*81] reasons discussed above, defendants are entitled to summary judgment with respect to Mangene's claim (1), which pertains to back pay. Mangene first contacted an EEO counselor on February 23, 2006. Mangene's claims (5) and (7) relate to alleged acts that preceded that date. Therefore, defendants are entitled to summary judgment on these claims, because the challenged conduct cannot have been in retaliation for Mangene's protected activity. Defendants are entitled to summary judgment with respect to Mangene's claim (6) -- that his health insurance was "wrongfully" terminated -- for the reasons discussed above with respect to Landi's claim (3). [17]

17 Moreover, like Landi, Mangene did not suffer any harm as a result of the lapse in coverage. Mangene took his daughter to the doctor twice in April 2006, and discovered that his FAA employee insurance had not been reinstated. About a week after speaking to Tracy, "it was fixed." DOT's 56.1 Statement, Ex. HH "Mangene Dep.", at 65-66.

Mangene's claim (2), which appears only in Mangene's EEOC complaint, alleges that he was improperly denied leave and improperly questioned about the reasons for the leave request, in violation of the Collective Bargaining [*82] Agreement. This claim does not appear again in the IR or his affidavit. However, claim (8) appears in both, and alleges that Mangene was counseled for sick leave abuse in January/February 2006. In the absence of additional detail regarding claim (2), I conclude that Mangene has not made a prima facie case regarding this claim because the complained-of action is not materially adverse. To the extent that claim (8) is a more detailed explanation of claim (2), it too fails under the same rationale. In his deposition, Mangene testified that in late January-early February 2006 he received a warning letter regarding his use of sick leave. However, he was not denied the time off nor was pay deducted for the days he allegedly abused the sick leave policy. Mangene Dep. at 53-54. As discussed above, although the denial of sick leave may be a materially adverse action in some circumstances, *see, e.g., Wells v. Gates, No. 08-1358, 336 Fed. Appx. 378, 2009 U.S. App. LEXIS 15307, 2009 WL 1991212, at *4 (4th Cir. Jul 10, 2009)* ("Based on the financial impact, we cannot say that a reasonable worker would not be dissuaded from engaging in protected conduct by the loss of this compensation from denial of sick leave."), receipt of a letter of warning [*83] alone is not. Even accepting as true Mangene's speculative belief that this letter was issued to enable "progressive discipline" in the future, Mangene Dep. at 53, this action cannot be characterized as one that would cause a reasonable employee to refrain from participating in protected activity because general reprimands and excessive scrutiny, without more, are not sufficiently materially adverse to be actionable. *See Scott*

*v. Cellco P'ship,* No. 98 CIV 7245, 2007 U.S. Dist. LEXIS 29063, 2007 WL 1051687, at *2 (S.D.N.Y. Apr. 3, 2007) ("general reprimands about plaintiff's lateness and other accusations, and alleged excessive scrutiny" do not constitute adverse action).

Mangene's claim that his supervisor, Kevin Watson, warned him "to watch out" because management "hates" him, fails for the same reasons that Landi's claim (5) fails: it does not allege an adverse action, nor is it action attributable to defendants. Mangene testified that he believed Watson, with whom he was on good terms, warned him about how management felt because he "was looking out" for him. Mangene Dep. at 57. Thus, Watson's comments are in no way retaliatory.

In claim (4), Mangene contends that he was retaliated against when Enzio Powell, [*84] another supervisor, followed him in the parking lot on numerous occasions and sat behind Mangene while he was in "position," directing air traffic. More specifically, Mangene claims that Powell "physically intimidated" him by walking closely behind him and by following him into the facility in his car and almost hitting him with his car. Mangene Aff. P 12. Mangene believed that Powell wanted to provoke him to have a "verbal or physical reaction" so that he would get fired again. Mangene Dep. at 62. Mangene explained that Powell did not like him and "was a very power-hungry man and I felt that if he could get me to do something, that it would look good in management's eyes." *Id.* With respect to the allegations that Powell sat directly behind him and monitored him while he was directing air traffic, Mangene stated that this occurred approximately seven times during a six-week period and ceased after he complained about it. *Id.* at 63-64. This claim fails because Mangene has not demonstrated that defendants had any role in Powell's behavior. Because Mangene alleges Powell intimidated him in these ways because he didn't like him and wanted to get in the good graces of the management, Mangene [*85] has not shown that Powell's behavior was in any way motivated by a desire to retaliate against Mangene for having engaged in protected activity.

*e. Thomas Fitzgerald*

Defendants are entitled to summary judgment with respect to all of Fitzgerald's claims for the following reasons.

For the reasons discussed above, defendants are entitled to summary judgment with respect to Fitzgerald's claim (1), which pertains to back pay. Fitzgerald's claims (2), (4), (9) and (10) relate to alleged acts that preceded Fitzgerald's first contact with an EEO counselor on February 6, 2006. These claims fail because they challenge employer actions that predated Fitzgerald's protected activity. Like claim (5), claims (3), (9) and (10) also fail to make a prima facie case of retaliation because they are based on inadmissible hearsay. In addition, claim (10) -- that management considered the arbitration a "huge victory" -- is plainly not retaliatory conduct, but rather is merely an unactionable opinion. Claim (5), which alleges that Fitzgerald's co-workers were warned not to cover for him, also fails because it there is no evidence that Fitzgerald suffered any adverse action (*i.e.*, that the co-workers followed [*86] this instruction); *see also Higgins v. Gonzales,* 481 F.3d 578, 591 (8th Cir. 2007) (plaintiff "cannot make [his] claim based on personality conflicts, bad manners, or petty slights and snubs"). That Fitzgerald was questioned about the need to take sick leave (claim (7)) may have been "out of the norm," as Fitzgerald claims, but is not a materially adverse action, especially in light of the fact that his request for leave was not denied. DOT's 56.1 Statement, Ex. II ("Fitzgerald Dep."), at 136-37.

In claim (6), Fitzgerald claims that a March 2006 request to move from a night shift to a day shift for one day was denied first by Jim Giotta, a supervisor, and then by his immediate supervisor, Keith McDonald, who told him he was instructed "to deny any requests from you guys." IR at 14. Fitzgerald then sought the assistance of the area manager, Doug Alter, who approved his request. The denial of his request for a one-day shift-change is not a materially adverse action; at most it is a "trivial harm" or "mere inconvenience." Moreover, that the matter was resolved three hours later militates even more strongly against a finding of *any* harm, let alone a "significant" one. Fitzgerald Dep. at [*87] 128-29.

Fitzgerald also claims that he was retaliated against when he received a letter from Clarke in June 2006, when he was a participant in the leave donation program, "threaten[ing] removal" unless he returned to work or provided medical documentation to the flight surgeon verifying his need to be on extended sick leave. Fitzgerald's wife had already delivered copies of the required paperwork to the Flight Surgeon; however, those documents were either lost or never received by the proper party. Fitzgerald's wife re-submitted the

documents, which resolved the matter. Fitzgerald Dep. at 138-41. As noted above, a request for medical documentation is not a materially adverse action. Accordingly, this claim, (8), also fails. *See, e.g., Wells v. Gates*, No. 08-1358, 336 Fed. Appx. 378, 2009 U.S. App. LEXIS 15307, 2009 WL 1991212, at \*4 (4th Cir. Jul. 10, 2009) (agreeing with district court's finding that [HN34]request for further medical documentation prior to granting request for additional medical leave was not a materially adverse action).

### f. Kevin Delaney

Defendants are entitled to summary judgment with respect to all of Delaney's claims for the following reasons.

Delaney first contacted an EEO counselor on January 20, 2006. Delaney's claims [*88] (1), (2), (3), (4) and (7) relate to alleged acts that preceded the protected activity. Accordingly, these claims fail.

Delaney's claim of retaliatory constructive discharge (claim (6)) also lacks merit. [HN35]"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003); *accord Petrosino v. Bell Atlantic*, 385 F.3d 210, 229 (2d Cir. 2004). The doctrine of res judicata 18 bars Delaney's constructive discharge claim because the Merit Systems Protection Board, *Delaney v. Dep't of Transp.*, NY-0752-07-0128-1-1, affirmed the administrative law judge's decision that Delaney failed to prove a constructive discharge, which was affirmed by the Federal Circuit on appeal. *Delaney v. Dep't of Transp.*, 319 F. App'x 905 (Fed. Cir. 2009). In addition, Delaney submitted his written resignation on January 3, 2006, over two weeks before he contacted an EEO counselor. Therefore, even assuming *arguendo* [*89] that the work atmosphere was intolerable, there is no causal connection between it and Delaney engaging in protected activity.

18 [HN36]The doctrine of *res judicata* "bars later litigation if [an] earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir.

2007) (internal citations and quotation marks omitted).

Delaney's claim (5) alleges that he was retaliated against when the Department of the Interior sent him incorrect collection notices claiming that he was overpaid thousands of dollars in salary (and demanding refunds) because of the way his time was miscategorized. However, Delaney has not demonstrated that he suffered any adverse action. Delaney never made any payments and after he complained (by both contesting the notices in writing and amending his EEO complaint), he ceased receiving the letters. DOT's 56.1 Statement, Ex. JJ ("Delaney Dep."), at 163-65.

Finally, Delaney's claim (8) is that he was retaliated against when he received a bill "which was evidently meant" for [*90] a different individual with the same name who was also a DOT employee. [HN37]Receipt of a misdirected bill is not a materially adverse action. Nor can Delaney satisfy the causal connection requirement with respect to this claim.

### g. John Kaplun

Defendants are entitled to summary judgment with respect to all of Kaplun's claims for the following reasons.

Kaplun first contacted an EEO counselor on January 19, 2006.

For the reasons discussed above, defendants are entitled to summary judgment with respect to Kaplun's claim (1), which pertains to back pay and leave under the Stipulated Award. His claim (2) regarding schedule changes "made for no reason, against the contract" fails because Kaplun was unable to provide any evidence that they occurred (he testified that he had no recollection what schedule changes he was referring to in his EEO complaint nor could he recall when they occurred, for how long or who changed his schedule). DOT's 56.1 Statement, Ex. KK ("Kaplun Dep."), at 41-42. [HN38]Conclusory allegations by a plaintiff are insufficient to make a prima facie case on a summary judgment motion. Moreover, as discussed above, [HN39]schedule changes, without more context as to the harm they caused, are not [*91] materially adverse actions.

Kaplun's claims (3), that he was singled out for

retraining without reason, and (4), that he had retraining administered against FAA's own orders," DOT's 56.1 Statement P 67 & Exs. U3, LL, were raised in a grievance dated March 29, 2006. That grievance was denied on April 21, 2006. *Id.*, Ex. LL (April 11, 2006 denial of Kaplun's grievance) (noting that "it was management's determination that in lieu of individual retraining plans ... the Training Department would develop an overall plan for the recertification of all eleven rehired controllers."). Kaplun did not appeal this denial. His claim (5), that he was wrongfully written up in February 2006 for an operational error which occurred in January 2005, was raised in an informal grievance dated March 21, 2006 and a formal grievance dated April 27, 2006. *Id.*, Ex. MM. It was denied on June 8, 2006 and not appealed to the next step. *Id.* Kaplun's failure to exhaust these grievances precludes my review of the related claims here.

Kaplun's claim (6) is that he was denied instructions for completing the application for medical certification in December 2006. This claim was raised in a grievance dated Dec. 12, 2006. *Id.*, [*92] Ex. NN. Although the grievance was found to be procedurally and/or jurisdictionally defective because it relied on the 2003 CBA, on March 2, 2007 Clarke found that Kaplun's claim was legitimate and agreed to settle the grievance by forwarding Kaplun the instructions he requested and giving him duty time to review them and prepare a request for any necessary corrections or amendments. *Id.* This claim fails because Kaplun has not demonstrated that he suffered any significant harm as a result of the alleged denial, which was ultimately resolved in his favor.

Kaplun's claim (8) is that his supervisors gave him advice such as "keep [your] head low" because they did not "want to see [him] get fired or in trouble," Kaplun Dep. at 55-56, and it fails for the reasons previously discussed: Kaplun suffered no adverse action, whether material or not, by defendants. Nor does his claim (9) pertain to an adverse action. Kaplun alleged in the IR that he was "harassed" when he took a day of FMLA leave in November 2006 for the death of his father-in-law. At his deposition Kaplun testified that his FMLA day had been approved, but his supervisor requested written proof from his father-in-law's doctor. Even [*93] though Kaplun refused to comply with this request, approval for his FMLA leave was not withdrawn nor was he subjected to any other consequences. Kaplun Dep. at 57-58.

It was not a materially adverse action for Kaplun to receive a sick leave restriction letter, requiring him to provide a doctor's note for each use of sick leave (claim (10)). None of the sick leave Kaplun requested was denied and the letter was withdrawn without any consequence. Kaplun Dep. at 53-55. His claim (7), that he was wrongfully denied FMLA leave in March/April 2007, fails because Kaplun has not shown that he suffered any significant harm or injury as a result of the denial. Finally, Kaplun's claim that his health insurance was cancelled in the spring of 2006 is denied for the reasons explained in above. *See supra* discussion regarding Landi's claim (3).

### h. John Smith

Defendants are entitled to summary judgment with respect to all of Smith's claims for the following reasons.

Smith first contacted an EEO counselor on January 19, 2006.

For the reasons discussed above, defendants are entitled to summary judgment with respect to Smith's claim pertaining to back pay (claim (4)). Smith's claims (1), (2), (3), (6) and (7), [*94] which involve comments overheard by Smith expressing the opinion that the terminated controllers should not have been reinstated and managements' failure to respond when Smith complained about the comments, fail because they do not allege materially adverse acts. These claims, like Landi's claim (1) and Mitchell's claims (5) & (6), fall within the range of "trivial harms" or "bad manners," but are not of the quality that would preclude someone from engaging in protected activity. [HN40]Because "Title VII, ... does not set forth a general civility code for the American workplace," *Burlington Northern*, 548 U.S. at 68, it cannot be invoked as a mechanism to regulate personality conflicts.

Smith's claim (5) is that he was precluded from meeting with an EEO counselor in January 2006. Smith has not shown that this adverse action was causally related to his engaging in protected activity. There is no evidence in the record that his requests for permission to meet with an EEO counselor were denied prior to his initial contact with one. To the extent Smith argues that his requests were denied based on his reinstatement or general dislike for him, his claim fails because it does not [*95] pertain to his protected activity. However, even assuming that Smith were able to make

his prima facie case of retaliation, here the defendants have offered a non-discriminatory reason -- staff shortages -- for denying Smith's request to leave during work hours. Smith has no evidence from which a jury could infer that this reason was a pretext, and that the real reason was to retaliate against him.

Like Landi's claim (3) and Mangene's claim (6), Smith's claim (8) is that his health insurance lapsed in the spring of 2006. And like Landi and Mangene, Smith cannot show that he suffered any harm from that lapse aside from a minimal amount of disruption. DOT's 56.1 Statement, Ex. PP ("Smith Dep."), at 52-53. He "never paid anything out-of-pocket" to the doctors, and insurance covered all of the claims that he made. Moreover, as discussed with respect to Landi, defendants have offered a non-discriminatory basis for the lapse, which has not been rebutted.

Smith's claim (9) is that Clarke asked him in a "derogatory" and "intimidating" manner, "How are you doing now?"; (10) is that a supervisor told him he was told to "watch" the reinstated controllers; [19] (11) is that a supervisor announced [*96] that Smith was contagious and not allowed to work when he called in with questions about whether he could work on the medication he was taking; (12) is that his name was not on the "Read and Initial" list after he was reinstated; (13) alleges that his name was not placed back on his mailbox when he was reinstated; and (15) is that his request for a special chair was denied. They all fail because they do not allege materially adverse actions. At most these incidents amount to inconveniences and verbal slights; they do not present cognizable Title VII retaliation claims.

19   This claim is also inadmissible hearsay and thus fails for that additional reason.

Smith's claim (14) pertains to his TSP loan. He claims that when he was reinstated, money was not automatically withheld from his paycheck to pay this loan and that he had to make payments manually. Smith does not know whether the failure to be enrolled in automatic payroll deductions is attributable to the FAA or the TSP offices. Defendants have established that TSP loans are not handled by TRACON but by out-of-state offices. In any event, regardless of which office is at fault, Smith has not presented evidence that he suffered an adverse [*97] action as a result of needing to mail in the checks manually. [20]

20   In the IR, Smith alleges that he was "told he had to pay back the entire loan by December 29, 2006. Thus, he was forced to take out a home equity loan to pay off the [TSP] loan, and as a result his interest rate was higher." IR at 9. However, Smith provides no details as to who required him to pay back the loan or why. Such conclusory allegations that this conduct was retaliatory, wholly lacking in supporting admissible evidence, do not survive summary judgment.

### i. Robert Serviss

Defendants are entitled to summary judgment with respect to all of Serviss's claims for the following reasons.

For the reasons discussed above, defendants are entitled to summary judgment with respect to Serviss's claim (4), which pertains to back pay under the Stipulated Award. Serviss first contacted an EEO counselor on January 20, 2006. Serviss's claims (1) and (2) relate to alleged acts that preceded the protected activity. Accordingly, these claims fail. They also fail because they were not exhausted as part of the grievance procedures in which they were unsuccessfully raised in January and February of 2006. See DOT's 56.1 Statement, Exs. [*98] QQ, RR. Similarly, claim (3), pertaining to the rejection of three of Serviss's training reports, was raised in a grievance via the negotiated procedure in February 2006 and was not exhausted after it was denied in March 2006. See DOT's 56.1 Statement, Ex. SS. Finally, claim (6), regarding an oral agreement between defendants and NACTA for prime time leave for the reinstated controllers, was raised in a grievance in January 2006 and was never exhausted after it was denied March 6, 2006. Id., Ex. WW.

Serviss's claim (5) is that in mid-January 2006, Clarke sought an ethics violation against him for "activity outside his employment" based on his appearance in a movie about 9/11. The claim fails for three reasons. First, the allegedly retaliatory letter from Clarke was dated January 18, 2006, and thus cannot be retaliatory because it preceded Serviss's first EEO contact on January 20, 2006. Second, this letter is not a materially adverse action. Contrary to Serviss's assertion that he "took this letter as a grave threat," Serviss Aff. at 4, the letter makes no threats or warnings. Rather, it explains that "there are certain restrictions" related to employees engaging in

"outside activities [*99] that are compatible with their Government duties" and requests additional information, such as whether he was paid, how he came to participate, what his role in the film was and whether he provided information to the film producers about either what it is like to be an air traffic controller, or the actual events on 9/11. *Id.*, Ex. TT. Serviss submitted his response on January 27, 2006, *id.*, Ex. UU, to which he never received any follow-up communication or reprimand. Such a letter cannot be construed as an action that would dissuade a reasonable employee from engaging in protected activity because Serviss suffered no significant harm as a result of receiving the letter. Third, Clarke had a legitimate, non-discriminatory reason for issuing the letter: [HN41]government employees may be subject to certain restrictions related to outside employment. Given the circumstances, it was entirely appropriate for Clarke to inquire into Serviss's participation in the film, and Serviss has not met his burden of showing that the proffered reason was pretextual.

The lack of response to Serviss's request for a transfer to a busier sector in the building (claim 9)) fails because it is not a materially adverse [*100] action. Aside from stating that the other sector would be busier and more challenging, Serviss has not demonstrated that there would be any meaningful change in his working conditions. DOT's 56.1 Statement, Ex. VV ("Serviss Dep."), at 66. Moreover, given the length of time between the alleged adverse action and Serviss's participation in protected activity, he has failed to adduce evidence of a causal connection. *See Cunningham v. Consol. Edison, Inc.,* No. 03 Civ. 3522, 2006 U.S. Dist. LEXIS 22482, 2006 WL 842914, at *19 (E.D.N.Y. March 28, 2006) ([HN42]"a passage of two months between the protected activity and the adverse employment action seems to be the dividing line"). Similarly, in connection with his claim (8), which alleges that he was called on three occasions in June and July 2007 to work overtime during a period in which he would have worked seven consecutive days, Serviss fails to demonstrate that he suffered any cognizable harm. There is no evidence in the record that Serviss was forced to work the extra shifts or penalized in any way. Rather, in his grievance, Serviss noted that these actions "created a nuisance" to him and his family. As previously stated, [HN43]mere inconveniences do not fall within the range [*101] of harms that Title VII's anti-retaliation provision protects against.

Serviss's claim (7) is that he was forced to take sick leave on March 28, 2007 because the FAA claimed to have no other "facility duties." It was the subject of a grievance filed after September 2006, which was denied in July 2007 as (a) untimely, (b) in accordance with applicable rules, and (c) procedurally and/or jurisdictionally defective because it relied on the September 2003 contract. *See* DOT's 56.1 Statement, Ex. XX. As a remedy, Serviss sought restoration of leave used on that date and restoration of any lost wages. *Id.* He asserts that the reason given by the defendants "was pretextual, in that overtime was used by other controllers on that day even thought it was my regular day to work." Serviss Aff. at 4. However, in his deposition, Serviss testified that he was disqualified to work the radar positions on that shift due to medication he was taking and that his request to be posted to flight duty was denied. Serviss Dep. at 67-68. The inference to be drawn from the record is that Serviss was forced to take sick leave because he could not work his usual post and his request to work other duties was denied. [*102] Although this claim is a closer call than other claims brought herein because Serviss asserts that he was prevented from working, and thus lost sick time, Serviss has not sufficiently demonstrated that he suffered significant harm as a result of defendants' alleged actions.

#### j. Peter Wong

Defendants are entitled to summary judgment with respect to all of Wong's claims for the following reasons.

Wong first contacted an EEO counselor on January 24, 2006. Wong's claims (4), (5), (6), (7), (8), (9) and (10) [21] fail because they challenge acts that preceded the protected activity. For the reasons discussed above, defendants are entitled to summary judgment with respect to Wong's claims (1) and (3), which pertain to the calculation of back pay under the Stipulated Award.

> 21    Although [HN44]denial of shift changes could amount to an adverse action, *see Burlington Northern,* 548 U.S. at 69, Wong has not demonstrated sufficient facts to show that this denial caused him "significant" harm.

Claim (2) is that Wong's health insurance was cancelled in April 2006. This claim fails for the same reasons discussed above; like some of the other reinstated controllers, when Wong was reinstated he was not properly reenrolled [*103] in his health insurance.

However, the coverage was made retroactive after he informed HR that it had lapsed and all of his expenses were paid. Although the denial of health coverage could in some contexts be a materially adverse action, here Wong suffered no "significant" harm because the problem was resolved "a couple of weeks" after he discovered the problem. DOT's 56.1 Statement, Ex. ZZ ("Wong Dep."), at 73. Moreover, evidence of any retaliatory motive is lacking because defendants have offered a non-discriminatory reason for the lapse that Wong has not rebutted.

Similarly, Wong has not shown that he suffered an adverse action when he was notified that he had lost his medical clearance in November 2008 (claim (19)). Wong lost his medical certification because he had not submitted a required medical form. After speaking with the Flight Surgeon, the matter was resolved. Wong was reinstated the same day, a mere three hours after the initial call. Wong Dep. at 115-19. That Wong needed to make phone calls to resolve the situation, which caused him some "unnecessary stress," does not elevate this inconvenience to an actionable retaliation claim.

Wong's claim (12) that he was "wrongfully" [*104] counseled regarding sick leave abuse is not a materially adverse action. [22] Nor was it a retaliatory act for defendants to deny his requests for shift changes and/or swaps (claim (9)) because such denials were not materially adverse actions. The denials of Wong's request for leave in the summer, in September and in October of 2006 (claim (13)); to wear sneakers after knee surgery (claim (14)); and to cancel one day of annual leave in November 2006 (claim (15)) were also not materially adverse actions. Without additional detail giving context to these events, Wong has failed to show that these claims can be characterized as more than "trivial harms." None is an action that would dissuade a reasonable employee from participating in protected activity. In addition, these three claims fail because Wong unsuccessfully grieved each of these denials and failed to appeal the decisions. Wong also claims that defendants failed to reinstate his TSP contribution until approximately four months after his reinstatement (claim (11)). Wong fails to show that he suffered any significant harm as a result of the delay in reinstating him into the automatic payroll deduction program.

[22]   Moreover, Wong grieved [*105] the counseling and the session was rescinded. Wong

Dep. at 76.

Wong claims that defendants retaliated against him by denying him overtime in January 2008. Overtime was offered based on a list showing the number of hours a controller had worked during the relevant period. When the opportunity to work overtime became available, a controller received a phone call based on his placement on the list. Wong testified that he often missed these opportunities because the call was made to his cell phone, which was shut off, rather than his home phone. Wong believed that defendants were required to call both phone numbers; however, he learned from his supervisor that they were required to call only one. Wong Dep. at 96-98. Wong was denied overtime three times: twice because the call was made to one number rather than two, and once because his overtime, which had been scheduled in advance, ultimately fell in a period in which he would have ended up working seven consecutive days, which is prohibited. Wong Dep. at 101-02. Wong has failed to demonstrate that he suffered any retaliatory act with respect to these undisputed facts. Thus claim (16) fails.

Wong did not suffer an adverse action (claim (20)) [*106] when his scheduled overtime was cancelled in July 2008 due to an operational error that occurred while training a developmental controller. After the operational error incident a supervisor, Hillary King, informed Wong's union representative that Wong would not be decertified and that he would work the overtime. However, when Wong arrived to work the scheduled day of overtime, he learned that he had in fact been decertified due to the error and consequently he lost the overtime. Wong testified that management was correct in charging him with an operational error and that as a result he was correctly decertified and unable to work overtime. Wong Dep. at 121-25. The crux of his claim appears to be that King misled him in thinking that he would be able to work the overtime notwithstanding the error. Wong has not demonstrated that he suffered any materially adverse action as a result of this incident.

Wong's claim (17) is that he was given an inadequate raise in January 2008. He believes that his raise was retaliatory and discriminatory because he received a raise of only .6%, whereas other employees who had less seniority and who trained fewer trainees received a raise of 1.8%. Wong Dep. [*107] at 105-08. [HN45]Failure to give a raise could amount to a materially adverse action because this type of action may discourage employees

from engaging in protected activity. However, Wong has not demonstrated a causal connection between the activity protected under Title VII and the adverse action: the inadequate raise. Wong has failed to show the causal connection either directly, through evidence of retaliatory animus or indirectly, "by showing that the protected activity was closely followed in time by the adverse action." *Cifra*, 252 F.3d at 216 (internal quotation marks and citation omitted). The conduct Wong complains of occurred in January 2008, a full two years after he first contacted an EEO counselor. Accordingly, this claim also fails.

Finally, Wong's claim (18) is that in May 2007, an Operational Error Development Procedure ("OEDP") was placed in his file without his or his supervisor's knowledge. An OEDP is a negative performance evaluation that notes "inadequacies" and offers advice to "rectify the situation." Wong Dep. at 109-10. It is not meant to be placed in an employee's file without his knowledge. *Id.* at 111. When his supervisor discovered the OEDP in Wong's file he ripped [*108] it out and tossed it in the garbage. *Id.* Although Wong could not point to any specific adverse affect or harm the OEDP caused, he speculated that it could have been a factor in determining whether he should be given the 1.8% raise. *Id.* at 112. Like claim (17), Wong has not established the requisite causal connection due to the long lapse in time between the protected activity and the adverse action.

CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted in its entirety. The Clerk is directed to enter judgment for the defendants and to close the case.

So ordered.

John Gleeson, U.S.D.J.

Dated: September 30, 2009

Brooklyn, New York

**4**



Caution
As of: Apr 17, 2013

SANDRA ELLIS, on behalf of herself and others similarly situated, Plaintiff, v.
J.R.'S COUNTRY STORES, INC., a Colorado corporation, Defendant.

Civil Action No. 12-cv-01916-CMA-KLM

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

2012 U.S. Dist. LEXIS 175257

December 11, 2012, Decided
December 11, 2012, Filed

**CORE TERMS:** summary judgment, certification, discovery, defer, opt-in, Fair Labor Standards Act, collective action, extension of time, similarly situated, dispositive, likely to prevail, public interests, judicial resources, quotation marks, citation omitted, prejudgment interest, statute of limitations, declaration, exacerbate, initiated, purported, putative, briefing, issuance, monetary, lawsuit, moot

**COUNSEL:** [*1] For Sandra Ellis, on behalf of herself and others similarly situated, Plaintiff: Bradley John Sherman, Donna E. Dell'Olio, Cornish & Dell'Olio, Colorado Springs, CO.

For J.R.'s Country Stores, Inc., a Colorado corporation, Defendant: Christian Dow Hammond, Lawrence Daniel Stone, Dufford & Brown, P.C., Denver, CO.

**JUDGES:** CHRISTINE M. ARGUELLO, United States District Judge.

**OPINION BY:** CHRISTINE M. ARGUELLO

**OPINION**

**ORDER GRANTING DEFENDANT'S MOTION TO STAY AND DENYING PLAINTIFF'S MOTION TO DEFER JUDGMENT**

This matter is before the Court on the "Motion for Temporary Stay of Certification Issue Pending Ruling on Defendant's Motion for Summary Judgment," filed by Defendant J.R.'s Country Stores, Inc. (Doc. # 16), as well as the "Motion to Deny or Defer Judgment upon Defendant's Motion for Summary Judgment," filed by Plaintiff Sandra Ellis (Doc. # 15). For the reasons discussed below, the Court grants Defendant's motion and denies Plaintiff's.

**I. BACKGROUND**

Plaintiff initiated this putative collective action on July 23, 2012, asserting one claim for relief against Defendant under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. (See Doc. # 1.) Defendant filed an Answer on August 31, 2012 (Doc. # 7), and moved for summary [*2] judgment on October 11, 2012 (Doc. # 8). Plaintiff neither responded to the motion nor moved for an extension of time in which to do so. Instead, Plaintiff filed a "Motion to Certify Conditionally a Collective Action under the Fair Labor Standards Act of 29 U.S.C. § 216(b) and for Court Assisted Notice" (Doc. # 13) on October 18, 2012, and her motion to defer judgment on October 31, 2012. Thereafter, Defendant filed its motion to stay, along with a "Motion for Extension of Time to File Response to Plaintiff's Certification Motion Pending the Court's Ruling on Defendant's Motion for Summary Judgment or its Ruling on Defendant's Motion for a

Page 1

Temporary Stay" (Doc. # 17), on November 7, 2012. Additional briefing ensued on the instant motions and Defendant's motion for extension of time. (*See* Docs. ## 18-22.)

## II. DISCUSSION

Although the parties raise overlapping arguments in the filings associated with the instant motions, the Court will address them in turn, as a different analytical framework applies to each motion.

## A. DEFENDANT'S MOTION TO STAY

Defendant asserts that, to preserve the Court's and the parties' resources, the Court should defer ruling on Plaintiff's certification motion until [*3] after it has ruled on Defendant's pending motion for summary judgment. The Court agrees.

A court has inherent power to stay proceedings "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S. Ct. 163, 81 L. Ed. 153 (1936) (observing that docket management "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance"). When determining the propriety of a stay, "a district court should consider: whether the defendants are likely to prevail in the related proceeding; whether, absent a stay, the defendants will suffer irreparable harm; whether the issuance of a stay will cause substantial harm to the other parties to the proceeding; and the public interests at stake." *United Steelworkers of Am. v. Oregon Steel Mills, Inc.*, 322 F.3d 1222, 1227 (10th Cir. 2003). Further, "when one issue may be determinative of a case, the court has discretion to stay discovery on other issues until the critical issue has been decided." 8 Charles Alan Wright, et al., *Federal Practice & Procedure* § 2040, at 521-22 (2d ed. 1994); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999); [*4] *Chavous v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 201 F.R.D. 1, 2 (D.D.C. 2001) ("A stay of discovery pending the determination of a dispositive motion is an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources." (internal quotation marks and citation omitted)).

To begin with, Defendant is likely to prevail in its motion for summary judgment. Defendant appears to convincingly counter each of Plaintiff's grounds for relief under the Fair Labor Standards Act ("FLSA"). (*See* Doc. ## 1; 8; and 16 at 4-6.) In response, Plaintiff does not dispute the arguments Defendant raises as to her, individually, but rather asserts that "the interests of persons not currently parties to the litigation will be prejudiced by the delay." (Doc. # 18 at 3.) But Plaintiff fails to establish how the action would proceed as to these purported others if the Court were to determine that Defendant is entitled to summary judgment on her claim. Plaintiff seeks to represent herself "and those similarly situated." (Doc. # 1 at 2.) Without a viable claim, however, Plaintiff would be unable to represent these other individuals. [*5] *See, e.g., In re Family Dollar FLSA Litig.*, 637 F.3d 508, 519 (4th Cir. 2011); *accord White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869 (6th Cir. 2012) (noting that "a lead plaintiff cannot be similarly situated and represent opt-in plaintiffs without a viable claim").

For this reason, the Court finds unavailing Plaintiff's citation to 29 C.F.R. § 541.603(a), which indicates that, in determining whether an employer maintained an actual practice of making improper deductions, courts can consider, among other things, "the number and geographic location of employees whose salary was improperly reduced." Such information surpasses the sole claim for relief that Plaintiff raises here. As to Plaintiff, the Court agrees -- absent any countervailing argument from her -- with Defendant's assertion that it has provided her with all the "payroll records and timesheets that she needs to respond to the Summary Judgment Motion, which motion relates solely to Plaintiff's claim since she is the only named party." (Doc. # 20 at 5.)

Additionally, Defendant will suffer harm in the absence of a stay because it will be required to expend resources briefing issues in this case, such as Plaintiff's certification [*6] motion, that probably need not be decided, given Defendant's likelihood of success in its motion for summary judgment. Similarly, refusing to stay the case would cause Defendant to have to conduct potentially unnecessary discovery on the putative opt-in plaintiffs, who may very well not be similarly situated to Plaintiff. *See, e.g., Edwards v. Zenimax Media, Inc.*, No. 12-cv-00411, 2012 U.S. Dist. LEXIS 68816, 2012 WL 1801981, at *3 (D. Colo. May 17, 2012) (unpublished) (in class-action case, finding that the burden of discovery weighed in favor of granting motion for stay where, due to a pending dispositive motion, "the requested discovery

may ultimately be useless and a waste of the parties' time and resources").

Further, the issuance of a stay will not cause substantial harm to Plaintiff, who is the only other party to the proceedings. In fact, Plaintiff will likely save herself expenses on the same motion and discovery-related issues as Defendant. Plaintiff, however, asserts that she is "seeking unpaid overtime wages and any delay in the already lengthy process of recovering those wages only exacerbates Ms. Ellis's injury." (Doc. # 18 at 6.) Plaintiff fails to explain how her purported injury would be "exacerbate[d]" [*7] by a stay in the proceedings. If Plaintiff succeeds on her claim, she could be compensated for any monetary harm she suffers, which is occasioned by a delay in the proceedings, through an award of prejudgment interest. *See, e.g., Hall v. Terrell*, 648 F. Supp. 2d 1229, 1232 (D. Colo. 2009) ("the purpose of prejudgment interest is to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of the judgment" (quotation marks and citation omitted)). To the extent that the exacerbation of injury to which Plaintiff refers is merely the delay she will experience in having her certification motion ruled on, the Court is unpersuaded by her concern. Plaintiff delayed almost three months in filing her certification motion after she initiated this action. (*See* Doc. ## 1 and 13.) Moreover, ruling on, and even granting, her certification motion at the present time will amount to an empty gesture, not to mention a waste of resources, if Plaintiff is unable to dissuade the Court from granting Defendant's motion for summary judgment.

Plaintiff further argues, however, that any amount of delay runs the risk of prejudicing potential opt-in [*8] plaintiffs, as the statute of limitations for their claims expires on a rolling basis. (Doc. # 18 at 3-4.) But these individuals, whoever they may be, are not parties to this action, and Plaintiff cites no case, nor is the Court aware of any, which would require them to become parties. In fact, although "[o]nly those individuals who opt-in to the collective action will be bound by the judgment in the case," the decision to opt-in is a discretionary one for the employee. *Smith v. Pizza Hut, Inc.*, No. 09-cv-01632, 2011 U.S. Dist. LEXIS 76793, 2011 WL 2791331, at *1 (July 14, 2011) (unpublished). Accordingly, the "persons not currently parties to the litigation" that Plaintiff is concerned about are free to seek relief through their own lawsuit(s). Such an eventuality is, in any event, assuredly the most expeditious way for them to stop the statute of limitations running as to their claims.

Finally, the public interests at stake in this litigation will be well-served by a stay of the proceedings. The public has, as a primary interest, the efficient and just resolution of actions pending before the Court, and "[a]voiding wasteful efforts by the Court clearly serves this interest." *Blixseth v. Cushman & Wakefield of Colo., Inc.*, No. 12-cv-00393, 2012 U.S. Dist. LEXIS 128977, 2012 WL 3962800, at *3 (D. Colo. Sept. 11, 2012) [*9] (unpublished). Although Plaintiff cites some cases that indicate early conditional certification can produce an economical use of judicial resources by helping to avoid duplicative lawsuits (*see* Doc. # 18 at 6-7), Plaintiff cites no cases, nor is the Court aware of any, which promote such certification despite the pendency of an apparently meritorious dispositive motion the granting of which would result in a dismissal of the plaintiff's cause of action.

Accordingly, the Court determines that granting Defendant's motion to stay is appropriate in this case.[1]

---

1   As such, the Court will deny as moot Defendant's motion for extension of time.

## B.   PLAINTIFF'S MOTION TO DEFER JUDGMENT

Plaintiff asserts that the Court should deny or defer ruling on Defendant's motion for summary judgment until the parties have completed discovery. The Court disagrees that additional discovery is necessary at this stage in the litigation.

Under Fed. R. Civ. P. 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering [*10] the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Under this rule, "summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

As previously explained, however, Plaintiff has failed to convince the Court that she lacks discovery

necessary for her to respond to Defendant's motion for summary judgment. Plaintiff is the only named party in this action, and Defendant's arguments (*see* Doc. # 8) -- and the evidence submitted in support thereof (*see* Doc. ## 8-1-8-12) -- appear to disprove Plaintiff's claim. As such, Plaintiff speculates as to facts that might affect potential opt-in plaintiffs who may have claims. (*See* Doc. # 15-1 at 2-4.) But under Rule 56(d), "summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." *Building & Const. Trades Dept., AFL-CIO v. Rockwell Intern. Corp., 756 F. Supp. 492, 496 (D. Colo. 1991).* Nor should Rule 56(d) be used as a "license [*11] for a fishing expedition." *Lewis v. City of Ft. Collins, 903 F.2d 752, 759 (10th Cir. 1990).* Further, in light of the Court's decision to stay the proceedings regarding Plaintiff's certification motion, waiting to rule on Defendant's motion for summary judgment until after the parties have completed discovery would be at odds with Plaintiff's concerns regarding the prompt administration of justice.

## III. CONCLUSION

For the foregoing reasons, it is ORDERED that: Defendant's "Motion for Temporary Stay of Certification Issue Pending Ruling on Defendant's Motion for Summary Judgment" (Doc. # 16) is GRANTED; Plaintiff's "Motion to Deny or Defer Judgment upon Defendant's Motion for Summary Judgment" (Doc. # 15)

is DENIED; and Defendant's "Motion for Extension of Time to File Response to Plaintiff's Certification Motion Pending the Court's Ruling on Defendant's Motion for Summary Judgment or its Ruling on Defendant's Motion for a Temporary Stay" (Doc. # 17) is DENIED AS MOOT. As such, it is

FURTHER ORDERED that all proceedings related to Plaintiff's "Motion to Certify Conditionally a Collective Action under the Fair Labor Standards Act of 29 U.S.C. § 216(b) and for Court Assisted Notice" (Doc. [*12] # 13) are HEREBY STAYED until the Court has ruled on Defendant's "Motion for Summary Judgment" (Doc. # 8). Accordingly, it is

FURTHER ORDERED that Plaintiff is DIRECTED to file her Response to Defendant's summary judgment motion within 21 days after the date of service of this Order.

DATED: December 11, 2012

BY THE COURT:

/s/ Christine M. Arguello

CHRISTINE M. ARGUELLO

United States District Judge

**5**

## TANA MITCHELL, Plaintiff, v. FIRSTRUST MORTGAGE, INC., Defendant.

### Case No. 11-2208-EFM

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

### 2013 U.S. Dist. LEXIS 16563; 163 Lab. Cas. (CCH) P36,096; 20 Wage & Hour Cas. 2d (BNA) 354

### February 7, 2013, Decided
### February 7, 2013, Filed

**CORE TERMS:** fluctuating, workweek, overtime, salary, genuine, summary judgment, annual salary, hours worked, mutual understanding, overtime compensation, issue of material fact, hourly, regular, compensated, earnings, fixed salary, base salary, deposition testimony, regular rate, rate of pay, minimum wage, salaried, weekly, number of hours, times, overtime pay, hourly rates, nonexempt, partial, retaliation

**COUNSEL:** [*1] For Tana Mitchell, Plaintiff: Donald R. Aubry, Jolley, Walsh, Hurley, Raisher & Aubry P.C., Kansas City, MO.

For Firstrust Mortgage, Inc., Defendant: Anthony J. Romano, Robert J. Hingula, Polsinelli Shughart PC - 12th St., Kansas City, MO.

**JUDGES:** ERIC F. MELGREN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** ERIC F. MELGREN

**OPINION**

**MEMORANDUM AND ORDER**

Defendant FirsTrust Mortgage, Inc., brought this motion for partial summary judgment on Plaintiff Tana Mitchell's claim that she was denied overtime pay in violation of the Fair Labor Standards Act ("FLSA").[1] FirsTrust argues that Mitchell's compensation complied with the FLSA's fluctuating workweek payment method. The Court concludes that no genuine issue of material

fact exists regarding the fluctuating nature of Mitchell's workweek, the adequacy of her annual salary, or her understanding that she received a base salary regardless of the number of hours worked. FirsTrust is therefore entitled to partial summary judgment on Mitchell's claims that FirsTrust violated the overtime provisions of the FLSA.

> 1  Count I of Mitchell's complaint alleges both a violation of overtime provisions and failure to compensate for hours that Mitchell worked through lunch. The complaint also [*2] includes a claim of retaliation (Count II). Neither the lunchtime compensation nor retaliation claims are at issue in the present motion. *See* Complaint, Doc. 1, at 3-5.

**I. Factual and Procedural Background[2]**

> 2  Consistent with the standard for summary judgment, the following facts are either uncontroverted or set forth in the light most favorable to Mitchell, the nonmovant. *See LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

Plaintiff Tana Mitchell was employed with Defendant FirsTrust Mortgage, Inc., as a funding and post-closing employee. Mitchell was classified as a nonexempt employee. Upon employment, Patricia Schoenwe, the Vice President/Corporate Secretary of FirsTrust, presented Mitchell with an employment offer letter. The letter sets out terms of Mitchell's employment, including paid time off, holiday pay, insurance options,

401K enrollment, and job training. The letter states, and Mitchell understood, that her base pay was an annual salary of $28,000. Schoenwe explained, and Mitchell understood, that FirsTrust employees were expected to work as long as it takes to get the job done and Mitchell's hours would thus fluctuate from week to week, although she [*3] worked a regularly scheduled shift. Her annual salary was later raised to $29,500. FirsTrust asserts that Mitchell was entitled to that base pay regardless of the number of hours she worked. Mitchell believed that her base salary represented a regular hourly rate of pay, first $13.46 and later $14.18 per hour.[3] Mitchell assumed that when she worked less than forty hours per week, she was not paid full wages.

> 3   Mitchell's Memorandum in Opposition to FirsTrust's motion for partial summary judgment states that Mitchell's regular hourly rate of pay was $13.36 per hour, later raised to $14.19 per hour. *See* Def. Mem. in Opposition, Doc. 22, ¶ 26. The deposition testimony that Mitchell cites as support, however, states that her regular hourly rates represented on the exhibits in front of the deponent were $13.46 and $14.18. *See* Schonewe Dep., Doc. 22-2, at 10:13, 21:15. Because the numbers contained in the deponent's testimony reflect Mitchell's annual salary ($28,000, later $29,000) divided by 2080 hours (52 weeks multiplied by 40 hours per week), the Court will assume the numbers used in Mitchell's memorandum are typographical errors and not issues of genuine fact.

Mitchell believed she was [*4] compensated for overtime work at a rate of one and one-half times her regular hourly rate--presumably, $6.23 and, later, $7.09 of additional pay for overtime hours. According to the twenty earnings statements submitted to the Court, Mitchell received overtime at or exceeding her expected amount seven times.[4] The rate of overtime pay Mitchell received varied over the course of her employment. Mitchell was not aware of these fluctuations because she was paid via direct deposit and did not look at the electronic records of her earnings statements. After receiving less compensation than she expected after working an unusually high number of overtime hours, Mitchell sought assistance to view her online payroll summary and discovered the fluctuating overtime rate. The human resources officer who assisted Mitchell in accessing her online earnings statements allegedly told Mitchell that FirsTrust paid "Chinese overtime."

> 4   Earnings Statements (Ex. H), Doc. 19-8, at 6-10.

In fact, Mitchell's earnings statements reflect that she was paid overtime based on the "fluctuating workweek" method of compensation, which calculates an employee's overtime pay by first dividing the employee's fixed weekly salary [*5] by the hours worked that week, and then multiplying that amount by one and one-half.[5] Schoenwe contends that she explains the FLSA's "fluctuating workweek" method of calculating overtime to all new employees. Mitchell's offer letter makes no mention of overtime compensation and Mitchell disputes any allegation that Shoenwe explained such provisions to her. FirsTrust's employee handbook states that nonexempt employees are entitled to overtime, but does not provide a formula for calculating overtime compensation. The human resources employee and Mitchell's supervisor allegedly expressed doubt as to whether they were permitted to explain the fluctuating workweek calculation to Mitchell.

> 5   *See* 29 C.F.R. § 778.114(a).

## II. Legal Standard

### A. Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[6] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[7] The movant bears the initial burden of proof, and must show the lack of evidence [*6] on an essential element of the claim.[8] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[9] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits--conclusory allegations alone cannot survive a motion for summary judgment.[10] The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment,[11] and the Court will not grant summary judgment "where there is reason to believe that the better course would be to proceed to a full trial.[12]

> 6   Fed. R. Civ. P. 56(c).

7  *Haynes v. Level 3 Communications, LLC,* 456 F.3d 1215, 1219 (10th Cir. 2006).
8  *Thom v. Bristol-Myers Squibb Co.,* 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).
9  *Garrison v. Gambro, Inc.,* 428 F.3d 933, 935, 150 Fed. Appx. 819 (10th Cir. 2005).
10  *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).
11  *LifeWise Master Funding,* 374 F.3d at 927.
12  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## B. Fair Labor Standards Act

The Fair Labor Standards Act was enacted to ensure [*7] safe, efficient, and fair working conditions for employees throughout the country.[13] The FLSA includes minimum wage and maximum hour requirements that apply to all employees who do not fall within the Act's exemptions.[14] For these nonexempt employees, the FLSA mandates that employees who work in excess of forty hours per week must be compensated for the overtime work at "a rate not less than one and one-half times the regular rate at which [s]he is employed."[15] An employee's "regular rate" is defined in the Act to "to include all remuneration for employment paid to, or on behalf of, the employee."[16]

13  *See* 29 U.S.C. § 202.
14  *See* 29 U.S.C. § 213.
15  29 U.S.C. § 207(a)(1).
16  29 U.S.C. § 207(e).

Department of Labor regulations permit payment based on a fluctuating work schedule. The applicable provision states:

> An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed [*8] salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act . . . if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.[17]

To determine the regular rate of pay for an employee receiving a fixed salary, the following calculation applies:

> [T]he regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.[18]

17  29 C.F.R. § 778.114(a).
18  *Id.*

The fluctuating workweek provision reflects the intention of the employer to pay the employee a flat rate for all hours worked--whether it be forty or sixty hours a week.[19] Employers must meet the following requirements [*9] to use the fluctuating workweek method of overtime compensation: (1) the employee's hours must fluctuate from week to week; (2) the employee must receive a fixed salary that is sufficient to provide compensation at a regular rate that is not less than minimum wage; and (3) the employer and the employee must have a clear, mutual understanding that the employee will receive the fixed salary regardless of the number of hours worked.[20]

19  *See Clements v. Serco, Inc.,* 530 F.3d 1224, 1230 (10th Cir. 2008).
20  *See id.*; *see also Flood v. New Hanover Cty.,* 125 F.3d 249, 252 (4th Cir. 1997).

## III. Analysis

FirsTrust argues that it is entitled to summary judgment on Mitchell's overtime compensation claim because Mitchell was a nonexempt employee who was fairly compensated pursuant to the FLSA's fluctuating workweek method. FirsTrust contends that it was entitled to use the fluctuating workweek method because (1) Mitchell worked fluctuating hours week to week as required "to get the job done"; (2) Mitchell's annual salary was fixed amount sufficient to guarantee that she received minimum wage for all hours worked; and (3) FirsTrust and Mitchell had a clear, mutual understanding that Mitchell's annual [*10] compensation was a fixed salary Mitchell was entitled to receive regardless of the number of hours she worked.

Mitchell contends that she worked a regular shift rather than a fluctuating schedule. Mitchell further argues that there was no clear understanding between the parties that Mitchell would be paid an annual salary regardless of the number of hours worked. Mitchell points to the employee manual, FirsTrust's utilization of paid time off, and representations from Mitchell's superiors as support for her argument that she reasonably believed she was compensated on an hourly basis. After careful review of the record, the Court finds, as a matter of law, that FirsTrust properly compensated Mitchell according to the fluctuating workweek method.

**A. There is no genuine issue of material fact as to whether Mitchell worked fluctuating hours.**

Mitchell argues that FirsTrust cannot use the fluctuating workweek method of overtime compensation because she did not work varying shifts. But nothing in 29 C.F.R. § 778.114 suggests that type of compensation is reserved for employees who work different shifts. The key inquiry is whether the employee's cumulative hours worked vary from week to week.[21] [*11] Mitchell's earnings statements show that her hours did indeed vary from week to week. Therefore, there is no issue of genuine fact as to whether Mitchell worked a fluctuating workweek.

> 21 *See, e.g., Valerio v. Putnam Assocs., Inc.,* 173 F.3d 35, 39 (1st Cir. 1999) (finding that an employee worked a fluctuating workweek under section 778.114 when the employee testified that she worked "8:30 to whenever").

**B. There is no genuine issue of material fact as to whether Mitchell was paid a fixed salary in an amount**

sufficient to guarantee that she received minimum wage.

Mitchell does not contest FirsTrust's allegations regarding the sufficiency of Mitchell's annual salary as that amount relates to the federal minimum wage. According to FirsTrust's calculations, Mitchell would have had to work more than 74.27 hours in a single week for her compensation to fall below the minimum hourly wage. There is no genuine issue of material fact that Mitchell's hours were under that threshold every week.

**C. There is no a genuine issue of material fact as to whether FirsTrust and Mitchell had a clear, mutual understanding that Mitchell was compensated on a salaried basis.**

FirsTrust correctly recites case law holding [*12] that the "clear mutual understanding" required in section 778.114 applies to the understanding between the employer and employee that "while the employee's hours may vary, his or her base salary will not."[22] An employer need not prove there was a clear understanding between the parties that the employee's overtime would be calculated pursuant to the fluctuating workweek formula.[23] The Court's only inquiry is whether a reasonable jury would necessarily conclude that Mitchell and FirsTrust "had a clear and mutual understanding that [Mitchell] would be paid on a salary basis for all hours worked."[24] The Court should look not only to Mitchell's deposition testimony and the post hoc contentions it contains about her understanding of the terms of her employment; instead, the Court should consider the understanding reflected in Mitchell's actions.[25] Comparing the record in this case to relevant case law, the Court must conclude there is no genuine issue of material fact as to whether Mitchell understood that she was not being paid on an hourly basis.

> 22 *Valerio,* 173 F.3d at 40.
> 23 *Id.* (citing *Bailey v. Cty. of Georgetown,* 94 F.3d 152, 156-57 (4th Cir. 1996)); *see also Mayhew v. Wells,* 125 F.3d 216, 219 (4th Cir. 1997).
> 24 *Clements,* 530 F.3d at 1230.
> 25 *See* [*13] *Clements,* 530 F.3d at 1231 (citation omitted).

In the cases FirsTrust cites as support for its motion, each court concluded that the evidence clearly showed that there was a mutual understanding between the

employer and employee as to the employee's status as a salaried worker, even if the evidence was equivocal as to the employee's understanding of overtime compensation methods. In *Clements v. Serco, Inc.*, the Tenth Circuit affirmed a district court's finding that a clear mutual understanding existed between the employer and employees because the employees stated in deposition testimony that they were hired on a salaried basis, routinely worked more than forty hours a week, and were neither docked for working less nor paid more for working in excess of forty hours a week.[26] The employees further described their employment to the Department of Labor in terms of salaried, rather than hourly, employment.[27]

26  530 F.3d at 1230-31.
27  *Clements*, 530 F.3d at 1231.

Similarly, in *Valerio v. Putnam Associates, Inc.*, the First Circuit upheld a finding that the employee understood that she was employed on a salaried basis because the employee's deposition testimony reflected that she understood she [*14] would receive a fixed weekly salary and that her hours were indefinite.[28] And in *Mayhew v. Wells*, the Fourth Circuit agreed with the district court that there was "little doubt that Wells and Mayhew possessed a clear mutual understanding as to Mayhew's fixed salary."[29]

28  173 F.3d at 39.
29  125 F.3d at 219.

Like the aforementioned cases, the evidence in the record before the Court shows the parties' understanding of the method of Mitchell's compensation. Mitchell now contends that she believed that amount was the result of a regular hourly rate of pay--that she was paid an hourly rate for only those hours worked. But her deposition testimony clearly states the opposite belief, as shown in the following excerpts:

Q. Was that your understanding of your pay, that you were being paid at least $28,000 a year?

A. At least.

Q. Okay. And did you have that understanding that that meant that whether you worked under 40 hours in a week or over 40 hours in a week that year, you

would at least receive 28,000?

A. At least.

Q. Is that a "yes," at least $28,000?

A. Yes, at least.

Q. At minimum?

A. At minimum.

Q. Is that you would? Yes?

A. Yes.

***

Q. And when I use the term salary, do you understand that to mean that's [*15] the minimum you were going to receive for that year? Is that right?

A. Yes.

Q. Okay. So when you received that raise, your minimum base salary went to $29,500, is that correct?

A. That's correct.

Q. And, again, it's your understanding that you received that amount regardless of the number of hours of work; that was the minimum amount you were going to receive for that year?

A. That was my understanding.[30]

30  Mitchell Dep. (Ex. A), Doc. 19-3, at 6:14-7:2, 7:16-8:3.

Mitchell clearly testified that she understood that she would receive "at least" and "at minimum" her base salary regardless of the number of hours she worked. The fact that Mitchell now asserts the opposite belief does not create a genuine issue of material fact for a jury to decide. The Tenth Circuit has warned that "the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit

contradicting his own prior testimony."[31] Mitchell has not submitted any evidence contradicting her earlier statement. It is undoubtedly true that references in the record to "hourly rate,"[32] "base weekly salary,"[33] and "annual salary"[34] [*16] show confusion about the form of Mitchell's compensation. But there is no evidence contradicting the nature of that compensation as Mitchell's "guaranteed,"[35] "minimum"[36] salary, "regardless of the number of hours of work."[37]

> 31  *Jackson v. Dillard's Dep't Stores, Inc., 92 Fed. App'x 583, 586 (10th Cir. 2003)* (citation omitted).
> 32  Mitchell Dep. (Ex. ), Doc. 22-3, at 14:21.
> 33  *Id.* at 14:17-18.
> 34  *Id.* at 15:9-10.
> 35  *Id.* at 14:24.
> 36  *Id.* at 7:17.
> 37  *Id.* at 7:25-8:1.

The fact that Mitchell received less than her guaranteed weekly salary during the week that she was sick does not create an issue of fact. That incident occurred in November 2009, yet it apparently did not alter the understanding Mitchell had of her salary on January 19, 2012, when she was deposed. At that time, Mitchell expressed a present understanding that she received a fixed annual salary. The deposition excerpts provided to the Court contain no clarifications or repudiations of that belief.

In conclusion, there is no genuine issue of material fact as to Mitchell's understanding that she received a fixed annual salary from FirsTrust, regardless of the number of hours she worked. FirsTrust was therefore entitled to utilize the fluctuating [*17] workweek method of overtime compensation as prescribed in 29 C.F.R. § 778.114. Consequently, FirsTrust is entitled to summary judgment on Mitchell's claims in Count I alleging inadequate overtime compensation. As FirsTrust clarified in its reply memorandum, the instant motion has no effect on Mitchell's claim in Count I that FirsTrust did not properly compensate Mitchell for the times she worked through lunch or the retaliation claim in Count II.

**IT IS ACCORDINGLY ORDERED** this 7th day of February, 2013, that Defendant's Motion for Partial Summary Judgment (Doc. 18) is hereby **GRANTED**.

**IT IS SO ORDERED.**

/s/ Eric F. Melgren

ERIC F. MELGREN

UNITED STATES DISTRICT JUDGE

## CERTIFICATION

I hereby certify that on this 16th day of April, 2013, a copy of the above document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing. A complete, duplicate copy of this document has been forwarded directly to Judge Young in Boston, MA.

/s/ Evangelos Michailidis
Evangelos Michailidis, Esq.